# Exhibit 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PRESTON JONES and SHIRIN DELALAT, on behalf of themselves, all others similarly situated, and the general public, )
)
)
Plaintiffs, )
vs. ) Case No. 3:16-cv-00711 HSG
NUTIVA, INC., )
Defendant. )
------------------------------)

VIDEO DEPOSITION OF NUTIVA, INC. 30(b)(6)

CORPORATE REPRESENTATIVE - JOHN ROULAC

San Francisco, California

Monday, March 20, 2017

*CONFIDENTIAL*

Reported by: REBECCA L. ROMANO, RPR, CSR NO. 12546

JOB NO: 120853

March 20, 2017
9:29 a.m.

Deposition of John Roulac, held at the offices of Hanson Bridgett, 425 Market Street, 26th Floor, San Francisco, California, before Rebecca L. Romano, a Registered Professional Reporter, a Certified Shorthand Reporter of the State of California.

A P P E A R A N C E S:

THE LAW OFFICE OF JACK FITZGERALD
Attorneys for Plaintiffs
Hillcrest Professional Building
3636 Fourth Avenue
San Diego, CA 92103
BY: JACK FITZGERALD, ESQ.

and

LAW OFFICE OF PAUL K. JOSEPH
4125 West Point Loma Boulevard
San Diego, CA 92110
BY: PAUL JOSEPH, ESQ.

AMIN TALATI & UPADHYE
Attorneys for Defendant
100 South Wacker Drive
Chicago, IL 60606
BY: SANJAY KARNIK, ESQ.

ALSO PRESENT:
Sean McGraft, Videographer

THE VIDEOGRAPHER: Good morning. This is the beginning of Disc No. 1 of the videotaped deposition of John Roulac in the matter Preston Jones, et al., versus Nutiva, Incorporated, in the United States District Court of Northern District of California, No. 3:16-cv-00711 HSG.

This deposition is being held at 425 Market Street, San Francisco, California on March 20th, 2017, at approximately 9:29 a.m.

My name is Sean McGraft from TSG Reporting, Incorporated, and I'm the legal video specialist. The court reporter is Rebecca Romano in association with TSG Reporting.

Will counsel please introduce yourselves, starting with the questioning attorney.

MR. FITZGERALD: Jack Fitzgerald for Plaintiffs.

MR. JOSEPH: Paul Joseph for Plaintiffs.

MR. KARNIK: Sanjay Karnick for Defendant.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness and we can proceed.

THE REPORTER: If you could raise your right hand for me, please.

THE DEPONENT: (Complies.)

THE REPORTER: You do solemnly state, under penalty of perjury, that the testimony you are about to give in this deposition, shall be the truth, the whole truth and nothing but the truth?

THE DEPONENT: I do.

/////

better for -- coconut oil is better for you because we don't spray pesticides, herbicides.
If you -- if you choose to be a vegetarian and not consume animal products, then coconut oil would be better for you.
Q. Okay.
A. That's -- that's a person's personal choice.
Q. Okay. Is anything on the label of the Nutiva coconut oil intended to convey the message to consumers that the product is healthier than better to consume; for example, healthier in terms of heart health?
MR. KARNIK: Objection. Calls for a legal conclusion.
THE DEPONENT: Yeah. Yeah. We are not making medical claims.
Q. (By Mr. Fitzgerald) Okay. And if the label, in fact, made that suggestion to consumers, notwithstanding that that's not Nutiva's business to do that, would that be inappropriate, in your mind?
A. I would state, again, that we are not -- the company does not make medical claims.
Q. And why is that?
A. We are a food manufacturer.

Q. Other than scientific and anec- -- anecdotal evidence, is Nutiva otherwise aware that coconut oil has -- coconut oil consumption has negative health effects?
A. Can -- I'm sorry. Can you repeat the question one more time?
Q. Yeah.
So we talked about potentially scientific evidence, as might be reported in peer-reviewed journals. We talked about anecdotal evidence; some of the emails we saw.
Other than scientific and anecdotal evidence, is Nutiva aware of any other evidence that coconut oil consumption has negative health effects, or is it otherwise aware that --
A. Not that I recall.
Q. Okay. Can you turn to tab 6, please. This should be a document that has Production No. NUT575 in the bottom right-hand corner; is that right?
A. 575? Okay.
Q. All right. Take a moment to look at that, please.
(Exhibit 5 was marked for identification by the court reporter and is attached hereto.)

