**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**THE LAW OFFICE OF PAUL K. JOSEPH, PC**
PAUL K. JOSEPH (SBN 287057)
*paul@pauljosephlaw.com*
4125 W. Pt. Loma Blvd. No. 206
San Diego, California 92110
Phone: (619) 767-0356
Fax: (619) 331-2943

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PRESTON JONES and SHIRIN DELALAT, on behalf of themselves, all others similarly situated, and the general public, <br><br> Plaintiffs, <br><br> v. <br><br> NUTIVA, INC., <br><br> Defendant. | Case No: 4:16-cv-00711-HSG <br><br> **NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION** <br><br> [Fed. R. Civ. P. 23] <br><br> **REDACTED FOR PUBLIC FILING** <br><br> Judge:   Hon. Haywood S. Gilliam, Jr. <br> Date:    October 13, 2017 <br> Time:    2:00 p.m. <br> Place:   Courtroom 2, 4th Floor |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................................................................................iii

NOTICE OF MOTION.................................................................................................................1

RELIEF SOUGHT........................................................................................................................1

MEMORANDUM OF POINTS & AUTHORITIES....................................................................1

I.     ISSUE TO BE DECIDED ...............................................................................1

II.    INTRODUCTION ............................................................................................2

III.   FACTS ............................................................................................................3

      A.    Nutiva Marketed its Coconut Oil as Healthy, and a Healthy Substitute for Butter..........................................................................................................3

      B.    Plaintiffs Purchased Nutiva's Coconut Oil in Reliance on Labeling Claims Suggesting the Products Were Healthy...........................................................11

      C.    Claims that Nutiva's Coconut Oil is Healthy, and a Healthy Substitute for Butter, are False and Misleading ...................................................................11

      D.    As Nutiva Admits, its Coconut Oil was Misbranded........................................11

      E.    The Class Paid a Premium Due to Nutiva's Unlawful and Misleading Labeling Claims ........................................................................................13

IV.   LEGAL STANDARDS ..................................................................................14

V.    ARGUMENT ..................................................................................................14

      A.    The Requirements of Rule 23(a) are Satisfied.................................................14

           1.    Numerosity..........................................................................................14

           2.    Commonality.......................................................................................14

           3.    Typicality ............................................................................................16

           4.    Adequacy .............................................................................................17

i

B.    The Requirements of Rule 23(b)(3) are Satisfied ............................................. 17

    1.    Predominance ............................................................................ 17

        a.    The Class's Claims will be Resolved through Objective Standards and Common Evidence that Apply Classwide ........................ 18

            i.    Consumer Fraud ................................................................ 18

            ii.    "Unlawful" Misbranding ................................................... 20

            iii.    Breach of Warranty .......................................................... 21

        b.    Application of California Law to a Nationwide Class is Appropriate ............................................................................ 22

        c.    The Class's Price Premium Damages Model is Consistent with its Theory of Liability, and Capable of Measuring Damages Classwide ...................................................................... 23

    2.    Superiority .................................................................................. 25

        a.    Class Members Have No Interest in Prosecuting Separate Actions ............................................................................... 25

        b.    No Manageability Concerns Outweigh the Superiority of the Class Action Device for Adjudicating the Class's Claims ..................... 25

VI.    CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Allen v. Hyland's Inc.,*
    300 F.R.D. 643 (C.D. Cal. 2014) ................................................................................ 22

*Allen v. Similasan Corp.,*
    306 F.R.D. 635 (S.D. Cal. 2015) ........................................................................... 20, 22

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ...................................................................................... 15, 17, 20

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
    133 S. Ct. 1184 (2013) ........................................................................................ 14, 19

*Ang v. Bimbo Bakeries USA, Inc.,*
    2014 WL 1024182 (N.D. Cal. Mar. 13, 2014) ......................................................... 21

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) .................................................................................... 16

*Berger v. Home Depot USA, Inc.,*
    741 F.3d 1061 (9th Cir. 2014) .................................................................................. 17

*Briseno v. ConAgra Foods, Inc.,*
    844 F. 3d 1121 (9th Cir. Jan. 3, 2017) ..................................................................... 14

*Brockey v. Moore,*
    107 Cal. App. 4th 86 (2003) ............................................................................... 18, 19

*Brown v. Hain Celestial Group, Inc.,*
    2015 WL 3398415 (N.D. Cal. May 26, 2015) ......................................................... 20

*Bruno v. Eckhart Corp.,*
    280 F.R.D. 540 (C.D. Cal. 2012) ............................................................................ 22

*Bruno v. Quten Research Inst., LLC,*
    280 F.R.D. 524 (C.D. Cal. 2011) ............................................................................ 22

*Bruton v. Gerber Prods. Co.,*
    --- Fed. Appx. ----, 2017 WL 3016740 (9th Cir. July 17, 2017) ............................. 20

*Bruton v. Gerber Prods. Co.,*
    2014 WL 172111 (N.D. Cal. Jan. 15, 2014) ............................................................ 19

*Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.,*
    917 F.2d 1171 (9th Cir. 1990) .................................................................................. 16

*Chavez v. Blue Sky Natural Beverage Co.*,
   268 F.R.D. 365 (N.D. Cal. 2010) ................................................................. 22, 23

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ................................................................. 18, 19, 23

*Culley v. Lincare Inc.*,
   2016 WL 4208567 (E.D. Cal. Aug. 10, 2016) ................................................................. 25

*De La Fuente v. Stokely–Van Camp, Inc.*,
   713 F.2d 225 (7th Cir. 1983) ................................................................. 16

*Deposit Guar. Nat'l Bank v. Roper*,
   445 U.S. 326 (1980) ................................................................. 25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ................................................................. 18

*Fitzpatrick v. Gen. Mills, Inc.*,
   263 F.R.D. 687 (S.D. Fla. 2010) ................................................................. 16

*Forcellati v. Hyland's, Inc.*,
   876 F. Supp. 2d 1155 (C.D. Cal. 2012) ................................................................. 22

*Gold v. Lumber Liquidators, Inc.*,
   2015 WL 7888906 (N.D. Cal. Nov. 30, 2015) ................................................................. 20

*Guido v. L'Oreal*,
   2014 WL 6603730 (C.D. Cal. July 24, 2014) ................................................................. 23

*Guido v. L'Oreal, USA, Inc.*,
   284 F.R.D. 468 (C.D. Cal. 2012) ................................................................. 19, 23

*Hadley v. Kellogg Sales Co.*,
   --- F. Supp. 3d ----, 2017 WL 3453391 (N.D. Cal. Aug. 10, 2017) ................................................................. 20

*Hale v. State Farm Mut. Auto. Ins. Co.*,
   2016 WL 4992504 (S.D. Ill. Sept. 16, 2016) ................................................................. 15, 23

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ................................................................. 16, 19

*Hinojos v. Kohl's Corp.*,
   718 F.3d 1098 (9th Cir. 2013) ................................................................. 20

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................................................. 21, 22

*In re Ferrero Litig.*,
  278 F.R.D. 552 (S.D. Cal. 2011) ................................................................ 20

*In re Pom Wonderful LLC*,
  2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) .......................................... 23

*In re Scotts EZ Seed Litig.*,
  304 F.R.D. 397 (S.D.N.Y. 2015) .......................................................... 21, 24

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009) ..................................................................... 18, 19

*Jefferson v. Chase Home Fin.*,
  2008 WL 1883484 (N.D. Cal. Dec. 14, 2007) .......................................... 18

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ................................................................ 15

*Johns v. Bayer Corp.*,
  280 F.R.D. 551 (S.D. Cal. 2012) ............................................................. 20

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998) .................................................................. 15

*Keilholtz v. Lennox Hearth Prods. Inc.*,
  268 F.R.D. 330 (N.D. Cal. 2010) ............................................................ 22

*Keith v. Buchanan*,
  173 Cal. App. 3d 13 (1985) .................................................................... 22

*Kumar v. Salov N. Am. Corp.*,
  2016 WL 3844334 (N.D. Cal. July 15, 2016) ........................................... 19

*Kurtz v. Kimberly-Clark Corp.*,
  --- F.R.D. ----, 2017 WL 1155398 (E.D.N.Y. Mar. 27, 2017) .................... 23

*Lanovaz v. Twinings N. Am., Inc.*,
  2014 WL 1652338 (N.D. Cal. Apr. 24, 2014) ........................................... 19

*Lavie v. Procter & Gamble Co.*,
  105 Cal. App. 4th 496 (2003) ................................................................. 18

*Levya v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) .............................................................. 18, 25

*Lilly v. Jamba Juice Co.*,
  308 F.R.D. 231 (N.D. Cal. 2014) .......................................................... 21, 23

*Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir. 2001) ...................................................................................... 17

*Mary Pickford Co. v. Bayly Bros., Inc.*,
    12 Cal. 2d 501 (1939) ................................................................................................... 21

*Mass. Mut. Life Ins. Co. v. Super. Ct.*,
    97 Cal. App. 4th 1282 (2002) ....................................................................................... 19

*Moyle v. Liberty Mut. Ret. Benefit Plan*,
    823 F.3d 948 (9th Cir. May 20, 2016) .......................................................................... 19

*Odyssey Wireless, Inc. v. Apple Inc.*,
    2016 WL 7644790 (S.D. Cal. Sept. 14, 2017) .............................................................. 23

