EXHIBIT 5

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESTON JONES and SHIRIN DELALAT, on behalf of themselves, all other similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>NUTIVA, Inc.,<br><br>Defendant. | Case No. 3:16-cv-00711-HSG |

## REBUTTAL DECLARATION OF DR. DENISE N. MARTIN

## JULY 7, 2017

# TABLE OF CONTENTS

I.          SUMMARY OF ASSIGNMENT                                          3

II.         QUALIFICATIONS                                                 3

III.        DOCUMENTS RELIED UPON                                          4

IV.         SUMMARY OF CONCLUSIONS                                         4

V.          BACKGROUND                                                     6

VI.         BASES FOR OPINIONS                                             7
A.          The "Price Premium" Results on Which Mr. Weir Relies Are
            Contradicted by Observed Retail Market Data                    7
*i.*        *Empirically, the Prices of Nutiva's Coconut Oil Products Are Not*
            *"Relatively High" Compared to Competitor Products*            7
*ii.*       *Empirically, the "But-For" Prices Used in Mr. Weir's Alleged*
            *Damages Estimate Are Inconsistent with the Pricing of Similar Coconut*
            *Oil Products by Nutiva's Competitors*                         9
B.          Mr. Weir's "Price Premium" Estimates Do Not Comport With Reality
            Because He Fails to Account for the Supply Side Response to the
            Changed Labeling and His Estimated "Price Premiums" Embed Other
            Flaws that Carry Over from the Conjoint Survey                 12
*i.*        *Mr. Weir's Proposed Formulaic Measure Does Not Consider How the*
            *Supply Side of the Market Would Have Been Affected by the Change in*
            *Labeling So Cannot Measure Any "Price Premium" Damages to*
            *Consumers*                                                    13
*ii.*       *Mr. Weir's Proposed Damages Model Will Suffer from All the Flaws*
            *Embedded in Dr. Dennis' Conjoint Survey*                      21
C.          Mr. Weir's Proposed Approach Cannot Estimate Any "Price Premium"
            Earlier in the Putative Class Period                           23

VII.        CONCLUSION                                                     26

## I.  SUMMARY OF ASSIGNMENT

1.      In connection with the above-captioned matter, I was asked by counsel for Nutiva, Inc. ("Nutiva" or "the Company") to evaluate the Declaration of Mr. Colin Weir (the "Weir Declaration").  Generally, I was asked to opine on whether Mr. Weir's proposed formulaic use of the "price premium" results derived from a conjoint survey and presented in the Expert Report of J. Michael Dennis (the "Dennis Report") will yield a reliable estimate either of the aggregate damages owed to the putative class of purchasers of Nutiva's coconut oil or to any individual class member.

## II.  QUALIFICATIONS

2.      I am a Managing Director at NERA Economic Consulting ("NERA") and have been with the firm since 1991.

3.      Before joining NERA, I earned a B.A. in Economics from Wellesley College and an M.A. and Ph.D., also in Economics, from Harvard University.  My undergraduate and graduate education included coursework in microeconomics, statistics and econometrics, including both classical and Bayesian methods.  Prior to attending Harvard, I served as an Assistant Economist at the Federal Reserve Bank of New York and as an Economic Consultant at Urban Systems Research & Engineering/Economica.

4.      While at Harvard, I taught classes in microeconomics, industrial organization and statistics to undergraduate and graduate students, and was awarded the Danforth Prize for Teaching.  Microeconomics includes consumer theory, which explains how individuals make decisions, including which products to buy given the attributes embodied in them and the prices at which they are offered.  Microeconomics also includes producer theory or industrial organization, which explains how firms make decisions, including what products to sell, with which attributes and at what prices.

5.      At NERA, I have been retained as an economic expert on more than 200 class actions, including consumer class actions, securities class actions and employment class actions. In the course of these assignments, I am frequently asked to analyze issues related to class certification and damages, including whether a formulaic method can be used to estimate damages on a class-wide basis.  I frequently work with large datasets involving pricing and sales data.  I routinely use and have provided testimony regarding the application of statistical and econometric techniques, including Bayesian methods.

6.      My C.V., including my most recent 4 years of testimony and 10 years of publications, is included as **Exhibit A**.

7.      NERA is being compensated for my services in this matter at $775 per hour. Other NERA consultants assisted me in this engagement and are being compensated at rates less than $775 per hour.  No part of NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

## III.  DOCUMENTS RELIED UPON

8.      A complete list of the documents I relied upon is provided in **Exhibit B**.

## IV.  SUMMARY OF CONCLUSIONS

9.      On the basis of my education and experience, as well as my review and analysis of the Dennis Report, the Weir Declaration, the Expert Report of Dr. Kent Van Liere (the "Van Liere Report"), as well as other documents and data produced in this matter, I have concluded that the formulaic method proposed by Mr. Weir will not yield a reliable estimate of alleged "price premium" damages either for the putative class as a whole or for any individual class member.  This opinion is supported by the following:

4

a) Mr. Weir does no empirical analysis of pricing in the coconut oil market.  The "price premium" estimates on which he relies, taken directly from the results of Dr. Dennis' conjoint survey analysis, are contradicted by observed retail market data.

- Empirically, contrary to Mr. Weir's assertion, the prices of Nutiva's coconut oil products are not "relatively high" compared to the prices of its competitors.

- Empirically, the "but-for" prices used in Mr. Weir's alleged damages estimate—that is, the market prices he and Dr. Dennis estimate for Nutiva coconut oil products without the challenged statements on the labeling— are inconsistent with the pricing of similar coconut oil products by Nutiva's competitors.

b) The "price premium" estimates relied upon by Mr. Weir do not comport with marketplace reality because: (i) he fails to account for the supply side response to the changed labeling to develop a realistic estimate of the but-for market prices; and (ii) the estimated "price premiums" embed other flaws that carry over from the conjoint survey.

- While Mr. Weir asserts that he and Dr. Dennis considered and accounted for supply side factors, neither has produced any analysis beyond generating a list of potential supply side factors.  In fact, Mr. Weir has ignored how Nutiva's marketing, production, product development or pricing strategy and decisions may have been different in the but-for world absent the alleged mislabeling.