Q. (By Mr. Fitzgerald) Okay. This has been marked as Exhibit 5.
Have you had a chance to look at it briefly?
A. I see the first page, yes.
Q. Okay. It looks like this is a email dated February 26th, 2014, from a consumer to the Nutiva help desk, and she says, "I just bought some Nutiva Coconut Oil and am interested in knowing whether it is highly inflammatory, as indicated on this website," and then she provides a link to a Website, nutritionaldata.self.com, with an extension, and it looks like she pasted it, and if you turn on to the second page, it looks like the Website rated coconut oil as "strongly inflammatory."
Have you ever seen this document before?
A. No, I have not.
Q. Have you ever seen any indication from any -- any person, whether on this Website or else otherwise, that coconut oil is strongly inflammatory?
MR. KARNIK: I will object to form. I don't think any reader can tell what the -- the writer of the email means by "inflammatory."

But you can answer.
THE DEPONENT: Not -- not that I -- not that I recall.
Q. (By Mr. Fitzgerald) Do you know if anybody at Nutiva, after receiving this, investigated whether coconut oil might be strongly inflammatory?
A. Not -- not -- not that I -- not that -- not that I can remember.
Q. Okay. Okay. Is the label of the Nutiva coconut oil -- the -- the Virgin Coconut Oil, today, in compliance with all FDA regulations?
MR. KARNIK: I will object in that it calls for a legal conclusion.
THE DEPONENT: We've made, you know, changes to the -- made some changes recently to the labels, and -- and those are now flowing out to the -- to the market. Not -- maybe not every SKU has hit the market, but -- but anytime we are printing new labels, has a -- has revised labels for the coconut oil.
Q. (By Mr. Fitzgerald) Okay. And how recently did you revise those labels?
A. Earlier this year.
Q. What were the revisions?
A. We just took off -- I don't have the

exact, but some of them would be -- I think we took off the -- mentioning the percentage of -- of MCTs, the "62% MCTs," and the "100% Less Cholesterol Than Butter."

Q. You removed that?

A. Yes.

Q. Any other changes?

A. There might have been, but I -- but I don't recall them exactly.

Q. Did you make those changes in order to comply with the regulations?

MR. KARNIK: I will object in that it calls for a legal conclusion. Let me also object in that it elicits information that is attorney-client privilege and so cannot have him answer that question.

MR. FITZGERALD: You are instructing the witness not to answer whether the -- the company removed the -- the label to comply with the regulations?

MR. KARNIK: Yeah, to be -- just to be sure, I would like the question to be read back. I don't want to --

MR. FITZGERALD: Okay.

MR. KARNIK: -- make that instruction

flippantly, so I want to be sure.

MR. FITZGERALD: Please.

(Record read as follows:

"QUESTION: Did you make those changes in order to comply with the regulations?")

MR. KARNIK: Let me with- -- let me withdraw the instruction not to answer, but I am going to maintain the objection that the question calls for a legal conclusion.

MR. FITZGERALD: Okay.

Q. (By Mr. Fitzgerald) All right. You can answer.

A. You know, we -- we were advised by -- by counsel, given that -- that we should, you know, make -- make a few of these changes, and so we did.

Q. And is it correct that you made the changes specifically in order to comply with the FDA regulations governing those statements?

MR. KARNIK: Let me -- let me -- let me object and say that calls for a legal conclusion and, that, I think, any further elaboration beyond his prior answer would -- would elicit attorney-client communications, so I can't instruct him -- I have to instruct him to not answer.

MR. FITZGERALD: Okay.

Q. (By Mr. Fitzgerald) Did you make the changes as a result of this lawsuit?

A. We made the -- as I stated, we made the change -- or our -- our counsel advised us to make some changes to the -- to the label, and I mentioned several of those changes, and that's the reason -- that's the reason why we did that.

Q. Okay. And -- and what counsel are you referring to?

A. Rakesh Amin's -- Amin Talati's law firm.

Q. Okay. And has Amin Talati given you regulatory advice in the past? Like, given you advice about your labels in the past?

MR. KARNIK: Let me object and -- and -- and say that, even providing an answer to that -- actually, let me -- let me withdraw that.

Can you read -- can you read the question again.

(Record read as follows:

"QUESTION: Has Amin Talati given you regulatory advice in the past? Like, given you advice about your labels in the past?")

MR. KARNIK: I'll allow -- I'll allow an

answer to that.