*Opperman v. Path, Inc.*,
    2016 WL 3844326 (N.D. Cal. July 15, 2016) ............................................................... 22

*Parkinson v. Hyundai Motor Am.*,
    258 F.R.D. 580 (C.D. Cal. 2008) .................................................................................. 22

*Pettit v. Proctor & Gamble Co.*,
    2017 WL 3310692 (N.D. Cal. Aug. 3, 2017) .......................................................... 15, 17

*Pulaski Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ........................................................................................ 18

*Rahman v. Mott's LLP*,
    2014 WL 6815779 (N.D. Cal. Dec. 3, 2014) ................................................................ 20

*Rasario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ...................................................................................... 15

*Reid v. Johnson & Johnson*,
    780 F.3d 952 (9th Cir. 2015) ........................................................................................ 13

*Rodman v. Safeway, Inc.*,
    2014 WL 988992 (N.D. Cal. 2014) .............................................................................. 15

*Rutledge v. Hewlett-Packard Co.*,
    238 Cal. App. 4th 1164 (2015) ..................................................................................... 22

*Salvagne v. Fairfield Ford Inc.*,
    254 F.R.D. 321 (S.D. Ohio 2009) ................................................................................. 16

*Sanchez-Knutson v. Ford Motor Co.*,
    310 F.R.D. 529 (S.D. Fla. 2015) .................................................................................. 24

*Schramm v. JPMorgan Chase Bank, N.A.*,
    2013 WL 7869379 (C.D. Cal. 2013) ................................................................. 24

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ........................................................................................... 14

*Simpson v. Fireman's Fund Ins. Co.*,
    231 F.R.D. 391 (N.D. Cal. 2005) ....................................................................... 16

*Spencer v. Beavex, Inc.*,
    2006 WL 6500597 (S.D. Cal. Dec. 15, 2006) .................................................... 16

*Stathakos v. Columbia Sportswear Co.*,
    2017 WL 1957063 (N.D. Cal. May 11, 2017) ................................................... 23

*Tait v. BSH Home Appliances Corp.*,
    289 F.R.D. 466 (C.D. Cal. 2012) ................................................................. 20, 25

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ............................................................................. 25

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..................................................................................... 14, 15

*Wang v. Massey Chevrolet*,
    97 Cal. App. 4th 856 (2002) .............................................................................. 20

*Weinstat v. Dentsply Int'l, Inc.*,
    180 Cal. App. 4th 1213 (2010) .......................................................................... 21

*Werdebaugh v. Blue Diamond Growers*,
    2014 WL 2191901 (N.D. Cal. May 23, 2014) ................................................... 23

*Wershba v. Apple Computer, Inc.*,
    91 Cal. App. 4th 224 (2001) .............................................................................. 22

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008) ............................................................................. 18

*Zakaria v. Gerber Prods. Co.*,
    2016 WL 6662723 (C.D. Cal. 2016) .................................................................. 24

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ........................................................................... 25

## STATUTES

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ........................................................................ 2

Cal. Bus. & Prof. Code §§ 17500 *et seq* ........................................................................ 2

Cal. Civ. Code §§ 1750 *et seq.* ...................................................................................... 2

Cal. Com. Code § 2313(1)(a) ........................................................................................ 21

Cal. Com. Code § 2313(1)(b) ........................................................................................ 21

## RULES

Fed. R. Civ. P. 23 ............................................................................................... passim

## REGULATIONS

21 C.F.R. § 101.13 ...................................................................................................... 13

## OTHER AUTHORITIES

56 Fed. Reg. 60421(Nov. 27, 1991) ............................................................................... 13

58 Fed. Reg. 2302, 2302 (Jan. 6, 1993) ........................................................................ 13

Cal. Com. Code § 2313, comment 8 ............................................................................. 21

Fowler R.L., *Filled milks, coconut oil, and atherosclerosis*, Pediatrics, Vol. 51, No. 3 (1973) .................... 2

**NOTICE OF MOTION**

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE, that on October 26, 2017,[1] at 2:00 p.m., or as soon thereafter as may be heard, in the Courtroom of the Honorable Haywood S. Gilliam, Jr., United States District Judge, Northern District of California, located at the Ronald V. Dellums Federal Building, 1301 Clay Street, Oakland, CA 94162, Courtroom 2, plaintiffs Preston Jones and Shirin Delalat will, and hereby do, move the Court to certify, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), a class of <u>all persons in the United States who, on or after January 8, 2012, purchased for household use, and not for resale or distribution, Nutiva Extra Virgin Coconut Oil or Nutiva Virgin Coconut Oil, whose label stated "100% Less Cholesterol than Butter" (the "Class")</u>. This Motion is based on this Notice of Motion, the below Memorandum of Points and Authorities, the concurrently-filed Declarations of Jack Fitzgerald ("Fitzgerald Decl."), Preston Jones ("Jones Decl."), Shirin Delalat ("Delalat Decl."), and Paul Joseph ("Joseph Decl."), all prior pleadings and proceedings in the action, and all written and oral argument and evidence presented in support of the Motion.

**RELIEF SOUGHT**

Plaintiffs request that the Court certify the Class, appoint plaintiffs as Class Representatives, and appoint their counsel as Class Counsel.

**MEMORANDUM OF POINTS & AUTHORITIES**

**I.    ISSUE TO BE DECIDED**

After taking substantial discovery, commissioning a survey of actual Class members, and engaging expert analysis, plaintiffs and their counsel have narrowed the claims to focus on those products and labeling statements for which the strongest possible merits and damages case can be made for the Class. Having carefully considered the most prudent contours of the Class and its liability and damages theories to best position the Class for certification and a substantial monetary judgment after trial, plaintiffs will pursue restitution and damages on behalf of the Class for Nutiva's consumer fraud, misbranding, and breach of warranty, as it relates to the labeling claims that Nutiva's semi-solid coconut oil—once called "Extra Virgin," later just "Virgin"—is or contains: (1) "100% Less Cholesterol than Butter"; (2) "Zero Trans Fats" or "0g

---

[1] This is the first civil motion hearing date available 9 weeks or later after the filing of this motion. (*See* Dkt. No. 100 at 1 ¶ 1.

Trans Fat"; (3) "a nutritious substitute in baking"; (4) a "'better-than-butter' replacement on bread, vegetables, or popcorn" or "is 'better than butter' on bread, vegetables, or popcorn"; and (5) a "Superfood."

Accordingly, the issue to be decided is whether the requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy), and Rule 23(b)(3) (predominance and superiority) are satisfied with respect to the Class's causes of action for violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL), False Advertising Law, *id.* §§ 17500 *et seq.* ("FAL"), and Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("CLRA"), and for breach of express and implied warranty, as those causes relate to the challenged labeling statements identified above.

## II.   INTRODUCTION

According to 200 leading cardiovascular experts representing 29 medical organizations, "we've known for nearly a half century that 'Coconut oil is one of the most potent agents for elevating serum cholesterol levels.'" Ex. 1,[2] May 8, 2017 Expert Report of Dr. Michael Greger, M.D., FACLM ("Greger Report"), at 9 (quoting Fowler R.L., *Filled milks, coconut oil, and atherosclerosis*, Pediatrics, Vol. 51, No. 3, at 583-84 (1973)). Thus, just weeks ago, the American Heart Association warned that "because coconut oil increases LDL cholesterol, a cause of [cardiovascular disease], and has no known offsetting favorable effects, we advise against the use of coconut oil." Dkt. No. 93-5, Fitzgerald Reply Decl. Ex. 1 at e13.

Despite overwhelming scientific evidence that consuming coconut oil increases risk of cardiovascular disease—the leading cause of death in the United States—by raising "bad" LDL- and total-cholesterol levels, causing inflammation, and impairing arterial endothelial function, *see* Greger Report at 9-16, until just this year, Nutiva marketed its "semi-solid" coconut oil as healthy, and a healthy substitute for butter. Several claims brazenly violated FDA regulations promulgated expressly to avoid consumer deception.

Plaintiffs brought this consumer fraud, misbranding, and breach of warranty class action to remedy these wrongs. The case is readily amenable to certification of a Rule 23(b)(3) damages class. Each of the Rule 23(a) criteria is satisfied. For numerosity, plaintiffs demonstrate retail sales of over ▮ million units and over $167 million. For commonality, plaintiffs demonstrate Nutiva's offending conduct was substantially the same to all Class members, so that its liability to all will be determined by answering the same questions. For typicality, plaintiffs demonstrate that all Class members share the same legal theories

---

[2] Unless otherwise noted, all exhibit references are to the Declaration of Jack Fitzgerald.

and suffered the same economic injury. And for adequacy, plaintiffs demonstrate that they and their counsel have no conflicts with the Class, and will continue vigorously prosecuting the case on its behalf.

Rule 23(b)(3)'s predominance and superiority criteria are also satisfied. Nutiva's liability to all Class members depends on whether Nutiva's conduct is objectively deceptive, violates FDA regulations, or breaches warranties, questions that can be resolved through evidence common to all Class members, so that common liability questions predominate. If Nutiva is liable, the amount of damages and restitution it owes the Class can be calculated based on the price premium associated with the offending claims, whether because they are unlawful, convey a misleading health message, or breach warranties. The Class's damages model uses conjoint analysis, a widely-accepted technique for isolating the marketplace premium associated with challenged claims, thereby ensuring any damages and restitution awarded are attributable only to Nutiva's conduct creating the legal liability. And class treatment is the superior means of adjudicating the Class's claims because adjudicating them individually is economically infeasible.