- Mr. Weir's proposed estimate of alleged damages relies on the estimates of alleged "price premiums" generated by Dr. Dennis using the results from his conjoint survey.  As explained by Dr. Van Liere, Dr. Dennis' survey suffers from methodological flaws that render its results unreasonable and unreliable.  Any attempt by Mr. Weir to use these estimated "price premiums" as inputs into his calculation of alleged damages will result in alleged damages that are also flawed.

5

     c)   The approach proposed by Mr. Weir cannot estimate the "price premium," if any, that existed earlier in the putative class period.  The conjoint survey designed by Dr. Dennis generates static measures of consumer choices and as such, it cannot allow the determination of how much, if any, premium was placed by consumers on the alleged mislabeling at earlier periods in time.

## V.  BACKGROUND

10.    Mr. Weir was advised by Plaintiffs' counsel that "Nutiva misleadingly markets various coconut oil products both as inherently healthy, and as healthy alternatives to butter and other oils, despite the fact that coconut oil is actually inherently unhealthy, and a less healthy option to these alternatives" and that "Nutiva's coconut oil labeling and advertising also violates several federal and California state food regulations."[1]  He was asked "to ascertain whether it would be possible to determine damages on a class-wide basis using common evidence and, if so, to provide a framework for the calculation of damages suffered by the proposed class of Plaintiffs as a result of the allegedly false and misleading Claims."[2]  The products he references are "Extra Virgin and Virgin coconut oil, of sizes 14/15 ounce, 23 ounce, 29 ounce, 54 ounce, and 78 ounce."[3] The phrases and time periods he was informed are at issue are:

- ▪    "100% Less Cholesterol than Butter," "a nutritious substitute in baking," and "better-than-butter…on bread, vegetables, or popcorn"  (January 2012 to February 2017);

- ▪    "Zero Trans Fats" (January 2012 to July 2014);

---

[1]   Weir Declaration, ¶ 3.

[2]   Weir Declaration, ¶ 3.

[3]   Weir Declaration, footnote 2.  While Plaintiffs' complaint also references Nutiva Refined Coconut Oil as a product at issue in this litigation, the Weir Declaration does not refer to Refined Coconut Oil.  In addition, while I understand the Plaintiffs challenge nine statements with regard to the Nutiva coconut oil product labels (*see, e.g.* Order Granting in Part and Denying in Part Motion for Judgment on the Pleadings, Denying Motion to Remand, and Denying Motion to Strike, filed September 22, 2016 at 10:21-11:5.), only a subset of these nine statements are included in the Dennis Report and the Weir Declaration.

- ▪   "0g Trans Fat" (July 2014 to February 2017); and

- ▪   "Superfood" (July 2014 to February 2017).[4]

## VI.   BASES FOR OPINIONS

### A.   The "Price Premium" Results on Which Mr. Weir Relies Are Contradicted by Observed Retail Market Data

11.     Mr. Weir references discussions that he and Dr. Dennis had regarding "actual sales of the Products in the real-world marketplace," but he presents no empirical analysis of pricing in the coconut oil market.[5]  And, critically, as described in the Van Liere Report and discussed below, the alleged "price premiums" and implicit but-for prices generated by the conjoint survey results used in Mr. Weir's damages analysis are estimates only of subjective consumer preferences and are not measures of market prices.[6]  Indeed, an empirical analysis of the prices for the coconut oil prices of Nutiva's competitors show that these "price premiums" bear no resemblance to market prices.  I reviewed real-world market prices and found this data contradicts assertions made in the Weir Declaration and is inconsistent with the "price premium" estimates on which he relies.

### i.   Empirically, the Prices of Nutiva's Coconut Oil Products Are Not "Relatively High" Compared to Competitor Products

12.     Mr. Weir uses two anecdotes from consumer surveys to offer the opinion that Nutiva's prices are "relatively high."[7]  He does no analysis of the market prices of Nutiva or its competitors.  However, empirical evidence on actual retail prices from SPINS data does not support his assertion.[8]  Indeed, in a study that Nutiva requested from Bedrock Insights in 2014,

---

[4]   Weir Declaration, footnote 3.

[5]   Weir Declaration, ¶ 42.

[6]   Van Liere Report, ¶ 23.

[7]   Weir Declaration, ¶ 15.

[8]   SPINS is a provider of retail sales data for products sold in natural, organic, and specialty food stores, including Sprouts and certain other key retailers for Nutiva.  The available data includes aggregate unit and dollar sales over rolling 4- to 52-week periods for select date ranges (http://www.spins.com/, accessed July 6, 2017).

one focus was to investigate and develop solutions for observed "price gaps" relative to the competition.[9]  In large part, these gaps involved Nutiva being priced *lower* than the competition. For example, according to the Bedrock study, Nutiva's 15 ounce, 23 ounce, and 29 ounce virgin coconut oil products were, on average, priced lower per ounce than their key competitors in INFRA (Independent Natural Food Retailers Association) stores over the 52-week period ending May 18, 2014.[10]  In that same study, analysis of the national low promotional pricing shows that Nutiva's 15 ounce and 29 ounce containers were consistently the cheapest among competitor brands Dr. Bronner's, Spectrum, and Artisana.[11]

13.     My team's review of the SPINS data produced in this action showed similar results for other periods.  Over the 52-week period ending in January 24, 2016, for example, Nutiva's 14 ounce Virgin Coconut Oil in a glass container was priced, on average, at ███ in natural food stores.  In Sprouts stores, this same product was ██████████████████ and the 15 ounce virgin coconut oil in a PET (polyethylene terephthalate) container was priced ██████████████  Similar products such as Spectrum 14 ounce, Artisana 14 ounce, and Dr. Bronner's whole kernel 14 ounce coconut oils were priced, on average, at $11.85, $10.85, and $9.52, respectively, in natural food stores.  In Sprouts stores over the same period, Dr. Bronner's whole kernel 14 ounce and Artisana's 14 ounce virgin coconut oil was sold, on average, at $9.43 and $10.49 respectively.

14.     These comparison help demonstrate that, even if the customers referenced by Mr. Weir had a perception that Nutiva's price was high relative to the competition, empirically, the opposite was generally true.  This empirical evidence, which was available to Mr. Weir, should have led him to question the significant "price premiums" estimated by Dr. Dennis; instead, the

---

[9]     Bates KAPLAN-LIZ00468-526.