THE DEPONENT: Yes, they have.

Q. (By Mr. Fitzgerald) Okay. When -- when did you -- the relationship between Nutiva and Amin Talati begin?

A. Somewhere in the last, you know, five, six, seven years.

Q. Is it correct that -- that you had a personal relationship with Rakesh Amin before -- and that's what led to -- to you hiring that firm?

A. I had met -- met Rakesh, you know, at industry events, and he has been -- was highly recommended, and that's why we hired his law firm.

Q. Okay. Before changing the labels -- and -- and, by the way, we'd call for a -- an exemplar of the new label, if you have it.

Before changing the labels earlier this year, did the old label comply with all FDA regulations?

MR. KARNIK: I will object in that the question calls for a legal conclusion.

THE DEPONENT: We relied on -- so state the question one more time.

Can you repeat the question?

MR. FITZGERALD: I'll have her read it

Page 54

back.
(Record read as follows:
"QUESTION: Before changing the labels earlier this year, did the old label comply with all FDA regulations?")
THE DEPONENT: The FDA regulations are very -- they are very intricate, and, you know, I'm not an expert on at all of those. We followed to the best that we could, and then we chose, recently, to -- to make some slight adjustments.
Q. (By Mr. Fitzgerald) Okay. Is it important to Nutiva's business that its regu- -- that its labels comply with applicable regulations?
A. It is.
Q. And what -- what does Nutiva do to try to make sure that its labels comply with regulations?
A. We try to -- we -- we do the best that -- that we can to, you know, interpret it and -- and follow it.
Q. Have you reviewed Plaintiffs' summary judgment motion in this case? Filed briefly and then withdrew regarding the -- you know, the compliance of the labels with the regulations?
A. If you want to show me the document, I

Page 55

can review it.
Q. I don't have that one with me.
Do -- do you remember ever having reviewed it, just generally?
A. I can't recall all the details with it, so...
Q. Okay. I take it you are aware that my co-counsel and I have filed lawsuits against not just Nutiva but several coconut oil manufacturers?
A. I understand that.
Q. Okay. Are you aware that virtually every coconut oil manufacturer we've either filed a lawsuit against or sent a demand letter to changed the label very shortly after we contacted them?
MR. KARNIK: I will object in that it assumes something not established in this case.
But you can answer.
THE DEPONENT: Not aware of that.
Q. (By Mr. Fitzgerald) Okay. Are you aware of any other coconut oil manufacturers changing their labels to get rid of the types of health and wellness claims that we challenge in this and other lawsuits?
A. I -- I -- I know that there are other companies that -- that -- that have changed their labels in the past.

Page 56

Q. What -- what companies are you aware of specifically that have changed their labels?
MR. KARNIK: Okay. Go ahead.
THE DEPONENT: I think Dr. Bronner's did it, you know, five or six years ago.
Q. (By Mr. Fitzgerald) Anybody else?
A. Not -- not that I'm -- that I can recall specifically.
Q. Okay. Has Nature's Way changed its coconut oil label in the last couple of years?
A. I think all companies change their labels on a -- on a regular basis, so I -- I haven't specifically examined their -- their -- their labels.
Q. Are you aware of a coconut manufacturer called BetterBody?
A. I -- I am.
Q. Are you aware that they agreed to remove a number of statements challenged in the lawsuit as -- in settling that lawsuit?
A. I understand that there was a -- a settlement recently. I didn't -- I don't know the specifics of the settlement.
Q. Okay. We brought this lawsuit against Nutiva in January 2016.

Page 57

Why did it take a year for Nutiva to change the label?
MR. KARNIK: Let me object in that it calls for -- it's -- it will ask for information that's attorney-client privilege, and I can't have him answer that.
Q. (By Mr. Fitzgerald) All right. Let me rephrase the question.
Other than if it would require you to reveal attorney-client communications, why did Nutiva change the -- wait, basically, a year af- -- till after the lawsuit was filed to change the label?
A. We just -- we just -- you know, it took a while to -- to review the label and -- and make some of the -- make the -- the changes that we did.
Q. Okay. But the -- the changes that you -- you made recently basically result from the lawsuit and the issues we have raised in the lawsuit, including the compliance with the regulations.
Is that fair to say?
A. As stated, our counsel recommended that we -- we make some changes to the -- to the labels, which we've -- which we've done.
Q. Is it Nutiva's position that -- well, let

me ask you this: Was it the lawsuit that led your counsel to advise you to change the label?