Plaintiffs and their counsel have worked diligently to ensure that all certification requirements are met, and that the Class's claims can be resolved efficiently through a class trial. Thus, the Court should certify the Class.

## III.   FACTS

### A.   As Nutiva is Well Aware, Consumers Are Influenced by Health Claims and Willing to Pay More for Products Marketed as Healthy

Nutiva's former Senior Advisor and current member of its Board of Directors, Neil Blomquist, testified to his awareness of "marketing research indicating that consumers are willing to pay more money for products they perceive to be healthy[.]" *See* Ex. 5, Blomquist Dep. Tr. at 125:22-126:8; *see also* Ex. 7, Nutiva's Responses to Request for Admission Nos. 240-41 (admitting Nutiva is aware of a consumer preference and trend for purchasing healthy foods). One consumer study Nutiva commissioned described "Nutiva Buyers" in particular as "resolutely health focused," Ex. 30, Roulac 30(b)(6) Dep. Ex. 87, BUZZBACK73-161 at BUZZBACK147. And as Nutiva's former Marketing Manager, Liz Kaplan, testified, Nutiva's "whole brand is about health and wellness," Ex. 6, Kaplan Dep. Tr. at 113:6-8, an attempt to capitalize on this trend.

Ms. Kaplan also testified that, when selling a single-ingredient product like coconut oil, "you have to

3

convince people what's unique and different about your product." *Id.* at 167:8-12. Aware that some consumers make purchasing decisions based on a product's label, *see* Roulac 30(b)(6) Dep. Tr. at 291:24-292:4; Kaplan Dep. Tr. 185:24-186:3 (the label is "obviously . . . your biggest billboard"), Nutiva tries to convey through its Coconut Oil's label that the product is healthy. Blomquist Dep. Tr. at 134:18-21, 139:22-140:6. It is "important" to Nutiva to "convey[] the health and nutritional benefits of Nutiva's Coconut Oils to its consumers," because this "influence[s] the purchasing decisions of Nutiva's consumers[.]" *See id.* at 144:1-7; *see also* Ex. 7, Nutiva Response to Request for Admission No. 291. Indeed, "[e]verything on the package is intended to influence consumers," Kaplan Dep. Tr. at 318:15-18. Moreover, it was important to Nutiva that ███████████████████████████████████████████████████████████████████████ ████████████████████████████. *See* Ex. 31, NUT204-207 at NUT206.

**B.    Nutiva Marketed its Coconut Oil as Healthy, and a Healthy Substitute for Butter**

Between January 2012 and late 2013, Nutiva sold its semi-solid coconut oil in 15, 29, 54, and 78 oz.[3] plastic jars with a label containing a predominantly yellow background, and bearing the following statements suggesting the product is healthy, and a healthy substitute for butter: (1) "100% Less Cholesterol than Butter"; (2) "Zero Trans Fats"; (3) "a nutritious substitute in baking"; and (4) "a 'better-than-butter' replacement on bread, vegetables, or popcorn." *See* Exs. 10-16 (label exemplars); Roulac 30(b)(6) Dep. Tr. 60:13-23.[4] These claims are indicated on the 15 oz. "Non-GMO" label (Ex. 14) replicated below.



In January 2013, Nutiva introduced 15 oz. and 23 oz. glass jars with a label containing a predominately red background, *see* Ex. 34, Roulac Dep. Ex. 18 (UNFI8); *see also* Roulac 30(b)(6) Dep. Tr.

---

[3] Nutiva introduced the 78 oz. product in around June 2012, which was sold through Costco. *See* Ex. 32, NUT760-64, at NUT760.

[4] *See also generally* Ex. 33, Roulac Dep. Ex. 61 (sales records indicating dates of sales for various items); Roulac 30(b)(6) Dep. Tr. at 190:13-191:12 (discussing Roulac Dep. Ex. 61)).

4

at 94:1-14; Kaplan Dep. Tr. at 193:7-194:8. Although the background colors differed, the language and layout of the claims was the same. Exs. 17-18. These claims are indicated on the 15 oz. label (Ex. 17) below.



In Spring 2013, Nutiva began contemplating a company-wide "brand refresh," meaning changing "the brand look and feel." *See* Roulac 30(b)(6) Dep. Tr. at 94:16-97:8; Ex. 9, Nutiva's Third Supplemental Response to Interrogatory No. 1. After working with graphic designers and testing different options with consumer surveys, *see id.* at 100:14-107:23, Nutiva selected a "watercolor" design, which it began rolling out to the marketplace in late 2013, *see* Kaplan Dep. Tr. at 176:1-20, 192:4-25, or early 2014, *see* Roulac 30(b)(6) Dep. Tr. at 109:11-110:10; Ex. 35, Roulac Dep. Ex. 22 (NUT6051).

Notwithstanding the new watercolor design, the challenged claims, including their layout, remained nearly identical, with Nutiva only adding the term "Superfood," modifying "Zero Trans Fat" to "0g Trans Fat," and slightly changing the syntax of the "better than butter" statement. Some minor revisions to the watercolor design label in 2014, *see* Roulac 30(b)(6) Dep. Tr. 132:23-136:13; Ex. 36 (NUT225), did not affect the challenged claims. *See* Exs. 19-29. These claims are indicated on the 78 oz. label (Ex. 29) below.



Early this year, Nutiva removed all challenged claims other than "Superfood." *See* Dkt. No. 91, Spellman Decl. ¶¶ 6-9 & Ex. 1; *see generally* Dkt. No. 86, Mot. for Fees at 6-10. The new labels are currently rolling out into the marketplace. *See* Roulac 30(b)(6) Dep. Tr. at 77:6-78:2; Ex. 37 (NUT7565).

The following table thus sets forth the approximate time during which each the yellow, red, and watercolor labels were available for purchase, and each's challenged labeling claims, which are highly consistent, always conveying the message that the product is healthy, and a healthy substitute for butter. *See* Kaplan Dep. Tr. 186:4-16 (Nutiva "tried to be consistent with the substance" of its messaging).

| Label (Challenged Claims) | Size(s) in Oz. | Start Date | End Date |
|---|---|---|---|
| <u>Extra Virgin (Yellow Label)</u><br>• "100% Less Cholesterol than Butter"<br>• "Zero Trans Fats"<br>• "a nutritious substitute in baking"<br>• a "'better-than-butter' replacement on bread, vegetables, or popcorn." | 15, 29, 54 | January 2012 | July 2014 |
| | 78 | June 2012 | Early 2014 |
| <u>Extra Virgin (Red/Glass Label)</u><br>• "100% Less Cholesterol than Butter"<br>• "Zero Trans Fats"<br>• "a nutritious substitute in baking"<br>• a "'better-than-butter' replacement on bread, vegetables, or popcorn." | 15, 23 | January 2013 | Early 2014 |
| <u>Virgin (Watercolor Label)</u><br>• "100% Less Cholesterol than Butter"<br>• "Zero Trans Fats" / "0g Trans Fat"<br>• "a nutritious substitute in baking"<br>• "is 'better than butter' on bread, vegetables or popcorn"<br>• "Superfood" | 15/14, 23, 29, 54 | Late 2013 | Currently phasing out |
| | 78 | Late 2013 | September 2016 |

In choosing labeling claims for its coconut oil, Nutiva was aware of public concerns over cholesterol and trans fat. *See* Roulac 30(b)(6) Dep. Tr. at 293:3-13. Mr. Blomquist testified to research showing "[c]onsumers are aware of cholesterol as a health issue," and associate "a cholesterol claim on a food . . . with health[.]" Blomquist Dep. Tr. at 124:23-125:10; *see also* Kaplan Dep. Tr. at 295:21-296:14.[5] Moreover, "some of those studies have shown" that "consumers [are] more likely to buy products that state they do not contain cholesterol[.]" Blomquist Dep. Tr. at 125:11-14; *see also id.* at 178:6-17. Based on consumer research with which he was familiar, Mr. Blomquist estimated that between "30 to 40 percent" of consumers are willing to pay more for a food that is cholesterol-free, and "20 percent," more for a food free of trans fat. *Id.*

---

[5] "Zero Trans Fat" claims also convey a health message. *See* Roulac 30(b)(6) Dep. Tr. at 298:17-300:6, 306:17-307:2; Kaplan Dep. Tr. at 296:16-24; *see also* Blomquist Dep. Tr. at 122:16-123:2 (consumers aware of trans fat), 150:8-151:11 (some consumers willing to pay more for "0g trans fat").

at 127:9-128:1. In prominently touting the absence of cholesterol, Nutiva was therefore "put[ting] information on [the label] that we think . . . gives information for people . . . to look whether they are going to buy the product or not." *See* Roulac 30(b)(6) Dep. Tr. at 292:11-15.