[10]    Bates KAPLAN-LIZ00485-6.

[11]    Bates KAPLAN-LIZ00519-23.  National data include total US average prices from INFRA, NCGA, Sprouts and New Seasons retailers over the 52-week period ending May 18, 2014.  No 23 ounce size competitor product was sold so none was available for comparison.

estimates generated using Dr. Dennis' conjoint survey results were simply taken as given by Mr. Weir in developing his estimate of alleged damages.

### ii. Empirically, the "But-For" Prices Used in Mr. Weir's Alleged Damages Estimate Are Inconsistent with the Pricing of Similar Coconut Oil Products by Nutiva's Competitors

15.      The supposed "price premiums" from the conjoint survey that form the cornerstone of Mr. Weir's estimate of alleged damages are also inconsistent with a simple examination of the observed market price differentials found when comparing the observed retail prices of Nutiva's products with competitor products without the challenged statements on the labels.  For example:

a)  In natural food stores, the average retail price in 2015 for a 14 ounce container of Spectrum brand virgin coconut oil *without* "superfood" on its label was $11.85; a comparable Nutiva product *with* "superfood" on its label sold for $9.44, on average, during the same time period.[12]  The "price premium" estimated by Dr. Dennis for Nutiva products with "superfood" on the label predicted a positive premium compared to a product without "superfood."[13]

b)  Dr. Bronner's 14 ounce virgin coconut oil products have none of the contested labeling, but were priced, on average, at $9.52 and $9.48 for its whole and white kernel virgin coconut oils, respectively, in natural stores in 2015.  These prices were quite similar to the average Nutiva's 14 ounce product pricing of $9.44.

c)  Nature's Way's 16 ounce container has "No trans fat" on the label, but was priced at $9.41, on average, in natural food stores in 2015, making it the least expensive of Nutiva's major competitors for comparable products.

---

[12]    The word "superfood" never appeared on Nutiva labels on its own – it always appeared as part of the phrase "organic superfood."  The calculations presented here are based on Dr. Dennis' created attribute level, "superfood." See Van Liere Report, footnote 36.

[13]    Using the same methodology outlined in the Dennis Report ¶ 40.

  d) Barlean's 16 ounce container was more expensive than any of Nutiva's

   competitors, priced, on average, at $15.25 in natural stores over 2015 despite

   having *none* of the contested labeling on the container.[14]

  16. Mr. Weir reports the "price premium" that he and Dr. Dennis estimate if one or at

most two of the challenged statements were not on the label, and the estimated magnitudes of the

"price premiums" associated with just these statements are as high as 35.3%.  No evidence in the

market supports the conclusion that the challenged statements are associated with "price

premiums" of more than one-third of the product price.  In fact, Nutiva removed at least three of

the challenged statements from its labels recently and no decrease in wholesale prices or MSRP

for any products has occurred since the change.[15]

  17. Taking more of the challenged statements together leads to even more extreme

and unrealistic results, as shown in the Van Liere Report.[16]  Specifically, the market simulator

used by Dr. Dennis predicts a "price premium" of between 50 percent to more than 80 percent of

Nutiva's price (depending on product size) for a product with four challenged statements

included on the label versus the same product with those statements excluded.[17]  Mr. Weir

accepts this differential as the basis for his alleged damages methodology without doing any

empirical analysis of what such predicted "but-for" prices would look like relative to actual

coconut oil market prices.  However, if predicted price differentials from Dr. Dennis' market

simulator were viewed as actual "price premiums," for the sake of illustration only, the resulting

---

[14] Despite the larger size, Barlean's 16 ounce product is the most expensive per ounce as well as most expensive overall. Though not indicated as a top competitor in the Bedrock Insights Study, the Barlean's brand was used for comparison in Dr. Dennis' conjoint survey.  Dennis Report, p. 12, Exhibit 1.

[15] Bates NUT07087-94.  In some of the product sizes, four of the challenged statements have been removed.

[16] Van Liere Report, ¶ 36.  As discussed in the Van Liere Report, these are lower bound estimates and "price premiums" estimated at the more typical average or mean level would be even higher and comport even less well with observed market prices.

[17] Van Liere Report pp. 16-17.  The four statements are 100 [percent] Less Cholesterol Than Butter, Zero Trans Fats, Nutritious Substitute in Baking and 'Better than Butter' on Bread, Vegetables and Popcorn.  As noted, the market simulator as designed caps the maximum estimable impact at 82% for 15 oz., 60% for 23 oz., 50% for 29 oz., and 71% for 54 oz.

but-for prices of Nutiva's products with the challenged statements removed from the labels would be completely disconnected from the market reality of the pricing of coconut oil products.

18.     From January 2015 to January 2016, Nutiva's label included the following four challenged phrases: "better than butter on bread, vegetables, or popcorn," "a nutritious substitute in baking," "superfood" and "100% less cholesterol than butter."  As indicated in Table 1, the Nutiva 14/15 ounce products had a national average price of ▮▮▮▮ in the natural stores over this period.  For products of this size, the "price premium" associated with the four challenged labels estimated using Dr. Dennis' market simulator is at least 82%.[18]  If this "price premium" were embedded in Nutiva's retail pricing as Mr. Weir and Dr. Dennis are suggesting, removal of the four challenged statements from the label would results in a "but-for" price for Nutiva's 14/15 ounce products of $1.77.  However, the minimum retail price for competitor 14/15 ounce virgin coconut oil products is $9.44, revealing the implausibility of such a significant impact.

**Table 1[19]**
**But-for Price Calculations**

**Total US - Natural Channel**

**January 25, 2015 - January 24, 2016**

| Size (A) | Average Nutiva Retail Price (B) | "Price Premium" (C) | Nutiva But-for Price (D) (B) * [1- (C)] | Minimum Competitor Price (E) | Maximum Competitor Price (F) |
|---|---|---|---|---|---|
| 14/15 oz. | $▮▮▮ | 82% | $1.77 | $9.44 | $11.85 |
| 23 oz. | $▮▮▮ | 60% | $5.15 | - | - |
| 29 oz. | $▮▮▮ | 50% | $9.37 | $16.28 | $18.74 |
| 54 oz. | $▮▮▮ | 71% | $8.39 | - | - |

---

[18]  Given the cap embedded in Dr. Dennis' market simulator, 82% is the maximum that it will estimate; if the cap were removed, the estimated "price premium" would be even higher.