MR. KARNIK: I'll object in that it's seeking attorney-client privilege and attorney-work-product information, and I will instruct the witness to not answer.

MR. FITZGERALD: Okay. I have to say, at this point, I think it's possible that the privilege has been waived. I won't proceed, but -- now, but, you know, I think it's something we -- we may need to revisit, and maybe on a break we can -- we can discuss, but let me move on for now.

Q. (By Mr. Fitzgerald) Is it correct that, in January 2012, Nutiva sold only one coconut oil product, which was the Organic Extra Virgin Coconut Oil?

A. Can you -- can you define what you -- you mean by that? We sell lots of different coconut oil products.

Q. Sure. Let me drill down a little bit.

So I want to focus just on January 2012 -- okay? -- which is the first month of our class period.

As of that date, we know that there was a product called Organic Extra Virgin Coconut Oil, the semisolid product that was sold in a yellow

label.

You are familiar with that product?

A. Yes.

Q. Okay. Was there any other coconut oil product, just pure coconut oil, that Nutiva was selling in January 2012?

A. Nutiva sells products all over the world and sometimes -- you know, in different packages and -- and different -- different label configurations, so --

Q. Okay.

A. -- so we may have -- we have multiple products, you know, selling around the world.

Q. Okay. Fair enough.

Under Nutiva's own brand --

A. Under the Nutiva brand, that's what I'm stating.

Q. Yes. Okay.

Under Nutiva's own brand in the United States as of January 2012, is it correct that the Organic Extra Virgin Coconut Oil in the yellow label was the only product?

A. I believe, then, we also sold a product with a -- a red label that was -- because the majority of -- of our -- of our coconut oil in the

United States was sold in the health and beauty -- you know, where is used for -- for body applications, and so we -- we came out with a -- with a product that would go in the grocery section.

Q. And that was in a glass container?

A. Yes.

Q. Okay. Do you remember what month and year the glass product was introduced?

A. We -- we had several different products, but in the -- we started selling in glass containers in the 2010-11 time frame.

Q. Okay. In January 2012, what sizes was the yellow label coconut oil extra virgin available in? I think it's 15, 29, 54, and 78.

Does that sound right?

A. And also 1 gallon, I believe.

Q. And 1 gallon. Okay.

Is it correct that there was no 23 ounce yellow label that was the -- the 23 ounce was the red label for the glass?

A. Twenty-three ounce was -- was glass container, not yellow.

MR. FITZGERALD: All right. Tab 7, please.

(Exhibit 6 was marked for identification by the court reporter and is attached hereto.)

Q. (By Mr. Fitzgerald) This is a document bearing Production No. NUT5163. It's been marked as Exhibit 6.

I will represent to you that this is the oldest yellow label that we've received from any party or nonparty in this action, and if you look, it's dated July 2, 2012, near the top, next to Clive Knell.

Do you see that?

A. Right.

Q. Do you know whether there were any differences between this label dated July 2012 and the label that was in the marketplace as of January 2012?

A. Can you repeat that question?

Q. Yeah.

Basically, in other words, from -- this is July 2012.

From January 2012 to July 2012, have there been any different label or -- or is this the same?

A. I -- I don't recall.

Q. Okay. If you wanted to find that out,

company believes meets regulations or not.
THE DEPONENT: Yeah, we -- you know, I don't know about the -- the second part of the question you asked.
Q. (By Mr. Fitzgerald) Do you have an understanding of whether the FDA requires or is -- to use your word, recommends a disclosure when making a statement about trans fat, like "0grams trans fat"? Is that required for that one as well?
A. I -- I don't recall that.
Q. Okay. What about for the statement "Non-Hydrogenated"?
A. I -- I -- I don't know that.
Q. You -- earlier, we talked about changing the label, and you had mentioned those two changes, removing the "62% MCTs" and the 100 percent cholesterol [sic] statement.
You say that was removed after a review that took -- how long did that review period take?
A. I'm -- I'm not clear what -- you kind of jumbled a bunch of things in there.
Q. Okay. Fair enough. Let me rephrase the question.
Nutiva recently changed its labels to remove "62% MCTs" and "100% Less Cholesterol Than