Thus, the prominent claim that Nutiva Coconut Oil contains "100% Less Cholesterol than Butter" is a "key feature," *id.* at 141:1-3; *compare* Ex. 38, KEHE702 ("███████████████" of Nutiva Coconut Oil is "███████████").[6] This is because the prominent "100% Less Cholesterol" claim "conveys a similar message" to one that was on the Nutiva Coconut Oil before the class period began: that it is a "healthy cooking oil." *See* Blomquist Dep. Tr. at 155:7-11; *see also id.* at 135:6-15; Kaplan Dep. Tr. at 278:10-280:1 ("Cholesterol and trans fat-free" part of message Nutiva Coconut Oil will "let you live . . . a healthier life.").[7]

Through the "100% Less Cholesterol than Butter" Nutiva "tries to convey a message that its coconut oils are healthier than butter[.]" *See* Blomquist Dep. Tr. at 153:25-154:3. The phrase "a nutritious substitute" conveys a similar health message "[f]or someone who is concerned about cholesterol," because "it's got no cholesterol, and butter does." *Id.* at 136:11-17; *see also id.* at 168:25-169:4 (agreeing "nutritious" is a synonym for health). The phrase "better than butter" is "getting at[] th[e] health difference . . . because of cholesterol[.]" *See id.* at 137:18-25; Kaplan Dep. Tr. at 87:19-25 (Nutiva coconut oil "better than butter," because "it has no cholesterol versus butter"), 89:4-14 (substituting is supposedly "better" for "people who want to avoid cholesterol and any negative health . . . issues around cholesterol," including "heart disease"), 89:15-21 (agreeing that "by advertising the Coconut Oil is better than butter, Nutiva is trying to convey to people who are concerned with heart disease that . . . [it] has no cholesterol, whereas butter has cholesterol"). Thus the claim "probably resonated with" Nutiva's customers. Kaplan Dep. Tr. at 94:1-13.

Nutiva also used "Superfood" "to say that the product was a healthier alternative to other things out there." Kaplan Dep. Tr. at 295:15-20. The term "seems to ring true with consumers." *Id.* at 83:14. Mr.

---

[6] In fact, while Nutiva's CEO privately "agree[s] that cholesterol is not the dark force of health," Nutiva nevertheless "makes this claim to get more to try our oil who might otherwise think it's bad." Ex. 39, NUT490-91, at NUT490.

[7] Nutiva's internal documents confirm this was the intent of its labeling. In a PowerPoint presentation provided to one of its distributors showing a "Superfood Shipper" available for purchase, Nutiva plugged its Coconut Oil as "████████████████████████." Ex. 40, KEHE436 (emphasis added); *see also* Kaplan Dep. Tr. at 333:3-334:11 (labeling claims convey message consistent with this copy).

*Jones et al. v. Nutiva, Inc.*, No. 16-cv-711-HSG
MOTION FOR CLASS CERTIFICATION

Blomquist agreed it conveys a health message, Blomquist Dep. Tr. at 134:22-135:2, and estimated that "10 percent" of consumers are willing to pay more for product labeled "Superfood," *id.* at 128:8-13. Nutiva's own consumer research found that "Superfood" conveys a specific health message. *See* Ex. 30 at BUZZBACK76 (for Nutiva buyers, the "Overall understanding of what defines a 'superfood' is precise"), Ex. 41, Roulac 30(b)(6) Dep. Ex. 86 at BUZZBACK8-9 (in defining "superfood," "All respondents play back descriptors related to health (healthy/nutritious, good for you),"[8] and "play back that superfood is not cheap/inexpensive," with 78% associating "superfood" with the attribute, "Is beneficial for health/wellbeing").[9]

In non-label advertising, Nutiva likewise conveyed a focused health message. Despite its CEO's repeated assertion that Nutiva did not make "medical claims" (his term for health claims), *see* Roulac 30(b)(6) Dep. Tr. at 16:11-17:1, 20:1-24, 43:6-10, 46:9-23, 300:24-303:5, Nutiva's website "stated that people [in Southeast Asia] . . . that followed a traditional diet," including coconut oil, "had less heart disease." *Id.* at 303:23-304:6; *see also* Ex. 44 (Nutiva website stating, "The traditional Pacific Islander diet included large quantities of coconut, and those who still follow this diet have a low incidence of heart disease or obesity.").

In fact, in a web article titled "Coconut Myths & Coconut Nutrition," Nutiva claimed that "Since the 1960s, coconut oil has been unfairly labeled as 'unhealthy,'" asserting that studies showing unhealthy effects were supposedly conducted on *hydrogenated* versions containing trans fat. Ex. 44, "Coconut Myths & Coconut Nutrition" (Aug. 15, 2012). Nutiva then touted coconut as "one of the most healthy superfoods in the world," including because "Coconut oil is cholesterol- and trans fat-free . . . and is rich in medium-chain 'good fats' that doctors recommend." *Id.* Nutiva told consumers it was "well positioned to deliver the nourishing 'good fats' in its . . . coconut oil products, which can play a vital role in our health." *Id.*[10]

---

[8] Ms. Kaplan testified this was "consistent with [her] experience of how Nutiva consumers view the word superfood on Nutiva's products[.]" *See* Kaplan Dep. Tr. at 138:13-139:4.

[9] In Europe, it is illegal to market a food as a "superfood" unless there is a specific medical claim for the food supported by credible scientific research. Nutiva does not market its coconut oil as a "superfood" in Europe. *See* Roulac 30(b)(6) Dep. Tr. at 315:18-316:10; *see also* Kaplan Dep. Tr. at 80:22-81:25.

[10] Tellingly, when confronted with this same information as it was presented in a Nutiva-authored PowerPoint presentation, Nutiva's CEO protested that he "never approved that" presentation, blaming it on "independent contractors," since "this is not something that . . . Nutiva . . . would ever approve of," Roulac Dep. Tr. at 317:13-19; *see generally id.* at 317:13-322:15; *compare* Ex. 42, Roulac Dep. Ex. 92.

Not surprisingly given Nutiva's marketing its coconut oil as healthy and a health alternative to butter, consumer research Nutiva commissioned found health and nutrition were the most important reasons for purchasing its coconut oil. One study found "███████ was the "███████" for ██% of Nutiva Coconut Oil purchasers, and that up to ██% were motivated to "█████████████████████████████ ███." Ex. 45, Kaplan Dep. Ex. 8, NUT117-55 at NUT138. Another confirmed that "Health benefits are . . . among top reasons for use," Ex. 30 at BUZZBACK128. Yet another found that "███████████" was "█████████████████████████████" among ██% of Nutiva purchasers. Ex. 46, NUT7096-7143 at NUT7108. Mr. Blomquist was thus "sure" that at least "some" consumers were "willing to pay more for the Nutiva Coconut Oils because they're marketed as [ ] being healthy," Blomquist Dep. Tr. at 144:8-11. And Ms. Kaplan agreed Nutiva buyers are "willing to spend more money on products that are healthier," Kaplan Dep. Tr. 174:13-18.

Despite using health messages to drive coconut oil sales and increase it profits, Nutiva "w[asn't] a research company," and so "didn't do research on the health benefits of coconut." Kaplan Dep. Tr. at 293:4-10; *see also id.* at 335:13-336:6; *compare* Blomquist Dep. Tr. at 143:14-18 (Mr. Blomquist did not know "what they . . . have used to substantiate" "Nutiva's representations that the coconut oils are healthy"). Even today, Nutiva does not actually believe coconut oil consumption provides any health benefits. *See* Roulac 30(b)(6) Dep. Tr. at 16:3-16; Kaplan Dep. Tr. at 72:23-73:1, 75:7-10 (Ms. Kaplan "can't definitively say whether" coconut oil "i[s] a superfood or not," and "It doesn't really matter what I believe. It was my job to market it as a superfood."), 103:20-105:10 (acknowledging impropriety of making "health claims" on coconut oil); 281:20-284:14 (similar discussion). Nutiva's CEO even testified that Nutiva's response to an Interrogatory asking it to identify substantiation, identified three scientific sources *only* to establish the *facts* that "there is such thing as MCTs; that coconut oil does contain . . . 62 percent MCT; [and] that it . . . doesn't contain hydrogenated fats, and it doesn't contain cholesterol." *See* Roulac 30(b)(6) Dep. Tr. at 334:16-338:4.

Not only did Nutiva have no real basis for believing its coconut oil was healthy while it labeled its coconut oil with health and wellness claims, but Nutiva was actually aware of evidence that coconut oil consumption was unhealthy, *see* Kaplan Dep. Tr. at 292:11-19 ("Nutiva is no stranger to the debate on saturated fats"). For example one consumer complained that "SINCE I HAVE BEEN USING COCONUT OIL, MY HDL IS GOING DOWN AND MY LDL IS RISING????? I HAVE NOT CHANGED MY DIET

9

1   AND DO NOT TAKE ANY MEDIATIONS, MY ONLY CHANGE ID [sic] THE COCONUT OIL!!!!!"

2   Ex. 47, Roulac Dep. Ex. 3, NUT387-88 at NUT388. Another sent Nutiva a link indicating that coconut oil is

3   "highly inflammatory," Ex. 48, Roulac Dep. Ex. 5, NUT575-76 at NUT575.