[19]  Data are from "SPINS_2016.24.Sales xlsx."  The minimum and maximum competitor market prices represent the lowest and highest sales weighted retail price of products of comparable size in SPINS category "Virgin Coconut Oil."  The brands included are those indicated as top competitors in the 2014 Bedrock Insights Study.  Comparable sizes for 29 oz. include 29 - 30 oz. products.  No comparable competitor products for 23 oz. and 53 oz. sizes exist.

19.     As another example, the estimated but-for price for the 29 ounce Nutiva product, which had an average retail price in natural food stores of $███, would be $9.37 with the four challenged statements removed from the label, since the "price premium" estimated is over 50%. In contrast, of Nutiva's competitors, the lowest retail price for comparably sized products was $16.28 over that same period in natural food stores.

20.     In natural food stores over that same period, Nutiva's 54 ounce container sold for an average price of $███   According to Dr. Dennis' market simulator, the removal of the four challenged statements from the label would have resulted in a but-for market price of $8.39 based on the estimated 71% "price premium" attached to those claims.  Over this period, then, that supposed but-for market price would have made the *54 ounce* Nutiva product cheaper than the minimum price of a *14/15 ounce* container offered in the natural channel by Nutiva's competitors.

21.     The contradictions between observed market prices for the products of Nutiva's competitors and the purported but-for market prices generated using the results from the conjoint survey analysis demonstrate that it was unreasonable for Mr. Weir to adopt these estimates without further investigation.  Mr. Weir's failure to consider and seek to understand the reasons for this disconnect renders his analysis unreliable.

## B. Mr. Weir's "Price Premium" Estimates Do Not Comport With Reality Because He Fails to Account for the Supply Side Response to the Changed Labeling and His Estimated "Price Premiums" Embed Other Flaws that Carry Over from the Conjoint Survey

22.     I investigated why the alleged "price premiums" used in Mr. Weir's analysis do not comport with market prices.  For at least two reasons, I concluded that his analysis does not and cannot measure any market price difference associated with the alleged mislabeling:

a) Market prices are determined by the interaction of demand and supply.  Mr. Weir's proposed formulaic measure, which relies solely on Nutiva sales and the results of Dr. Dennis' conjoint survey and market simulation, does not consider the supply side response to the assumed change in labeling so does not and cannot measure any "price premium" damages to consumers.

b) Mr. Weir's proposed damages model suffers from all the other flaws embedded in Dr. Dennis' conjoint survey, making it an unreliable estimate of even the demand side of the market for Nutiva's coconut oil prices.

*i.* ***Mr. Weir's Proposed Formulaic Measure Does Not Consider How the Supply Side of the Market Would Have Been Affected by the Change in Labeling So Cannot Measure Any "Price Premium" Damages to Consumers***

23.      According to *The Reference Manual on Scientific Evidence,* damages are the amount of compensation needed to place the plaintiff in the same economic position that she would have occupied if the unlawful act had never occurred.[20]  In theory, this compensation could be calculated on an individualized basis, determining the difference between the value expected and the value received or the price paid and the value received by each putative class member.  Mr. Weir writes that such individualized analysis is not appropriate in a class action setting.[21]  Instead, to estimate any damages using the "price premium" approach, Plaintiffs need to compare the actual market price that consumers paid for Nutiva's products to the market price that the products would have commanded absent the challenged statements on the labels (the "but-for" market price).[22]

---

[20]   Federal Judicial Center and National Research Council.  *Reference Manual on Scientific Evidence.*  3rd ed.  Washington DC: National Academies Press, 2011: p. 432.

[21]   Weir Declaration, ¶ 29.

[22]   The use of the singular "market price" is a simplification that should not be interpreted to mean that prices for a given product do not vary by, *e.g.*, product type and size, geographic region, type of retailer, time period and promotional activity.  As described below, significant variation exists along each of these dimensions in the market for coconut oil and in the pricing of Nutiva's products in particular.

24.     Accepted principles of microeconomics explain that market prices are determined by the interaction of the forces of supply and demand.[23]  Both supply side and demand side forces must therefore be incorporated into any attempt to estimate the but-for market price necessary to estimate a market-based price premium.  As explained in the Van Liere Report, however, at best, Dr. Dennis' conjoint survey generates an estimate of consumers' subjective preferences for the products absent the alleged mislabeling.  Even if well-designed and well-implemented, which I understand Dr. Dennis' survey was not, a conjoint survey is a *demand side* tool, providing an estimate of how the behavior of consumers might change with a labeling change.  While Dr. Dennis and Mr. Weir label the results from the survey as estimated "price premiums," those estimates are divorced from the *supply side* of the market so cannot be used to estimate how the market price for Nutiva's products would have changed absent the challenged statements on the labels.

25.     While Mr. Weir asserts quite vaguely that he and Dr. Dennis "considered" and "accounted for" supply side factors in the determination of the "price premium" and associated damages, that exercise seems limited to having drawn up with a list of potential supply side factors.  Neither expert has conducted (or, at a minimum, neither expert has produced) any economic analysis of the supply side of the market for coconut oil or how prices for coconut oil products are actually determined by Nutiva and its retailers.

26.     Initially, Mr. Weir seems to argue that supply side considerations need not be taken into account in determining the "price premium" because the "real world" prices Nutiva consumers paid "*already* reflect the supply side factors then extant in the marketplace."[24]   It appears that, in making this statement, Mr. Weir is implicitly asking the Court to accept that, faced with the significant decline in consumer demand that he and Dr. Dennis estimate would result from the removal of the challenged statements from its coconut oil product labels, Nutiva

---

[23]     *See, e.g.*, Mankiw, Gregory.  Principles of Microeconomics, 7th Edition, 2014, Chapter 4.

[24]     Weir Declaration, ¶ 42.

would have made no strategic changes to prices, marketing, or quantities supplied to the market. Such an assumption is implausible.  It defies economic logic to assume that Nutiva would have maintained the same inputs, produced the same output and kept the same strategy in this but-for market, simply letting the price of its products fall by up to 82% or more.