Butter," correct?
A. Correct.
Q. And, earlier, you described that that change happened after some period of reviewing the labels; is that fair?
A. Yes.
Q. Okay. How long was that review period?
A. I -- I don't recall the -- the exact time frame.
Q. What's your best estimate?
A. Well, we're -- always look at the labels and review -- depends on what you mean by "reviewed," but we -- we did make the change and started that -- started that process, you know, as -- as -- as mentioned.
Q. And when was -- when did you start that process?
A. Over the past year.
Q. And so is it your testimony that that review process, leading to the decision to remove those statements, took Nutiva a year to do, or was it less than a year?
A. I -- I don't -- I don't recall the exact time frame.
Q. If you wanted to determine when that

review period started, what would you do?
A. I'd probably need to look at more information.
Q. And what information would you look at?
A. Just so I can determine it.
Q. What information --
A. I don't --
Q. -- would you --
A. -- I don't -- I don't know what that information would be.
Q. Do you have emails talking about making the label changes?
MR. KARNIK: Let me object. I think the questioning is starting to, you know, elicit -- like you just mentioned emails. Emails and communication, that would be between the attorney and client, and so I am not sure how much more specific he can get. I mean, I will allow you to rephrase it --
MR. FITZGERALD: Okay.
MR. KARNIK: -- but --
Q. (By Mr. Fitzgerald) So I'm not asking about the substance of any communications with your lawyers. Okay? But if -- I am entitled to know if you had communications with your lawyers, the dates of the

communications, who the communications are with.
So are there emails that you could consultant to determine the time frame of when Nutiva began to review the label which ultimately led to the removal of these claims?
A. Well, if I look -- if I -- if I looked at the emails, I could -- you know, if they -- if there -- a time frame from there, then I could try to piece something together.
Q. Okay. Let's leave a blank in the transcript right here, and I'm going to ask you to review the information you need to and, in the blank, put in the month and year that you began the review process that led to the removal of "62% MCTs" and "100% Less Cholesterol Than Butter."
(Intentionally left blank)
A.
MR. KARNIK: I'm going to object to asking him to review that here and now. I think, you know, inquiring any further about the revision process, again, is going to elicit information that is attorney-client privilege.
I understand that -- let's say that this -- this is the -- and I don't mean to do a running objection. I'm going to try to wrap it up.

Page 170

If this was a document request, the response would be in the form of a privilege log, and you are -- you know, you would be entitled to the date and the communication, but no -- no further.

But I think there's also an understanding between the parties that communications following the -- the filing -- the initiation of a lawsuit, privilege logs are not required.

So I am not sure how you think you can get the information you are seeking.

MR. FITZGERALD: Okay. I think my question is actually a lot similar. It's just, when did the review process that led to removing the label start. That's -- that's just a month and a year. I don't think that could reveal anything that's remotely attorney-client privileged, and so I am going to maintain the blank in the -- in the transcript, and, if we have to serve, we'll serve an interrogatory.

Q. (By Mr. Fitzgerald) Did you make the change as a result of this lawsuit?

MR. KARNIK: I'm going to object and say that the -- the answer would elicit attorney-client privilege information and I have to instruct him

Page 171

not to answer.

Q. (By Mr. Fitzgerald) Would you have made the change if we hadn't filed the lawsuit?

A. We -- we made changes based on -- on advice from -- from, you know, our -- our counsel.

Q. Okay. Does Nutiva concede that, prior to making the changes, the label was not in compliance with all applicable FDA regulations?

MR. KARNIK: I'm going to object in that the question calls for a legal conclusion.

You can answer.

THE DEPONENT: Okay. We -- we, at the time, put what we felt was the -- you know, was a fair and accurate label, and we made a decision to change it later.

MR. FITZGERALD: Okay. Can you repeat my question, please.

(Record read as follows:

"QUESTION: Does Nutiva concede that, prior to making the changes, the label was not in compliance with all applicable FDA regulations?")

THE DEPONENT: Now, after -- after further -- further review and recommendation of counsel that we change the -- change the label, you

Page 172

know, we now -- we made those changes, and -- and, you know, we could have made those changes in the previous, but we didn't -- at the time didn't see it that way.

Q. (By Mr. Fitzgerald) Okay. But you recognize, as you sit here today, now after getting advice of your counsel, that the previous version of the label -- or previous versions of the label did violate some FDA regulations; is that fair?

MR. KARNIK: Object to -- object to calling for legal conclusion again.

THE DEPONENT: Yes.

Q. (By Mr. Fitzgerald) Please describe the different types of packaging that Nutiva has used for its coconut oils during the class period?

MR. KARNIK: Objection. Broad and calls for a narrative.