4           Despite this, Nutiva pushed its marketing position, with its customer service representatives telling

5   consumers its coconut oil was "healthy," *see*, *e.g.*, Ex. 49, NUT386; Ex. 50, NUT868, recommending they

6   eat *three tablespoons per day or more*, *see* Ex. 51, NUT888; Ex. 52, Kaplan Dep. Ex. 92 (NUT515); Ex. 53,

7   Kaplan Dep. Ex. 94 (NUT587),[11] and referring them to a book, "The Coconut Oil Miracle," in which its

8   author, Bruce Fife, makes incredible claims that coconut oil is effectively a cure-all, *see*, *e.g.*, Exs. 54-64,

9   NUT422, NUT460-61 at NUT460, NUT479-80 at NUT479, NUT481, NUT482, NUT555, NUT556,

10  NUT561, NUT564-65 at NUT564, NUT790-91 at NUT790, NUT1040. And when a consumer with heart

11  disease presented Nutiva with a source asserting that "coconut oil should be avoided because of the high

12  saturated fat content," and asking Nutiva for "scientific literature, based on studies, that says coconut oil is

13  good for you," while noting her "life depends on getting the right information," Mr. Roulac himself instructed

14  consumer service representatives to direct her to its "Coconut Myths" article—the one containing the

15  information Mr. Roulac testified for purposes of this litigation that he would "never approve." *See* Ex. 56,

16  NUT479-480 at NUT479; *supra* n.10.

17          Market data demonstrate that Nutiva's strategy—which it maintained for over a year into this

18  litigation, *see* Dkt. No. 92 at 10—was highly successful, with Nutiva consistently ranked as the top coconut

19  oil manufacturer in the nation. *See* Ex. 65, Roulac Dep. Ex. 65 (NUT6071-72); Ex. 66, Roulac Dep. Ex. 67

20  (NUT6924-48); Ex. 67, Roulac Dep. Tr. 68 (NUT6865-89); Ex. 68, Roulac Dep. Tr. Ex. 93 (NUT6411-42

21  at NUT6422) ("███████████████████████████"); Ex. 69, NUT7009 (Nutiva is the

22  "#1 SELLING COCONUT OIL BRAND 10 YEARS IN A ROW!," with a "24% $$ SHARE OF

23  CATEGORY"); Kaplan Dep. Tr. 340:5-9. This success translated into over $█ million of profit on the class

24  products alone. (Fitzgerald Decl. ¶ 55.)

25

26

---

27  [11] Privately, Nutiva's Marketing Manager avoids coconut oil, which she likens to butter and bacon, and says
28  she would be concerned for her health if forced to consume three *teaspoons* of coconut oil. *See* Kaplan Dep.
    Tr. at 91:17-93:20, 109:11-110:17, 125:21-126:5.

**C.    Plaintiffs Purchased Nutiva's Coconut Oil in Reliance on Labeling Claims Suggesting the Products Were Healthy and Rendered the Coconut Oils Misbranded**

Plaintiff Preston Jones purchased Nutiva Coconut Oil on several occasions between January 2014 and February 2015. Jones Decl. ¶¶ 5-7. In doing so, he relied on labeling claims suggesting the product was healthy, and a healthy substitute for butter, including "100% Less Cholesterol than Butter," "is 'better than butter' on bread, vegetables or popcorn," "a nutritious substitute in baking," and "0g trans fat." *Id.* ¶¶ 2-4.

Plaintiff Shirin Delalat periodically purchased Nutiva Extra Virgin Coconut Oil from 2012-2014, including from Costco. *See* Delalat Decl. ¶ 2; Ex. 70, COSTCO1-2. In purchasing the product, Ms. Delalat relied on labeling claims including "100% Less Cholesterol than Butter," "'better-than-butter' replacement on bread, vegetables, or popcorn," "a nutritious substitute in baking," and  "Zero Trans Fats." *Id.* ¶ 2.

**D.    Claims that Nutiva's Coconut Oil is Healthy, and a Healthy Substitute for Butter, are False and Misleading**

For Nutiva's coconut oil, "the vast majority of usage . . . is for cooking." Kaplan Dep. Tr. 159:14-15. Nutiva encourages the increased consumption (and thus sale) of its Coconut Oil by "com[ing] up with recipes to give people," which Nutiva places on the label. *See id.* at 156:13-22; *see also*, *e.g.*, Ex. 29 (78 oz. watercolor label with recipe). Consistent with its goal, research Nutiva commissioned showed that ███% of its purchasers ████████████████████, while ████████████████████. Ex. 45, Kaplan Dep. Ex. 8 at NUT142; *see also* Kaplan Dep. Tr. at 128:8-20 (study findings comport with Ms. Kaplan's experience). A separate survey consistently found that "[a]mong Nutiva Buyers, nearly 8 in 10 coconut oil purchasers use this superfood at least once a day, which is in line with the varied reported usages: for consumption (e.g., sautéing, baking) and/or personal care . . . ." Ex. 30 at BUZZBACK91; *see also id.* at BUZZBACK128 ("Nearly 9 in 10 Nutiva Coconut Oil users use this product at least once a day for both physical consumption and beauty use."); Kaplan Dep. Tr. at 146:2-6, 171:23-172:2 (study findings comport with Ms. Kaplan's experience). In the survey, 85% of Nutiva Buyers reported using the coconut oil in sautéing, and 78% in baking. Ex. 30 at BUZZBACK128.

But contrary to Nutiva's representations, its Coconut Oil is not healthy, and is not a healthy replacement for butter. Dr. Michael Greger, M.D., FACLM, performed a comprehensive literary review of over 250 articles relevant to the issue here (from an initial list of over 2,400 potentially-relevant articles),

and additional sources Nutiva claimed as substantiation. Greger Report at 4-7. Dr. Greger's review confirms what experts have known for decades: consuming coconut oil consistently increases LDL-cholesterol, total cholesterol, and inflammation, and impairs critical arterial function. These physiological effects are well understood, and there is scientific consensus that they directly increase risk of cardiovascular disease and other morbidity.

Decades of research establishes "total and LDL cholesterol blood levels are two of the most important risk factors in predicting coronary heart disease (CHD), with higher total and LDL cholesterol levels associated with increased risk of CHD." *Id.* at 9. Studies on coconut oil consumption "consistently" show it causes "a pronounced negative physiological impact that increases risk of cardiovascular disease." *Id.* For example, researchers performing a year-long study demonstrated that reducing coconut oil consumption from 2.75 tablespoons per day to 0.75, lowered participants' LDL cholesterol by 21.8% and total cholesterol by 11.9%, reducing coronary morbidity and mortality risk by 6-8%. *See id.* at 10 (citation omitted). Coconut oil also significantly increases CHD risk by increasing inflammation, and impairing both arterial endothelial function and the anti-inflammatory properties of "good" HDL cholesterol. *Id.* at 16 (citations omitted). And coconut oil's detrimental health effects are not limited to long-term consumption, but are *immediate*, as a single meal can, within hours, "significantly raise cholesterol levels and inhibit arterial endothelial function," both "key risk factors," *id.* at 9-10 (citations omitted).

The only three articles Nutiva has cited as the basis for its health claims, *see id.* at 5-7, are not contrary. One demonstrates only that coconut oil and butter both negatively affect heart health. *See id.* at 14. The two others "are irrelevant because neither studied coconut oil." *Id.* One "specifically excludes coconut oil from its list of higher quality fats due to its saturated fat content." *Id.* (citation omitted). The other "tested purified medium-chain triglycerides, which lack the cholesterol-raising long-chain saturated fats found in coconut oil," and therefore "cannot be extrapolated to coconut oil." *See id.* at 14-15 (citation omitted).

In sum, "[t]he relevant scientific literature demonstrates that coconut oil substantially increases cardiovascular and metabolic disease risk by adversely affecting blood lipids, artery function, and insulin sensitivity," and therefore "is unhealthy and is not a healthy replacement for butter," *Id.* at 1-2. Instead, "[t]he scientific community has known for more than a half century that coconut oil consumption adversely impacts cardiovascular risk," and "[t]he majority of studies subsequently published in peer reviewed medical

literature have since validated this initial assessment." *Id.* at 18.

**E.      As Nutiva Admits, its Coconut Oil was Misbranded**

In addition to being misleading, several labeling statements violated FDA-promulgated nutrient content regulations and thereby also violated the UCL's "unlawful" prong. The primary purposes of nutrient content regulations is "[t]o ensure that consumers are not misled and are given reliable information." 56 Fed. Reg. 60421, 60423 (Nov. 27, 1991) (citations omitted); *see also* 58 Fed. Reg. 2302, 2302 (Jan. 6, 1993) ("basic objectives" of labeling laws include "assist[ing] consumers in selecting foods that can lead to healthier diets," and "eliminat[ing] consumer confusion by establishing definitions for nutrient content claims"). Thus, food manufacturers are prohibited from using nutrient content claims unless specifically permitted, *see* 21 C.F.R. § 101.13; *Reid v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015) ("Under the FDA regulations, the general rule is that 'nutrient content claims' are not permitted on food labels."). Nutiva's "100% Less Cholesterol than Butter" and "Zero Trans Fat" claims are categorically prohibited, and its "0g Trans Fat" claim is prohibited absent an adjacent disclosure directing viewers to the nutrition information for fat content. Nutiva has admitted it violated FDA regulations. *See* Roulac 30(b)(6) Dep. Tr. at 172:5-12.