27.     While Mr. Weir makes passing reference to a number of specific "supply side" factors that he and Dr. Dennis "considered and accounted for," he does no analysis of those factors and does not attempt to incorporate them into his estimate of alleged "price premium" damages.  For example:

a) Cost of Inputs:  In a one-sentence paragraph, Mr. Weir offers nothing more than the statement:  "A[n] important supply side factor that Dr. Dennis and I discussed was Defendant's costs of inputs."[25]  No detail is provided about the substance of the discussion, about whether costs would be expected to be the same in the but-for world absent the alleged mislabeling or about how Nutiva's decisions or retailers' decisions about pricing would therefore have been different.  Indeed, it is unclear which input costs Mr. Weir is referencing – did he consider costs of marketing and raw materials, for example?  Two potential changes illustrate why such consideration is important:

- While Nutiva's product labels mention uses outside the kitchen, its placement, branding and 2014 product redesign was primarily focused on coconut oil used in the diet.  Were the Company not permitted to use the challenged labeling, however, it might have repositioned its coconut oil products for sale in the bodycare department, and incurred different marketing costs as a result.  Evidence that such repositioning may have occurred (particularly in response to a labeling change that engendered demand side changes of the magnitude that Dr. Dennis and Mr. Weir

---

[25]    Weir Declaration, ¶ 43.

estimate would occur) is found considering the Company's internal

documents.  For example, a 2015 "Bodycare Study" described how Nutiva

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ █

- For coconut oil products that Nutiva decided to continue to sell in the food

  section, costs may also have changed.  A series of input memos detail how

  Nutiva rejected the coconut oil offered by certain suppliers as not meeting

  its quality standards.[27]  If Nutiva were unable to use the challenged

  labeling, however, it may have decided to expand the supplier base from

  which it obtained coconut oil, once again changing its cost structure.

Generally, Mr. Weir is silent not only with respect to identifying the relevant input

costs but also on evaluating how such costs may have differed and, in turn, led to

changes in the market prices faced by consumers had the challenged labels not

been used.  His silence belies his assertion that he considered and accounted for

this supply side factor and render his estimate of alleged "price premium" damages

unreliable.

b) <u>Drivers of Wholesale and Retail Prices</u>:  The strategy used to set prices at Nutiva is

   complex.  Nutiva's CEO John Roulac testified that Nutiva's target gross profit

   margin is ████ and that Nutiva sets prices ██████████████████████████

   █████████████████████████████████████████ █  Mr. Weir

   asserts that he and Dr. Dennis discussed and accounted for Nutiva's pricing

   strategy and the variation in wholesale and retail prices.[29]  Once again, however,

   no detail is provided about the substance of this discussion, or any evaluation they

---

conducted of how Nutiva's decisions about pricing would have been different in the but-for world in which the challenged labels were not used.  Internal documents and data indicate that Nutiva's wholesale coconut oil product prices vary depending on, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████  Here again, some examples help highlight why consideration of these drivers is important:

- Nutiva memos to distributors, retailers and customers on the availability and costs associated with securing coconut oil indicate the importance of coconut oil availability in determining the quantity of product that Nutiva can produce and that will be sold.  In 2014 and 2015 in particular, with "recent typhoons and weather events in the Philippines, in addition to escalating global demands," these supply forces were an important consideration in the wholesale (and manufacturer suggested retail price or MSRP) for Nutiva coconut oil products.[30]  Mr. Weir has done no analysis of how the reduction in willingness to pay estimated by Dr. Dennis and Mr. Weir may have interacted with these supply side forces to determine the but-for market prices for Nutiva's coconut oil prices.  To the extent that Nutiva used contracts to hedge against volatility in raw input prices, this usage adds yet another layer of complexity to any analysis of its strategic pricing response to pricing.  As noted, Nutiva may even have decided that

---

[30]    Bates KEHE00570.

selling its coconut oil products in grocery and health food stores would not be sensible, at least without changes to its inputs and costs, and may have decided to refocus its strategy for those products to bodycare departments.

- Adding another layer of complexity, and as Mr. Weir acknowledges, Nutiva does not set the retail price of its products.  These retail prices are paid by consumers and are presumably set by the each individual retailer based on that retailer's own pricing strategy.  Assuming for the sake of argument that the results from the conjoint survey are reliable, these retailers also would have been faced with the significant demand side changes, as well as any resulting changes in the wholesale price and/or MSRP set by Nutiva.  To understand the but-for price of Nutiva's coconut oil products to consumers, then, Mr. Weir would have to understand and model not only how Nutiva sets the wholesale price and MSRP for its products, but how retailers set their prices, and how these prices also may have changed in the but-for world without the alleged mislabeling.  Mr. Weir offers no such analysis, belying his assertion that he considered and accounted for these supply side factors and further rendering his estimate of alleged "price premium" damages unreliable.

c) <u>Profit Margins</u>:  Nutiva's profit margin is both an input and an output of its pricing strategy.  Mr. Weir again merely asserts that he and Dr. Dennis "discussed" the issue of profit margin and then cites to testimony of Nutiva's CEO that Nutiva's target gross profit margin is ▮▮▮  Mr. Weir offers no analysis of whether that profit margin was achieved, whether it varied across products, geographic regions, retailers or time periods.  He offers no analysis of how the profit margin might have changed in the but-for world without the alleged mislabeling.  Here again,

---

[31]   Weir Declaration, ¶ 46.

had Nutiva decided to react, rather than passively accept the reduction in willingness to pay estimated in a hypothetical demand side scenario, its profit margin may have differed in ways not considered by Mr. Weir.  When faced with significant changes in market demand, economic theory and empirical evidence indicate that companies react by adjusting prices and margins, sometimes in products not even directly affected by these changes.  Again, the absence of any such analysis belies Mr. Weir's assertion that he has considered and accounted for this supply side factor and further renders his estimate of alleged "price premium" damages unreliable.

d)  <u>Competitive pressures, economic conditions and consumer preferences</u>:  In seeming contradiction to his implicit assumption that Nutiva would have done nothing in response to the estimated reduction in demand, Mr. Weir also notes that the market for Nutiva's coconut oil products is an "ordinary" market, subject to competitive pressures that both Nutiva and retailers identified as risks to their business and that "retailers…expressed willingness to adjust prices in response to changing economic conditions and consumer preferences."[32]  Dr. Dennis and Mr. Weir assert that significant changes on the consumer side would occur in response to the change in labeling; as noted above, these changes would be expected to engender a response by Nutiva and its retailers and yet Plaintiffs' experts instead assume a passive, non-response by these market participants.  Significant changes at Nutiva and in the market for coconut oil products were also occurring over the purported class period, including, *e.g.*, an increase in the demand for coconut oil, weather-related supply constraints of coconut oil and a significant redesign of the packaging of Nutiva's line of products.[33]  Mr. Weir acknowledges that such supply

---

[32]    Weir Declaration, ¶ 48.