Q. (By Mr. Fitzgerald) Okay. Let me be more specific.

As far as we know, there were three types of packaging; namely, glass, PET, and HDPE plastic.

Is it true that those three were used for coconut oils?

A. Correct.

Q. Are there any other, other than those

Page 173

three?

A. Not -- not that I can recall.

Q. What's the difference between PET and HDPE plastic?

A. PET is clear, and HDPE is -- is opaque.

Q. Any other differences?

A. HDPE is thicker than PET.

Q. Anything else?

A. HDPE has a tendency to -- to -- to, in shipping or hot temperatures, leak a little -- leak -- maintain the seal integrity versus PET.

Q. HDPE better maintains the seal integrity?

A. Yes.

Q. Okay. Both the PET and HDP -- PE are BPA-free, correct?

A. Correct.

Q. Does Nutiva communicate, on the label of the products, whether the plastic packaging is PET or HDPE in any way?

A. We do not.

Q. Is Nutiva aware of any consumer preference for either PET or HDPE?

A. We are not aware of any -- any -- any significant difference.

Q. Okay. Is Nutiva aware of any significant

Page 338

substantiated by studies like those; is that correct?
A. Our tes- -- my testimony is, is that we are not making medical claims about coconut oil.
MR. FITZGERALD: Okay. One last thing. Just -- your counsel had emailed us a copy of the revised label, and we will put this in front of the camera briefly.
Got it nice and sharp?
THE VIDEOGRAPHER: Yup.
Q. (By Mr. Fitzgerald) Why don't you look at that and just let me know if that is, in fact, the revised label.
A. It appears to be. I don't know if it's the -- if it's the final label, but I -- I believe so.
Q. Okay. And one of the things I notice on there is that statement "0 grams trans fat" is still on there, but it looks like you've added the disclosure statement underneath it.
Do you see that?
A. Correct. Yes.
Q. And that was part of the review and advice of counsel we talked about earlier?
MR. KARNIK: I'll object and instruct not

Page 339

to answer that question as phrased.
Q. (By Mr. Fitzgerald) Okay. That was part of the review we talked about earlier?
A. There was -- there was some advice from counsel to make changes to our label.
Q. And it looks like a couple of the other things changed to. For example, I don't think it says "Nutritious Substitute" anymore.
Is that a change that Nutiva made?
A. Correct.
Q. And was that also basically in response to the lawsuit and given the review and advice you got from counsel?
MR. KARNIK: I have to object and instruct not to answer because it would reveal attorney-client privilege.
MR. FITZGERALD: Let me -- let me re-ask the question with the -- with the third thing taken out.
Q. (By Mr. Fitzgerald) So was that also basically part of the response to the lawsuit and reviewing the label?
A. It was under advice from counsel that we -- we should make some changes, and -- and we did that.

Page 340

Q. Okay. And that was earlier this year, right?
A. Correct.
MR. FITZGERALD: Okay. All right. I don't have anything else.
MR. KARNIK: Just a couple of things.
EXAMINATION BY
MR. KARNIK:
Q. If we can just go quickly to Plaintiff Exhibit 81, which is the Nutiva Pure Branding.
Can we show that to the witness one more time.
(Discussion off the stenographic record.)
Q. (By Mr. Karnik) And if -- Mr. Roulac, if you can just turn to the bottom right-hand corner, NUT137, on that, and it states: "For general population (chart below): research and friends."
Did I read that sentence correctly?
A. For -- for general population research and friends, yes.
Q. Okay. The green bars indicate responses as to coconut oil; is that correct --
A. Correct.
Q. -- in you're reading --
A. Correct --

Page 341

Q. -- of the document?
A. -- yes.
Q. I want to refer you to packaging of the product, and it says 5 percent above the green coconut bar?
A. Right.
Q. What does that indicate to you?
A. That -- it indicates that 5 percent of the -- of the general population relies on -- on the label, 19 percent rely on cookbooks and other -- other -- doctors, store staff, magazines, partners, et cetera.
Q. Okay. So is it fair to state that this chart reflects that 95 percent of first-time purchases of coconut oil are influenced by reasons other than the packaging of the product?
A. Correct.
Q. And does Nutiva have any research of its own or that it's retained from companies such as Pure Branding that -- that the company's aware of that would contradict that conclusion --
A. No.
Q. -- that -- this survey conclusion?
A. No.
MR. KARNIK: Okay. I have no further