**F.      The Class Paid a Premium Due to Nutiva's Unlawful and Misleading Labeling Claims**

The class alleges that by using the challenged claims to convey a health message, Nutiva was able to charge more than it otherwise could have; and that because the Nutiva Coconut Oil was not healthy, and was not a healthy replacement for butter, it was worth less than what class members paid.

To quantify the marketplace premium associated with the challenged claims, Dr. J. Michael Dennis designed and performed a rigorous survey employing the well-accepted conjoint methodology and using accepted survey techniques, testing those challenged labeling claims that most strongly convey the messages that Nutiva Coconut Oil is healthy, and healthier than butter. The results show significant premiums associated with the challenged health claims. *See*, *e.g.*, Ex. 2, May 8, 2017 Expert Report of J. Michael Dennis, Ph.D. ("Dennis Report"), at 22 (Table). This is unsurprising, given that Nutiva Coconut Oil was priced many times higher than competing products that did not use health claims. *See* Ex. 71, NUT454 & Ex. 72 (photos of Louana Coconut Oil); *see also* Kaplan Dep. Tr. at 143:20-144:4 (Ms. Kaplan "regularly hear[d] from consumers that Nutiva's products were expensive," and specifically, Nutiva was "on the higher

end of the Coconut Oil pricing"), 161:4-21 (to be profitable, Nutiva had to price its coconut oil high, and thus was "one of the[]" "most expensive Coconut Oil[s] among its peer" "in the culinary set"), 357:14-358:1.

## IV.    LEGAL STANDARDS

Under Rule 23, "'[a] class action may be maintained' if two conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b)." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ["*Shady Grove*"]. But these are the *only* criteria that must be met. *Briseno v. ConAgra Foods, Inc.*, 844 F. 3d 1121, 1124-26 (9th Cir. 2017). Rule 23 "[b]y its terms . . . creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove*, 559 U.S. at 398 (citations omitted). Although a certification motion requires a district court to conduct a "rigorous analysis" that "[f]requently . . . will entail some overlap with the merits," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ["*Dukes*"], the merits may be considered "only" to "determin[e] whether the Rule 23 prerequisites to class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013).

## V.    ARGUMENT

### A.    The Requirements of Rule 23(a) are Satisfied

#### 1.    Numerosity

Rule 23(a)(1) is satisfied if "the class is so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1). Nutiva's Coconut Oil has been sold in "large grocery chains, independent retailers, regional chains, . . . [and] online." Blomquist Dep. Tr. at 114:3-9. Upon removing the case, Nutiva's CEO testified that "Consumers in the United States who purchased the Products during the class period would number in the tens of thousands." Dkt. No. 3, Roulac Decl. ¶ 5. There are more than ███ million units included in the class, with retail sales of over $167 million. Weir Report ¶ 60; Fitzgerald Decl. ¶¶ 51-54 & Ex. 33. Nutiva agreed the number of purchasers was likely in the millions. Roulac 30(b)(6) Dep. Tr. at 14:19-15:7; *see also* Ex. 7, Nutiva Response to Request for Admission No. 27. Numerosity is easily satisfied.

#### 2.    Commonality

Rule 23(a)(2) is satisfied if "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), which means that "the class members have suffered the same injury," so that their claims "depend

upon a common contention . . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. "What matters" is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quotation omitted). Questions "have that capacity" when they have a "close relationship with the . . . underlying substantive legal test." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). "Where questions common to class members present significant issues that can be resolved in a single adjudication 'there is clear justification for handling the dispute on a representative rather than on an individual basis.'" *Rodman v. Safeway, Inc.*, 2014 WL 988992, at *4 (N.D. Cal. 2014) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) ["*Amchem*"]). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts," *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "[A] common nucleus of operative fact is usually enough to satisfy the commonality requirement," *Rasario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), which exists "where a defendant has engaged in standardized conduct toward members of the class," *Hale v. State Farm Mut. Auto. Ins. Co.*, 2016 WL 4992504, at *6 (S.D. Ill. Sept. 16, 2016) (citing *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (collecting cases)).

Commonality is satisfied here because all class members were exposed to labeling claims that rendered the products misbranded and conveyed the same allegedly misleading messages that Nutiva's Coconut Oil is healthy, and a healthy substitute for butter. *See Pettit v. Proctor & Gamble Co.*, 2017 WL 3310692, at *2-4 (N.D. Cal. Aug. 3, 2017) (certifying class and rejecting defendant's argument that differing definitions of "flushable" wipes showed a lack of commonality, since this inquiry is subsumed by the reasonable consumer test). The minor variation in the product labels during the class period does not undermine commonality because the Class labels all bore the statements "100% Less Cholesterol than Butter," and "zero trans fat," or "0g Trans Fat," which rendered them misbranded.[12] Likewise, the labels, regardless of background color, always conveyed the same misleading health messages through a small set of labeling statements that did not materially vary. Thus each Class member, whether she purchased the

---

[12] Moreover, both labels bore the misbranded "100% Less Cholesterol than Butter" claim, and the misbranded "Zero Trans Fat" and "0g Trans Fat" claims. If the Court nevertheless finds that the design elements or other label differences means there are *not* common issues as between Extra Virgin (yellow label) and Virgin (watercolor label) purchasers, this problem could be easily solved by designating two subclasses, with Ms. Delalat representing the former, and Mr. Preston the latter.

yellow, red, or watercolor label, will use the same evidence, for example, Dr. Greger's testimony, to demonstrate deception. *C.f. Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687, 693-94 (S.D. Fla. 2010) (rejecting defendant's argument that individual questions predominated "because each plaintiff was likely exposed to a unique array of advertising statements," where defendant "employed a number of devices, jingles, and turns of phrase to convey the common message that eating Yo-Plus aids in . . . digestive health"), *vacated on other grounds*, 635 F.3d 1279 (11th Cir. 2011).

### 3. Typicality

The typicality requirement under Rule 23(a)(3) is satisfied if plaintiffs' claims "are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "[T]he focus should be on the defendants' conduct and plaintiff's legal theory," *Simpson v. Fireman's Fund Ins.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005) (quotation marks omitted).

"A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (quotation and citations omitted). *See also In re Brazilian Blowout Litig.*, 2011 WL 10962891, at *3 (C.D. Cal. Apr. 12, 2011) ["*Brazilian Blowout*"]. "Rule 23 'does not require the named plaintiffs to be identically situated with all other class members. It is enough if their situations share a common issue of law or fact and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief." *Spencer v. Beavex, Inc.*, 2006 WL 6500597, at *11 (S.D. Cal. Dec. 15, 2006) (quoting *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990)). "In instances where it is alleged that the defendant[] engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent members." *Salvagne v. Fairfield Ford Inc.*, 264 F.R.D. 321, 328 (S.D. Ohio 2009).

Here, plaintiffs and all Class members were exposed to labels containing materially the same misleading and unlawful labeling claims conveying the common messages that the product is healthy, and a

healthy substitute for butter. Plaintiffs allege all Class members were injured in the same manner because they all paid a premium attributable to the label's false, misleading, and unlawful claims. Plaintiffs' claims are therefore typical of the class's claims. *See Brazilian Blowout*, 2011 WL 10962891, at *4; *Pettit*, 2017 WL 3310692, at *4.

### 4. Adequacy

Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4) "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020 (citation omitted). Plaintiffs are adequate class representatives because they are *bona fide* purchasers with standing, have no conflicts of interest, are aware of their obligations as class representatives, and will vigorously prosecute the case on behalf of the class, *see* Jones Decl. ¶¶ 8-11; Delalat Decl. ¶¶ 3-7. *See Brazilian Blowout*, 2011 WL 10962891, at *5 (class representatives adequate where they "submitted declarations" stating "they understand their responsibilities as class representatives, that no conflicts exist between their interests and other members of the class, and that they intend to vigorously pursue all claims asserted in this lawsuit"); *c.f. Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) (A plaintiff is adequate if he "understands his duties and is currently willing and able to perform them. The Rule does not require more."). Moreover, plaintiffs have retained counsel with significant experience in prosecuting false advertising consumer class actions involving food products—and in particular involving allegations of false health claims on coconut oil—who have no conflicts, and are therefore adequate Class Counsel. Fitzgerald Decl. Ex. 73; Joseph Decl. Ex. A.

### B. The Requirements of Rule 23(b)(3) are Satisfied

### 1. Predominance

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623; *see also* Fed. R. Civ. P. 23(b)(3). Predominance exists where common questions present "a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal quotation, brackets, and alteration omitted). This includes where classwide

17

1   "damages stemmed from the defendant's actions that created the legal liability." *See Levya v. Medline Indus.*

2   *Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013)

3   ["*Comcast*"]). "[W]hen common questions present a significant aspect of the case and they can be resolved

4   for all members of the class in a single adjudication, there is clear justification for handling the dispute on a

5   representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022 (quotation omitted).

### a.   The Class's Claims will be Resolved through Objective Standards and Common Evidence that Apply Classwide

8   "Considering whether 'questions of law or fact common to class members predominate' begins . . .

9   with the elements of the underlying causes of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S.

10  804, 809 (2011).