[33]    Bates KEHE0570 and KAPLAN-LIZ00186-206.

side factors are important and yet has done no analysis of how they would have interacted with the purported change in consumer preferences to determine a but-for price during the putative class period.  His failure to do so further renders his estimate of alleged "price premium" damages unreliable.

e)   <u>Quantity produced</u>:  Mr. Weir asserts that the number of products sold is "a known quantity and fixed as a matter of history."[34]  He contrasts this situation with one in which alleged damages are being estimated under Lanham Act and intellectual property litigation, where a "but for quantity of sales may need to be determined."[35]  His wording suggests he may be opining that, as a matter of law, all consumers who purchased a Nutiva coconut oil product over the purported class period should be entitled to any "price premium" that is found by the Court.  The Court, of course, will reach its own determinations about the relevant law and which consumers are eligible to receive damages.  From the perspective of economics, however, determining the but-for market price to *any* purported consumer of Nutiva's coconut oil and putative class member requires an analysis of the supply side, which includes an analysis of the quantity that the Company would have decided to produce in that but-for market.  Prices and quantities are interdependent in a competitive market.  If a change in the labeling engendered demand side responses, as Mr. Weir and Dr. Dennis contend it would, these changes in demand would have potentially affected both the steady-state quantity and prices of coconut oil products sold in the market.  It is only by modeling both the demand side reaction and the supply side reaction that the but-for price and any "price premium" can be estimated.  Mr. Weir's failure to undertake such an

---

[34]   Weir Declaration, ¶ 45.

[35]   Weir Declaration, ¶ 37.

analysis further renders his estimate of alleged "price premium" damages unreliable.

28. Note that while Dr. Dennis' conjoint survey purports to estimate the subjective consumer preferences that affect demand for coconut oil with alternative labels, it can only estimate relative preferences for the attributes included in the model. There are also other demand side factors that affect the market prices for coconut oil that are neither considered in the conjoint survey nor included Mr. Weir's proposed damages methodology. As described above, for example, there was a growing demand for coconut oil for beauty applications during the alleged class period, which, in turn, had an impact on competitor marketing decisions, demand for raw materials, and pricing in the coconut oil market. This demand side factor is absent from Dr. Dennis' conjoint survey, and Mr. Weir has not put forward any methodology that can account for the impact of this type of demand shift for coconut oil on any estimated "price premium."

29. Given that Mr. Weir's damages methodology does not consider any of these other supply side factors and relies solely on the results of Dr. Dennis' conjoint survey analysis, which also does not consider them, his proposed damages framework does not and cannot produce a reliable estimate of the market price at which Nutiva's coconut oil products would have sold absent the alleged mislabeling. As a result, his proposed model does not and cannot estimate any "price premium" damages allegedly owed to consumers.

### ii. Mr. Weir's Proposed Damages Model Will Suffer from All the Flaws Embedded in Dr. Dennis' Conjoint Survey

30. Dr. Dennis was asked by Plaintiffs' counsel to "design (in consultation with plaintiffs' expert, Mr. Colin Weir), conduct, and report on a consumer survey to measure the market price premium attributable to the challenged claims displayed on Nutiva's coconut oil products."[36]

---

[36]    Dennis Report, ¶ 12.

21

Mr. Weir claims that he can use the results generated from Dr. Dennis' conjoint survey to estimate damages on a class-wide basis.  In fact, these survey results feed directly into Mr. Weir's estimate, in which he simply multiplies the estimated "price premium" for each product by the sales of that product.

31.     To the extent that the results from the survey are flawed, then, these flaws will flow directly into Mr. Weir's proposed estimate of alleged damages.  As summarized in the report of my colleague, Dr. Kent Van Liere, Dr. Dennis' conjoint survey suffers from serious methodological flaws that render its results unreliable.[37]  Specifically:

a)  Dr. Dennis' survey fails to replicate the way that consumers see coconut oil products in the market place for several reasons.  For example, it presents all the claimed statements as equally visible on the front label, whereas on the *actual* products, the statements may be on the back label or incorporated into a paragraph of text.  Dr. Dennis also shows Nutiva's current slogan as part of the brand's logo, but ignores the slogans of competitor brands when showing their logos.  He fails to show nutrition labels for all the products presented in his survey, which would provide information on trans fat content for every product in the market.  These failures take the claimed statements out of any real-world context, and mean that Dr. Dennis' survey is not a realistic representation of consumer purchasing decisions.

b)  Dr. Dennis also deviates from best survey practices by failing to use attributes with a concrete meaning to respondents.  His survey shows participants unrealistic choice sets, out of actual market context, which exacerbates the attention consumers pay to the claimed statements and thus potentially causes biased estimates of the import of the attributes.  Dr. Dennis also places restrictions on his

---

[37]     Van Liere Report, ¶ 13.

survey design that prohibit him from estimating the separate impact of some of the claimed statements.

    c) Dr. Dennis does not have sufficient sample size of respondents of Costco and Nutiva purchasers to estimate the combined impact of the claimed statements on consumer preferences, as a proper specification would need to model the interaction between these statements.

32.    Because he uses the results generated from Dr. Dennis' conjoint survey analysis as presented, Mr. Weir has not (and indeed cannot) offer any corrections of the infirmities in the survey.  Consequently, each of these flaws will transfer directly from the flawed survey output into Mr. Weir's proposed formulaic measure of alleged damages, which is the simple multiplication of the "price premiums" estimated by Dr. Dennis and the sales dollars of Nutiva's coconut oil prices.