### i.   Consumer Fraud

12  California's FAL, CLRA, and UCL's "fraudulent" prong "prohibit 'not only advertising which is

13  false, but also advertising which, although true, is either actually misleading or which has a capacity,

14  likelihood or tendency to deceive or confuse the public,'" *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938

15  (9th Cir. 2008) (quotation omitted). This is "judged by the effect it would have on a reasonable consumer,"

16  *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506-507, 510 (2003). *See also Pulaski Middleman,*

17  *LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015) ["*Pulaski*"] (under UCL and FAL's reasonable

18  consumer standard "'it is necessary only to show that members of the public are likely to be deceived.'"

19  (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009))). "[T]he primary evidence in a false advertising

20  case is the advertising itself," *Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003), and "[t]he 'misleading

21  character' of a given representation 'appears on applying its words to the facts.'" *Jefferson v. Chase Home

22  Fin.*, 2008 WL 1883484, at *17 (N.D. Cal. Dec. 14, 2007) (quoting *Colgan*, 135 Cal. App. 4th at 679).  Thus,

23  a product's packaging is misleading if it objectively presents "a likelihood of confounding an appreciable

24  number of reasonably prudent purchasers exercising ordinary care." *Brockey*, 107 Cal. App. 4th at 99; *see

25  also Petit*, 2017 WL 3310692, at *3.

26  If plaintiffs demonstrate Nutiva's labeling was likely to deceive under this objective "reasonable

27  consumer" test, they will have established its liability as to all Class members, because relief under the FAL

28  and UCL fraud prong "is available 'without individualized proof of deception, reliance and injury,' so long

18

as the named plaintiff[] demonstrate[s] injury and causation." *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 482 (C.D. Cal. 2012) (quotation omitted); *see also Moyle v. Liberty Mut. Ret. Benefit Plan*, 823 F.3d 948, 964-65 (9th Cir. May 20, 2016) ("[W]here the defendant's representations were allegedly made on a uniform and classwide basis, individual issues of reliance do not preclude class certification." (citing *Hanon*, 976 F.2d at 509 ("non-reliance is not a basis for denial of class certification."))). Here, common evidence—Dr. Greger's testimony that Nutiva's Coconut Oil is not healthy, and not a healthy substitute for butter—can establish deception for the whole Class.

While the Class's CLRA claims have a reliance or causation element, "[t]he causation required by the CLRA does not make plaintiffs' claims unsuitable for class treatment because causation as to each class member is commonly proved more likely than not by materiality." *Guido*, 284 F.R.D. at 482 (quotation omitted). *See also Tobacco II Cases*, 46 Cal. 4th at 327 (a "presumption, or at least an inference, of reliance arises" upon showing "a misrepresentation was material"). "As materiality is an objective inquiry [under the CLRA], no individualized examination of materiality is necessary." *Lanovaz v. Twinings N. Am., Inc.*, 2014 WL 1652338, at *4 (N.D. Cal. Apr. 24, 2014). *See also Mass. Mut. Life Ins. Co. v. Super. Ct.*, 97 Cal. App. 4th 1282, 1294 (2002) (materiality presents a "common question of fact suitable for treatment in a class action"); *accord Amgen*, 133 S. Ct. at 1195-96 (since materiality is objective, "materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)).

While this objective standard obviates the need for *any* proof of materiality at certification, *Amgen*, 133 S. Ct. at 1189, 1195, 1204, here the Class has developed strong evidence that the challenged claims are material. Namely, Nutiva's consumer research, the testimony of its witnesses, and Dr. Dennis' survey findings that actual Nutiva purchasers attached a premium to the challenged claims all demonstrate materiality. *See Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *8 (N.D. Cal. July 15, 2016) (materiality can be shown by, *inter alia*, "third party's, or defendant's own, market research" or "evidence of a price premium attributable to [challenged] representations"); *see also Brockey*, 107 Cal. App. 4th at 99-100. And, of course, it is just common sense that "consumers rely on health-related claims on food products in making purchasing decisions," *Bruton v. Gerber Prods. Co.*, 2014 WL 172111, at *11 (N.D. Cal. Jan. 15, 2014).

Further, defendants' use of prohibited nutrient content claims, like "100% Less Cholesterol than Butter," "zero trans fat," and "0g Trans Fat," are both material and misleading as a matter of law, since "the

legislature's decision to prohibit a particular misleading advertising practice is evidence that the legislature has deemed that the practice constitutes a 'material' misrepresentation, and courts must defer to that determination." *Rahman v. Mott's LLP*, 2014 WL 6815779, at *7 (N.D. Cal. Dec. 3, 2014) (citing *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (citation omitted)). *C.f. Brown v. Hain Celestial Group, Inc.*, 2015 WL 3398415, at *7 (N.D. Cal. May 26, 2015) ("the California legislature's decision . . . to prohibit the sale, labeling, or representation of products as 'organic,' when they contain less than 70% organic ingredients, establishes as a matter of law that violations . . . are 'material' misrepresentations under the UCL."); *Kumar*, 2016 WL 3844334, at *7-8.

The objective tests for deception and materiality "renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate class members' 'individual interaction with the product.'" *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) (quotation omitted); *accord Amchem Prods.*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer . . . fraud"); *Allen v. Similasan Corp.*, 306 F.R.D. 635, 644 (S.D. Cal. 2015) (reasonable consumer test "is an objective test, and as such is a common question determinable on a class-wide basis"). Here, "the predominating common issues include whether [defendant] misrepresented" that the Nutiva Coconut Oil is inherently healthy, and healthier than butter, "and whether the misrepresentations were likely to deceive a reasonable consumer." *See Johns v. Bayer Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2012); *see also In re Ferrero Litig.*, 278 F.R.D. 552, 560 (S.D. Cal. 2011).

### ii.    "Unlawful" Misbranding

Plaintiffs bring separate claims for misbranding under the UCL's unlawful prong, which "borrows" predicate legal violations and treats them as independently actionable, *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 871 (2002); *Gold v. Lumber Liquidators, Inc.*, 2015 WL 7888906, at *6 (N.D. Cal. Nov. 30, 2015) (prongs of UCL are independent and separate claims). The Class alleges the claims "100% Less Cholesterol than Butter," and "0g trans fat" (or "Zero trans fats") violate FDA nutrient content regulations. (FAC ¶¶ 79-99.) Stating a UCL "unlawful" prong claim for violation of FDA regulations "include[s] no requirement that the public be likely to experience deception." *See Bruton v. Gerber Prods. Co.*, --- Fed. Appx. ----, 2017 WL 3016740, at *2 (9th Cir. July 17, 2017) (citations omitted); *see also Hadley v. Kellogg Sales Co.*, --- F. Supp. 3d ----, 2017 WL 3453391, at *35 (N.D. Cal. Aug. 10, 2017) (Recognizing "err[or]

20

[in] imposing a 'reasonable consumer' test for unlawful prong UCL causes of action predicated on violations of the FDA regulations.").

Whether Nutiva is liable for misbranding is a question common to the class because resolving these claims requires only applying the regulations to the labels to determine their compliance, so "proving the . . . 'unlawful' prong[] of the UCL . . . do[es] not depend upon any issues specific to individual consumers," *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 242 (N.D. Cal. 2014). In short, "[t]he label is either illegal or it is not," *Ang v. Bimbo Bakeries USA, Inc.*, 2014 WL 1024182, at \*8 (N.D. Cal. Mar. 13, 2014), and that determination will apply to all class members the same so that common questions predominate.

### iii.   Breach of Warranty

A warranty is a guarantee that something contemplated by a contract has a particular character or quality; the promising party in effect insures against the possibility it is not as warranted. *See Mary Pickford Co. v. Bayly Bros., Inc.*, 12 Cal. 2d 501, 520 (1939) (warranty obligation "is absolute, and is imposed as a matter of law irrespective of whether the seller knew . . . falsity of his representations."). Breach of warranty requires: "(1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *In re ConAgra Foods*, 90 F. Supp. 3d 919, 984 (C.D. Cal. 2015) (quotation omitted); Cal. Com. Code §§ 2313(1)(a)-(b) .

Plaintiffs allege Nutiva warranted its coconut oils as "a nutritious substitute in baking," and its Virgin Coconut Oil as "Superfood." "Whether such a statement constitutes an express warranty, [and] whether that warranty was breached . . . are issues subject to common and generalized proof." *Martin v. Monsanto Co.*, 2017 WL 1115167, at \*7 (C.D. Cal. Mar. 24, 2017). And "[b]ecause reliance is not an element of express warranty claims under California law, common questions predominate and class action treatment is appropriate." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 411 (S.D.N.Y. 2015) (citations omitted); *accord Karim v. Hewlett-Packard Co.*, 311 F.R.D. 568, 573 (N.D. Cal. 2015) (plaintiffs "need not establish reliance on a classwide basis" for California express warranty claims). The Class also benefits from a presumption that "all statements of the seller" become part of the basis of the bargain "unless good reason is shown to the contrary." *Karim*, 311 F.R.D. at 574 (quoting Cal. Com. Code § 2313, comment 8); *see also Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1229 (2010) ("Any affirmation, once made, is part of the agreement unless there is 'clear affirmative proof' that the affirmation has been taken out of the agreement.");

*Keith v. Buchanan*, 173 Cal. App. 3d 13, 23 (1985). Thus, there are *no* individualized questions that might colorably predominate over the common questions because "[w]hether Defendant's statements about the Products' efficacy are affirmations of fact . . . focuses on defendant's labels, not consumers, and therefore is plainly subject to common proof." *See Allen*, 306 F.R.D. at 648-49; *see also*; *ConAgra*, 90 F. Supp. 3d at 985 (certification proper where "whether defendant misrepresented its product and whether such misrepresentations breached warranties are issues common to members of the putative class").