### C. Mr. Weir's Proposed Approach Cannot Estimate Any "Price Premium" Earlier in the Putative Class Period

33.    The conjoint survey conducted by Dr. Dennis and any survey he might conduct in the future ask consumers to make choices among products today.  As such, at best, a well-designed and well-implemented survey of the type proposed by Dr. Dennis measures consumers' current subjective preferences for attributes and generates static measures of these preferences.  As a result, it will not and cannot allow determination of how any premium placed by consumers on particular attributes may have varied looking back in time.

34.    The relative value of product attributes embedded in retail price of Nutiva's coconut oil price would be expected to change over time, however, given significant changes that occurred on both the demand side and the supply side.  For example, during the putative class

period, changes included an increase in the demand for coconut oil, supply constraints due to weather and the redesign of the packaging of Nutiva's product line.[38]

35.     Significant swings in price occurred as a results of these and other changes.  For example, Figure 1 below shows the variability in the average retail price of Nutiva's 15 ounce Virgin Coconut Oil at Whole Foods for five states.[39]



**Figure 1**
**Average Retail Price at Whole Foods by State**
**Nutiva Virgin Coconut Oil - 15 ounce Container**
**January 2012 - April 2017**

---

[38]    Bates KEHE0570 and KAPLAN-LIZ00186-206.

[39]    Data are from "Nutiva Coconut Oil Sales (01.01.2012 thru 04.09.2017) xlsx"

36.     More generally, the prices faced by consumers in the marketplace for coconut oil varied depending on when and where they purchased the product.  Figure 2 shows the variability in sales-weighted average Nutiva product prices across retailers in the natural channel over a 12-

**Figure 2**
**Average Retail Price by Retailer**
**Nutiva Virgin Coconut Oil - 15 ounce Container**
**9/8/13 - 12/1/13**



week period in 2013.  While substantial variability is evident in this data, the weighted average prices mask even more underlying variability in individual purchase prices.[40]

37.     The 2014 study by Bedrock Insights that was commissioned by Nutiva includes a series of charts labeled "Nutiva Price Trends" that further highlight variability in the retail pricing of the Company's coconut oil products over the period 2013-2014.[41]  For example, the

---

[40]   Data are from "Nutiva_SNA_Coconut_P2.xls"

[41]   Bates KAPLAN-LIZ00487-500.

New Seasons price for 15 ounce Extra Virgin Olive Oil exhibited peaks and troughs in price ranging from $13 down to $8.

38.     Given that substantial changes to the product and market were occurring, it is not reasonable to assume that the relative importance of the challenged labeling and an estimate of the associated current "price premium" (assuming one could be estimated from Dr. Dennis' survey) would be an accurate estimate of any "price premium" for consumers purchasing earlier in time.  Mr. Weir offers no justification for his assumption that the premium would be a constant percent of Nutiva's varying coconut oil product prices over the putative class period, which spans more than five years.

## VII. CONCLUSION

39.     Based on my expertise and my review of the evidence in this matter, it is my opinion that the formulaic approach proposed by Mr. Weir will not generate a reliable estimate of aggregate damages to putative class members or to any individual class member.

40.      My opinions and conclusions as expressed in this report are to a reasonable degree of professional certainty.  My work is ongoing and my opinions will continue to be informed by any additional material that becomes available to me.

41.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am competent to testify to the facts contained in this report if called as a witness.

Executed this 7th day of July, 2017, in New York, NY

Denise N. Martin                    26

# Exhibit A

# DENISE NEUMANN MARTIN
## Managing Director

## Education

**Harvard University**
Ph.D., Economics, 1991
M.A., Economics, 1988

**Wellesley College**
B.A., *magna cum laude*, Economics and French, 1985
Honors: Phi Beta Kappa

## Professional Experience

**NERA Economic Consulting**

| | |
|---|---|
| 2001- | Senior Vice President |
| 1998-2000 | Vice President |
| 1994-1997 | Senior Consultant |
| 1991-1993 | Senior Analyst |

**Harvard University**

1986-1990    Teaching Fellow, Department of Economics
Taught courses in Microeconomics and Industrial Organization at the graduate and undergraduate levels. Assisted senior honors candidates with theses. Awarded Danforth Prize in Teaching.

1986-1990    Research Associate, Department of Economics
Projects included an investigation of the timing of international horizontal mergers, an evaluation of the effect of generic entry into the pharmaceutical market, and a comparison of technical efficiency across countries.

|          | **Urban Systems Research and Engineering/Economica, Inc.** |
|----------|-----------------------------------------------------------|

1987-1988 Economic Consultant
Consulted on all aspects of government agency projects, including proposals and the design of survey instruments. Provided economic forecasts and technical support.

**Federal Reserve Bank of New York**
1985-1986 Assistant Economist, International Financial Markets
Analyzed Eurobond markets, interest rate swap markets, and US commercial banks' balance sheets.

## Testimony (4 years)

Affidavit, in *Dara Fresco vs. Canadian Imperial Bank of Commerce*, Ontario Superior Court of Justice, 2017.

Testimony, Deposition and Expert Reports, before the Circuit Court of Cook County, Illinois County Department, Chancery Division in the matter of *John Crane, Inc. v. Allianz, et al.*, 2015/2016/2017.

Deposition and Declaration, before the United States Court District of South Carolina Greenville Division in *Myriam Fejzulai and Monica Moore, et al. v. Sam's West, Inc.; Sam's East Inc.; and Wal-Mart Stores, Inc.*, 2017.

Declaration, before the United States Court Central District of California in *Morgan Chikoski, et al. v. Sam's West, Inc.; Sam's East Inc.; and Wal-Mart Stores, Inc.,* 2017.

Rebuttal Reports, before the United States District Court Western District of Missouri, Western Division, *In Re: Simply Orange, Orange Juice Marketing & Sales Practices Litigation*, 2016.

Expert Report and Declarations, before the United States District Court for the Northern District of California, in the matter of *Senne, et al. vs. Office of the Commissioner of Baseball, et al*., 2016.

Expert Report, before the Superior Court of the State of California County of Santa Clara, in the matter of *In Re: FireEye, Inc. Securities Litigation*, 2016.