### b.   Application of California Law to a Nationwide Class is Appropriate

Nutiva has always been "incorporated, organized, and existing under the laws of California." Dkt. No. 3, Roulac Decl. ¶ 3. California is the "principal place of business . . . where the majority of Nutiva's corporate books, decision makers, and management has been and continues to be located." *Id.* ¶ 4; *see also* Roulac 30(b)(6) Dep. Tr. at 12:13-21. It has no other corporate offices; all labeling decisions were made out of California. Roulac 30(b)(6) Dep. Tr. at 12:22-13:7. "District courts routinely apply the . . . CLRA[] and . . . UCL[] . . . to nationwide classes." *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 547 (C.D. Cal. 2012) (collecting cases). In doing so, courts have frequently found that evidence of the type plaintiffs proffer here satisfies the initial burden of showing that applying California law to a nationwide class is proper, as should the Court here.[13] *See Opperman v. Path, Inc.*, 2016 WL 3844326, at *8-9 (N.D. Cal. July 15, 2016); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 656-57 (C.D. Cal. 2014); *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1160 (C.D. Cal. 2012); *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 538-39 (C.D. Cal. 2011); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010); *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 339-40 (N.D. Cal. 2010); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 589 (C.D. Cal. 2008); *see also Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1185-89 (2015); *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224 (2001).

---

[13] If the Court does not certify a nationwide class, plaintiffs request leave to add a California purchaser of Nutiva Virgin Coconut Oil as a class representative, if necessary, and to amend the Complaint to add claims under Virginia's consumer protection laws (with supplemental briefing regarding the Rule 23(a) and 23(b)(3) requirements as they apply to these laws); and request that the Court thereafter certify California and Virginia subclasses, rather than a nationwide class.

c.  **The Class's Marketplace Premium Damages Model is Consistent with its Theory of Liability, and Capable of Measuring Damages Classwide**

At the class certification stage, a plaintiff must show "damages are capable of measurement on a classwide basis," in a manner "consistent with [plaintiff's] liability case," *Comcast*, 133 S. Ct. at 1433, 1434 (quotation omitted). "Often, this will impose only a very limited burden." *Lilly*, 308 F.R.D. at 244. Plaintiff need only "present a *likely* method for determining class damages," "it is not necessary to show that this method will work with certainty," *Chavez v. Blue Sky Natural Beverage Corp.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (emphasis added, quotation omitted). "If damages are capable [of] measurement on a class-wide basis, questions of individual damage calculations will not overwhelm questions common to the class." *Hale*, 2016 WL 4992504, at *8 (citing *Comcast*, 133 S. Ct. at 1433).

"The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Comcast*, 133 S. Ct. at 1435 (citation and emphasis omitted). Here, the marketplace price premium attributable to the misleading, unlawful, or breached warranties is a proper measure of restitution and damages. *See Stathakos v. Columbia Sportswear Co.*, 2017 WL 1957063, at *11 (N.D. Cal. May 11, 2017) (citing *In re Pom Wonderful LLC*, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, *22 (N.D. Cal. May 23, 2014); *Guido*, 284 F.R.D. at 479.

One widely-accepted method for determining the price premium is conjoint analysis, "a representative survey technique that permits an economist to analyze the value of various product attributes." Weir Report ¶ 21. *See Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *9 (S.D. Cal. Sept. 14, 2017) ("conjoint analysis is a generally accepted method for valuing the individual characteristics of a product"); *Kurtz v. Kimberly-Clark Corp.*, --- F.R.D. ----, 2017 WL 1155398, at *58 (E.D.N.Y. Mar. 27, 2017) (conjoint analysis "ha[s] previously been approved in consumer class actions as [a] reliable metholog[y] available for calculating the price premium attributable to a product characteristic"); *Guido v. L'Oreal*, 2014 WL 6603730, at *11 (C.D. Cal. July 24, 2014) (approving conjoint analysis damages model under *Comcast*). The premium determined from the conjoint survey "can then be multiplied by the number of units purchased by each class member to determine both total and individual damages." *Zakaria v. Gerber Prods. Co.*, 2016 WL 6662723, at *16 (C.D. Cal. 2016).

Many courts have found false advertising damages measurable on a classwide basis through conjoint analysis even before the conjoint survey was conducted, because it is widely-accepted as a reliable method for isolating a misrepresentation's price premium. *See*, *e.g.*, *Zakaria*, 2016 WL 6662723, at *14-16 (Because for class certification, matching "[t]he theories of liability and proposed methods for calculating damages [is] sufficient," where plaintiff merely proposed "using 'conjoint analysis' or 'hedonic regression' to calculate the price premium," "Plaintiff ha[d] presented a method for calculating damages that is tied to the theory of liability" satisfying *Comcast* requirements); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015) ("the Court disagrees that [the class's expert] must have already performed his proposed conjoint analysis").

While fully designing and conducting a survey is not required to demonstrate damages are capable of being measured, here the Class's survey expert, Dr. Dennis, has already performed a rigorous conjoint survey and analysis, demonstrating that the price premium attributable to the challenged claims can reliably be determined. *See generally* Dennis Report. And the Class's damages expert, Mr. Weir, has already used transactional retail sales data obtained from major national retailers, and scan data obtained from SPINS, to "estimate [the] sales of the Products in both dollars and units Nationwide during the proposed class period." Ex. 3, Weir Report at 18-19, ¶¶ 54-60. He then applied price premium data from Dr. Dennis's survey to the aggregate retail sales to calculate the class's restitution and damages. *See id.* at 20-24, ¶¶ 61-64.

Thus, plaintiffs have not only demonstrated that the Class's price premium model is properly tied to its theory of liability, but also that it is capable of measuring damages classwide. The calculation methodology is identical for every purchaser. And the amount of damages is identical for each different size of Nutiva Extra Virgin or Virgin Coconut Oil. In fact, the only individualized damages issue is the number of units a Class member purchased, but this is not predominating. *See Schramm v. JPMorgan Chase Bank, N.A.*, 2013 WL 7869379, at *5 (C.D. Cal. 2013). Accordingly, common questions concerning damages predominate, and the class should be certified. *Compare In re Scotts EZ Seed Litig.*, 304 F.R.D. at 413-14 ("Dr. Weir has provided enough evidence—at this stage—to satisfy the Court that a price premium associated with the 50% thicker claim exists."); *Sanchez-Knutson*, 310 F.R.D. at 539 ("The Court accepts Plaintiff's proffered expert's proposed conjoint analysis damages model for purposes of class certification, finding that it is sufficiently tied to Plaintiff's legal theory . . . .").

### 2.      Superiority

In determining whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," courts consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).[14] "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under [Rule 23(b)(3)] are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (quotation omitted). Superiority is satisfied here considering these factors.

#### a.      Class Members Have No Interest in Prosecuting Separate Actions

Class members have no interest in controlling individual actions because the product costs under $35. *See* Dennis Report ¶ 38. Superiority "is met '[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis.'" *Tait*, 289 F.R.D. at 486 (quoting *Wolin*, 617 F.3d at 1175); *see also Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980).

#### b.      No Manageability Concerns Outweigh the Superiority of the Class Action Device for Adjudicating the Class's Claims

This case concerns straightforward claims for consumer fraud, misbranding, and breach of warranty, based on a limited number of labeling statements that conveyed consistent health messages, made on a single-ingredient product that did not change. Manageability concerns will be minimal and cannot, in any event, scuttle class certification under the rubric of superiority "if no realistic alternative exists." *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996); *Culley v. Lincare Inc.*, 2016 WL 4208567, at *8 (E.D. Cal. Aug. 10, 2016) ("a class action is a plaintiff's only realistic method for recovery if there are multiple claims against the same defendant for relatively small sums."); *Levya*, 716 F.3d at 514-15.

## VI.      CONCLUSION

The Court should certify the Class, and appoint Class Representatives and Class Counsel.

---

[14] Plaintiffs are unaware of any other related litigation, and Nutiva resides in this District. Accordingly, factors (B) and (C) support superiority.

Dated: August 14, 2017               Respectfully submitted,

                                     /s/ Jack Fitzgerald

                                     **THE LAW OFFICE OF JACK FITZGERALD, PC**
                                     JACK FITZGERALD
                                     *jack@jackfitzgeraldlaw.com*
                                     TREVOR M. FLYNN
                                     *trevor@jackfitzgeraldlaw.com*
                                     MELANIE PERSINGER
                                     *melanie@jackfitzgeraldlaw.com*
                                     Hillcrest Professional Building
                                     3636 Fourth Avenue, Suite 202
                                     San Diego, California 92103
                                     Phone: (619) 692-3840

                                     **THE LAW OFFICE OF PAUL K. JOSEPH, PC**
                                     PAUL K. JOSEPH
                                     *paul@pauljosephlaw.com*
                                     4125 W. Point Loma Blvd. No. 206
                                     San Diego, California 92110
                                     Phone: (619) 767-0356

                                     ***Attorneys for Plaintiffs and the Proposed Class***