Affidavit, before the State of Wisconsin Circuit Court Milwaukee County, in *Harley-Davidson, Inc., v. Hartford Accident and Indemnity Company, et al.*, 2016.

Deposition and Rebuttal Report, before the United States District Court Northern District of Ohio Eastern Division, in the matter of *Christopher Meta, et al., v. Target Corporation, et al.*, 2016.

Declarations and Rebuttal Declaration, before the United States District Court for the Central District of California Western Division, in the matter of *In Re NJOY, Inc. Consumer Class Action Litigation*, 2015/2016.

2

Deposition and Expert Report, in the Court of Common Pleas of Lucas County Ohio in the matter of *Certain Underwriters at Lloyd's London, et al., v. Allstate Insurance Co., et al.*, 2015.

Deposition, Expert, Supplemental, and Rebuttal Reports, In the North Carolina Superior Court for Mecklenburg County, in *Radiator Specialty Group v. Arrowood Indemnity Company, et al.*, 2015.

Deposition, Expert, and Rebuttal Reports, In the United States District Court Western District of Pennsylvania, in *The Goodyear Tire & Rubber Company v. Travelers Casualty and Surety Company and Travelers Indemnity Company*, 2015.

Expert and Rebuttal Reports, In the United States District Court Eastern District of New York, in *D. Joseph Kurtz, et al. vs. Kimberly-Clark Corporation and Costco Wholesale Corporation*, 2015.

Deposition and Expert Report, In the United States District Court Northern District of California San Francisco Division, in *Betty Dukes, et al. v. Wal-Mart Stores, Inc*., 2015.

Deposition and Expert Report, In the United States District Court Southern District of Florida (Fort Lauderdale Division), in *Zenovdia Love, et al. v Wal-Mart Stores, Inc.*, 2015.

Expert Report, In the United States Bankruptcy Court for the District of Delaware, *In Re: Blitz U.S.A., Inc., et al.*, 2014.

Testimony and Expert Reports, In the United States Bankruptcy Court for the District of Delaware, *In Re: Specialty Products Holdings Corp., et al.*, 2012/2013.

## Publications and Presentations (10 years)

"Trends in Wage and Hour Settlements: 2013 Update," (co-author) NERA Monograph, November 2013.

"Trends in Wage and Hour Settlements: 2012 Update," (co-author) NERA Monograph, March 2013.

 "Trends in Wage and Hour Settlements: 2011 Update," (co-author) NERA Monograph, March 2012.

"Recent Trends in Wage and Hour Settlements," (co-author) NERA Monograph, March 2011.

"Data in Wage and Hour Litigation: What to Do When You Have it and What to do When You Don't," (co-author) NERA Monograph, November 2010.

"Get in the Game: The Latest News and Developments in Wage and Hour Litigation," presented at the *4th Annual Section of Labor and Employment Law Conference,* Chicago, IL, November, 2010.

"Why Daubert Makes Sense at Class Certification Under Title VII," (co-author) published in *Law 360*, July, 2010.

"The Economic Impact of New MMSEA Regulations," (co-author) published in *Law360,* April, 2010.

"The Economic Implications of Medicare Section 111 Reporting Requirements" presented at the *Asbestos Litigation Conference*, Beverly Hills, CA, February 2010.

"Class Certification in Wage and Hour Litigation: What Can We Learn from Statistics?" (co-author) NERA Monograph, November 2009.

"Wage and Hour: Advanced Topics in Litigation," presented at Law Seminars International conference on Litigating Employment Class Actions, April, 2009.

"Implications of the Fair Pay Act for Statistical Analysis in Wage Discrimination Suits," (co-author) NERA Monograph, March 2009.

"The Use of Economic Analysis in Predatory Lending Cases: Application to Subprime Loans," (co-author) NERA Monograph, November 2008.

July 2017

# Exhibit B

# Documents Relied Upon

- Complaints:

    - Class Action Complaint, Preston Jones, on behalf of himself, all others similarly situated, and the general public, Plaintiff, v. Nutiva, Inc., Defendant, Superior Court of the State of California County of Contra Costa, Case C16-00014, January 8, 2016

    - First Amended Complaint, Preston Jones and Shirin Delalat, on behalf of themselves, all others similarly situated, and the general public, Plaintiffs, v. Nutiva, Inc., Defendant, United States District Court Northern District of California, Case 3:16-cv-00711-HSG, December 5, 2016

- Deposition Transcripts:

    - Deposition of John Roulac, Corporate Representative, dated March 20, 2017

- Expert Reports:

    - Declaration of Colin B. Weir and associated materials, dated May 8, 2017

    - Expert Report of Dr. J. Michael Dennis, Ph.D. and associated materials, dated May 8, 2017

    - Expert Report of Kent Van Liere and associated materials, dated July 7, 2017

- Documents:

    - Defendant's Reponses to Plaintiff's First Interrogatories, dated May 5, 2016

    - Defendant's First Supplemental Response to Plaintiff's First Requests for Admission, dated June 24, 2016

    - Defendant's Reponses to Plaintiff's Second Set of Requests for Admission, dated October 14, 2016

    - Defendant's First Supplemental Responses to Plaintiff's Second Set of Requests for Admission, dated November 11, 2016

    - Defendant's Second Supplemental Responses to Plaintiff's Second Set of Requests for Admission, dated November 21, 2016

    - Order Granting in Part and Denying in Part Motion for Judgement on the Pleadings, Denying Motion to Remand, and Denying Motion to Strike, dated September 22, 2016

- NUT05490 – 05603

- NUT07087 – 07094

- KAPLAN-LIZ00145 – 00206

- KAPLAN-LIZ00468 – 00526

- KEHE00570

- Nutiva Coconut Oil Sales (01.01.2012 thru 04.09.2017).xlsx

- Nutiva_SNA_Coconut_P2.xls

- SPINS_2016.24Sales.xlsx

- Information from http://www.spins.com/, accessed July 6, 2017.

- Federal Judicial Center and National Research Council. *Reference Manual on Scientific Evidence.*  3rd ed.  Washington DC: National Academies Press, 2011.

- Mankiw, Gregory.  Principles of Microeconomics, 7th Edition, 2014, Chapter 4