1  Matthew R. Orr, Bar No. 211097
     morr@calljensen.com
2  William P. Cole, Bar No. 186772
     wcole@calljensen.com
3  CALL & JENSEN
   A Professional Corporation
4  610 Newport Center Drive, Suite 700
   Newport Beach, CA  92660
5  Tel:    (949) 717-3000
   Fax:    (949) 717-3100
6
   Appearance *Pro Hac Vice:*
7  Rakesh M. Amin, Illinois Bar No. 6228751
     rakesh@amintalati.com
8  Ryan M. Kaiser, Illinois Bar No. 6269873
     ryan@amintalati.com
9  Sanjay S. Karnik, Illinois Bar No. 6300156
     sanjay@amintalati.com
10 AMIN TALATI & UPADHYE, LLC
   100 S. Wacker Drive, Suite 2000
11 Chicago, IL 60606
   Tel:    (312) 327-3382
12 Fax:    (312) 884-7352
13 Attorneys for Defendant Nutiva, Inc.

14

15                    **UNITED STATES DISTRICT COURT**

16                   **NORTHERN DISTRICT OF CALIFORNIA**

17 SHIRIN DELALAT, on behalf of herself, all        Case No.    4:16-cv-00711 HSG
   others similarly situated, and the general public,
18                                                   Hon. Haywood S. Gilliam, Jr.
                    Plaintiff,
19                                                   **DEFENDANT'S OPPOSITION TO**
                    vs.                              **PLAINTIFF'S MOTION FOR CLASS**
20                                                   **CERTIFICATION**
   NUTIVA, INC.,
21
                    Defendant.                       Date:       February 8, 2018
22                                                   Time:       2:00 p.m.
                                                     Place:      Courtroom 2, 4th Floor
23

24

25                                                   Complaint Filed:  January 8, 2016
                                                     Trial Date:       None Set
26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................................. 1

II.     BACKGROUND .................................................................................................... 2

        A.      Nutiva's Organic Coconut Oil Products ................................................... 2

        B.      Plaintiff's Proposed Class ........................................................................ 3

        C.      The False Premise of Plaintiff's Case ..................................................... 3

        D.      Labeling Changes During the Proposed Class Period .............................. 5

        E.      Shirin Delalat's False Testimony ............................................................. 7

III.    ARGUMENT ......................................................................................................... 9

        A.      Legal Standards ....................................................................................... 9

        B.      Delalat Cannot Represent Virgin Coconut Oil Consumers on any
                Claim that the Label Is False or Misleading ........................................... 9

        C.      Delalat Fails to Satisfy Rule 23(a)'s Typicality and Adequacy
                Requirements ......................................................................................... 10

        D.      Delalat Has Not Satisfied the Requirements of Rule 23(b)(3) .............. 11

                1.      The UCL and CLRA Claims Do Not Meet the Predominance
                        Requirement Because Delalat Does Not Demonstrate Class
                        Cohesion as to Materiality .......................................................... 11

                2.      There is No Class Cohesion as to the Express Warranty Claim ........... 15

                3.      The Implied Warranty Claim Fails the Predominance Test for
                        the Additional Reason that Privity Cannot Be Established on a
                        Common Basis ............................................................................ 16

                4.      Delalat Has Failed to Offer a Valid Method for Determining
                        Class-Wide Damages, as Required by *Comcast* ........................... 17

                5.      Applying California Law to a Nationwide Class Is Improper .............. 21

                6.      The Proposed Class Action is not Manageable or Superior ................. 25

IV.     CONCLUSION ..................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

Page

3

Federal Cases

4

*Allen v. Hyland's Inc.*,
 300 F.R.D. 643 (C.D. Cal. 2014) ................................................................ 16, 17, 22

5

*Apple, Inc. v. Samsung Elecs., Co.*,
 2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ..................................................... 18

6

7

*Astiana v. Kashi*,
 291 F.R.D. 493 (S.D. Cal. 2013) ................................................................ 12, 14, 15

8

*Badella v. Deniro Mktg. LLC*,
 2011 WL 5358400 (N.D. Cal. Nov. 4, 2011) .................................................. 12, 14

9

10

*Berger v. Home Depot USA, Inc.*,
 741 F.3d 1061 (9th Cir. 2014) ....................................................................... 11

11

*Brazil v. Dole Packaged Foods, LLC*,
 660 Fed. App'x 531 (9th Cir. Sep. 30, 2016) ................................................. 17, 19

12

13

*Bruno v. Eckhart Corp.*,
 280 F.R.D. 540 (C.D. Cal. 2012) ................................................................... 22

14

*Bruno v. Quten Research Inst., LLC*,
 280 F.R.D. 524 (C.D. Cal. 2011) ................................................................... 22

15

16

*Califano v. Yamasaki*,
 442 U.S. 682 (1979) ...................................................................................... 9

17

*CE Designs Ltd. v. King Architectural Metals, Inc.*,
 637 F.3d 721 (7th Cir. 2011) .......................................................................... 10

18

19

*Clemens v. DaimlerChrysler Corp.*,
 534 F.3d 1017 (9th Cir. 2008) ....................................................................... 16

20

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) .............................................................................. 9, 17, 19

21

22

*Czuchaj v. Conair Corp.*,
 2016 WL 1240391 (S.D. Cal. Mar. 30, 2016) .................................................. 24

23

*Dei Rossi v. Whirlpool Corp.*,
 2015 WL 1932483 (E.D. Cal. Apr. 27, 2015) .................................................. 23

24

*Figy v. Amy's Kitchen, Inc.*,
 2013 WL 6169503 (N.D. Cal. Nov. 25, 2013) ................................................. 11

25

26

*Forcellati v. Hyland's Inc.*,
 876 F.Supp.2d 1155 (C.D. Cal. 2012) ............................................................ 22

27

*Glenn v. Hyundai Motor America*,
 2016 WL 3621280 (C.D. Cal. June 2, 2016) .................................................. 22

28

CALL &
JENSEN

**TABLE OF AUTHORITIES (con't)**

Page

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) ................................................................. 10

*Harris v. Vector Mktg. Corp.,*
  753 F. Supp. 2d 996 (N.D. Cal. 2010) .................................................. 10

*Holt v. Globalinx Pet LLC,*
  2013 WL 3947169 (C.D. Cal. July 30, 2013) ...................................... 22

*Hughes v. The Ester C Company,*
  317 F.R.D. 333 (E.D.N.Y. 2016) ........................................ 12, 13, 17, 20

*Hunter v. Nature's Way Products, LLC,*
  2016 WL 4262188 (S.D. Cal. Aug. 12, 2016) ...................................... 16

*In re Bridgestone/Firestone, Inc.,*
  288 F.3d 1012 (7th Cir. 2002) ............................................................. 22

*In re Clorox Consumer Litig.,*
  894 F. Supp. 2d 1224 (N.D. Cal. 2012) ............................................... 15

*In re ConAgra Food, Inc.,*
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ...................................... 15, 16, 17

*In re NJOY, Inc. Consumer Class Action Litig.,*
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) .......................................... 17, 18

*In re Wells Fargo Home Mortg. Overtime Pay Litig.,*
  571 F.3d 953 (9th Cir. 2009) ............................................................... 11

*J.H. Cohen & Co. v. American Appraisal Associates, Inc.,*
  628 F.2d 994 (7th Cir. 1980) ............................................................... 10

*Jackson v. Bank of Hawaii,*
  902 F.2d 1385 (9th Cir. 1990) ............................................................. 25

*Jones v. ConAgra Foods, Inc., No. C,*
  2014 WL 2702726 (N.D. Cal. Jun. 13, 2014) ........................ 11, 12, 14, 25

*Mazza v. American Honda Co., Inc.,*
  666 F.3d 581 (9th Cir. 2012) .................................................... 22, 23, 24

*Opperman v. Path, Inc.,*
  2016 WL 3844326 (N.D. Cal. July 15, 2016) ...................................... 22

*Otto v. Abbott Laboratories, Inc.,*
  2015 WL 12776591 (C.D. Cal. Jan. 28, 2015) ............................... 14, 15

*Prods., Inc.v. Windsor,*
  521 U.S. 591 (1997) ............................................................................. 11

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**TABLE OF AUTHORITIES (con't)**

<u>Page</u>

*Saavedra v. Eli Lilly & Co.*,
2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)..................................................... 18

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ............................................................................. 11

*Tasion Communs., Inc. v. Ubiquiti Networks, Inc.*,
2014 WL 1048710 (N.D.Cal. Mar. 14, 2014) ............................................... 23, 24

*Tasion Comm'n, Inc. v. Ubiquiti Networks, Inc.*,
308 F.R.D. 630 (N.D. Cal. 2015) ......................................................................... 23

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
497 F.3d 144 (2d Cir. 2007) ................................................................................. 12

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............................................................................................... 9

*Walsh v. Ford Motor Co.*,
130 F.R.D. 260 (D.D.C. 1990) ............................................................................. 24

*Williamson v. The Reinalt-Thomas Corp.*,
2012 WL 1438812 (N.D. Cal. Apr. 25, 2012)...................................................... 10

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ............................................................................. 11

*Zinser v. Accufix Research Inst.*,
253 F.3d 1180 (9th Cir. 2001).............................................................................. 24

*Zinser v. Accufix Research Inst., Inc.*,
235 F.3d 1180 (9th Cir. 2001).............................................................................. 22

<u>State Cases</u>

*Burr v. Sherwin Williams Co.*,
42 Cal.2d 682 (1954) ........................................................................................... 16

*Caro v. Proctor & Gamble Co.*,
18 Cal. App. 4th 644 (1993) ................................................................................ 12

*Compaq Comp. Corp. v. Lapray*,
135 S.W.3d 657 (Tex. 2004) ............................................................................... 24

*Dabush v. Mercedes-Benz USA, Inc.*,
378 N.J. Super. 105, 874 A.2d 1110 (App. 2005).............................................. 23

*Debbs v. Chrysler Corp.*,
810 A.2d 137 (Pa. Super. 2002) .......................................................................... 23

CALL &
JENSEN

**TABLE OF AUTHORITIES (con't)**

<u>Page</u>

*Egwuatu v. South Lubes, Inc.*,
   976 So.2d 50 (Fla.App. 2008) ................................................................. 23

*In re Vioxx Class Cases*,
   180 Cal. App. 4th 116 (2010) ................................................... 11, 17, 20

*Kearney v. Salomon Smith Barney, Inc.*,
   39 Cal. 4th 95 (2006) .............................................................................. 24

*Kolarik v. Cory Int'l Corp.*,
   721 N.W.2d 159 (Iowa 2006) ................................................................. 23

*Kwikset Corp. v. Super. Ct.*,
   51 Cal.4th 310 (2011) ........................................................................ 10, 21

*Martinez v. Metabolife Intern., Inc.*,
   113 Cal. App. 4th 181 (2003) ............................................................. 16, 19

*McCann v. Foster Wheeler LLC*,
   48 Cal.4th 68 (Cal. 2010) ....................................................................... 22

*Norcold, Inc. v. Gateway Supply Co.*,
   154 Ohio App.3d 594, 798 N.E.2d 618 (2003) ...................................... 24

*Pace v. Sagebrush Sales Co.*,
   114 Ariz. 271, 560 P.2d 789 (Ariz. 1977) .............................................. 23

*Samuel–Bassett v. Kia Motors Am., Inc.*,
   613 Pa. 371, 34 A.3d 1 (Pa. 2011) ......................................................... 24

*Stultman v. Chem. Bank*,
   95 N.Y.2d 24, 731 N.E.2d 606 (N.Y. 2000) .......................................... 23

<u>State Statutes</u>

Bus. & Prof. Code § 17203 ............................................................... 21, 23

Cal. Civ. Code § 1780(a)(1)-(5) .............................................................. 23

Mich. Comp. Laws Ann. § 445.911(6) ................................................... 23

<u>Federal Rules</u>

Fed. R. Civ. P. 23(a) ............................................................................. 9, 10

Fed. R. Civ. P. 23(a)(3) ........................................................................... 10

Fed. R. Civ. P. 23(b)(3) ................................................................ 9, 11, 25

CALL &
JENSEN
EST 1979

1

**STATEMENT OF THE ISSUES TO BE DECIDED PER CIVIL LR 7-4(a)(3)**

2      1.      **Standing.** Whether Plaintiff Delalat lacks standing to represent purchasers of Nutiva

3  Virgin Coconut Oil, a product she never purchased, on any claim that the label was misleading.

4      2.      **Typicality.** Are Delalat's claims typical where she is subject to unique defenses as to

5  whether she even read the challenged statements before her purchase?

6      3.      **Adequacy.** Is Delalat an adequate representative where she will be forced to devote

7  attention to unique defenses arising from her extensive false testimony concerning purchases of

8  Nutiva coconut oil that never occurred?

9      4.      **Predominance.** Should the class be certified where individual issues of reliance,

10 materiality and privity predominate, where Delalat has no valid class-wide damages model, let alone a

11 model tied to her theory of liability, and where California law does not apply to the nationwide class

12 and variations in state laws defeat predominance?

13     5.      **Manageability and Superiority.** Is the proposed class manageable?

14

**MEMORANDUM OF POINTS AND AUTHORITIES**

15 **I.      INTRODUCTION**

16     Preston Jones is no longer a party to this action. All his claims have been dismissed. Only

17 Shirin Delalat remains. For many reasons, her motion for class certification should be denied.

18     First, the proposed class is overbroad because despite Jones's dismissal, it still seeks to include

19 purchasers of Organic Virgin Coconut Oil, a product Delalat never purchased. She cannot represent

20 such purchasers on any claim that the label was false or misleading.

21     Second, Delalat has testified falsely—fabricating an elaborate story of Nutiva coconut oil

22 purchases with her father. The purchases never even occurred. Delalat is neither a typical nor adequate

23 representative, because she has serious credibility problems and is subject to unique defenses.

24     Third, the proposed class fails the predominance test. There is no common evidence as to what

25 consumers perceived and what they would find material. Consumers purchase coconut oil for a variety

26 of reasons, the labels changed repeatedly, many of the challenged statements have no fixed, single

27 meaning, and Delalat herself agrees that the purported secondary meaning allegedly derived from the

28 labels "as a whole"—i.e., "healthy"—also has no fixed, common meaning. Furthermore, she has failed

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

to present a class-wide damages model able to measure only those damages attributable to her theory of liability. Her proposed conjoint analysis does not even measure actual market value, but rather only consumer willingness to pay: it is incapable of determining any price premium, let alone one tailored to the theory of liability.  Class certification should be denied.

## II.   BACKGROUND

### A.   Nutiva's Organic Coconut Oil Products

Nutiva produces high-quality, organic coconut oil products. Decl. of Steven Naccarato ("Naccarato Decl.") ¶ 2. Nutiva used to sell a product named "Organic Extra Virgin Coconut Oil." *Id.* The product contained a single ingredient: unrefined, cold-pressed virgin coconut oil. *Id.* In late 2013, Nutiva discontinued the "Organic Extra Virgin Coconut Oil" product and instead began producing a product labeled "Organic Virgin Coconut Oil." *Id.* Delalat purchased only the discontinued "Organic Extra Virgin Coconut Oil"; she did not purchase the "Organic Virgin Coconut Oil" product. Third Amended Complaint ("TAC")(Dkt. 115), ¶¶ 110-111.

Delalat does not allege that there was ever any problem with the *quality* of Nutiva's coconut oil products. She has never alleged Nutiva's coconut oil is inferior to other organic coconut oil, or that it has a nutritional profile different from any other virgin coconut oil. Like other virgin coconut oil, Nutiva's product naturally contains no cholesterol and no trans fat. Naccarato Decl., ¶ 3. Nutiva's coconut oil, like coconut oil generally, is used for a variety of consumption and non-consumption purposes. *Id.* ¶ 4. While used for baking, cooking, sautéing, or mixing in smoothies or "bulletproof" coffees, coconut oil also is used for skin moisturizing, hair care, oil pulling (dental hygiene), personal lubrication, massage, even household cleaning. *Id.*

Nutiva sells some coconut oil directly to consumers online, but most is purchased by consumers from retailers, rather than from Nutiva. *See, e.g., id.* ¶ 5; TAC, ¶ 47. Nutiva does not control the prices that retailers charge to consumers. Naccarato Decl. ¶ 6. While Nutiva purchases general retail pricing information, that data does not distinguish among the various label versions used during the proposed class period. *Id.* Also, coconut oil has a long shelf life—up to two years—and Nutiva does not control the widely-varying sell-through rates at the thousands of retail stores offering its coconut oil products, making it highly individualized as to what particular label version (or

1   versions) appeared on a particular retailer's shelf at various points. *Id.* ¶ 7. Nutiva has no way to

2   determine the identities of all the consumers who purchased its coconut oil through retailers. *Id.* ¶ 8.

3       **B.     Plaintiff's Proposed Class**

4       Delalat seeks to represent a nationwide class of consumers who purchased, for household use,

5   Nutiva Extra Virgin Coconut Oil or Virgin Coconut Oil bearing a label stating "100% Less

6   Cholesterol than Butter." TAC, ¶ 128. The proposed class makes no distinction between persons who

7   purchased the coconut oil for consumption and those who purchased for topical or other non-

8   consumption uses. And although Delalat has alleged that at least 15 different label statements were

9   false and misleading "in context of the label as a whole" (TAC ¶ 56-64)[1], she now seeks to pursue

10  claims on behalf of the proposed class only "as it relates to the labeling claims that Nutiva's semi-solid

11  coconut oil . . . is or contains: (1) '100% Less Cholesterol than Butter'; (2) 'Zero Trans Fats' or '0g

12  Trans Fat'; (3) 'a nutritious substitute in baking'; (4) a '"better-than-butter" replacement on bread,

13  vegetables, or popcorn' or 'is "better than butter" on bread, vegetables, or popcorn'; and (5) a

14  'Superfood.'" Pl.'s Mot., Dkt. 102, p.1-2. Half these statements ("Superfood," "0g Trans Fat," "'better

15  than butter' on bread, vegetables or popcorn") never appeared on any product Delalat purchased.

16      Delalat's theory is that these challenged statements, in the context of the label as a whole,

17  misleadingly conveyed to consumers that coconut oil is "healthy" and "healthier than butter."  TAC ¶

18  55; Pl.'s Mot., p.6. Despite filing multiple Complaints, Delalat never defines "healthy" or "healthier

19  than butter" and makes no showing that consumers share any common understanding of those terms.

20      **C.     The False Premise of Plaintiff's Case**

21      Delalat's liability theory rests on the simplistic and anachronistic premise that coconut oil is

22  not "healthy" because it is high in saturated fat. With each passing week, month and year, her premise

23  fades deeper and deeper into the abyss of outdated "conventional wisdom" from the same era that gave

24  us the "food pyramid." Even though a certification motion is not a "merits" motion, Delalat has

25
26  [1] The 15 statements are: "NOURISHING PEOPLE & PLANET"; "NURTURE VITALITY"; "World's Best Cooking Oil"; "Organic Superfood"; "Nature's Ideal All-Purpose Oil"; "one of the world's most nourishing foods"; "100% less cholesterol than butter"; "better than butter"; "a 'better-than-butter' replacement"; "a nutritious substitute in baking"; "contains 62% medium chain triglycerides and 50% lauric acid"; "contains 62% medium chain triglycerides (MCTs) along with lauric and caprylic acids"; "non-hydrogenated"; "zero trans fats"; and "0g trans fats."  TAC ¶¶ 56-63.

27
28

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1    submitted the declaration of Dr. Greger to put lipstick on her false assertion there is "scientific

2    consensus" that coconut oil is not "healthy" or not "healthier" than butter.[2] Delalat knows better, as

3    even her own counsel has stated, under oath, that there is "a substantial contingency of people,

4    including some scientists and nutritionists, who believe that coconut oil consumption *is* healthy[.]"

5    Decl. of William P. Cole ("Cole Decl."), Ex. 7, ¶ 13 (emphasis in original).

6        In fact, the discovery produced by Delalat herself is replete with evidence rebutting the notion

7    that saturated fat—especially fat high in medium-chain triglycerides, like coconut oil—increases the

8    risk of cardiovascular disease. For example, a March 2016 scientific article from Columbia University

9    states: "The adverse cardiovascular health effects of saturated fats have been debated recently since the

10   publication of studies reporting no increase in cardiovascular risk with saturated fat intakes." Cole

11   Decl., Ex. 8, p.81. The authors observed that "[p]articularly, medium-chain triglycerides (MCT) may

12   be potential beneficial modulators of cardiovascular health" and that "[c]oconut oil is known as a rich

13   source of MCFA [of medium-chain fatty acids]" which "are absorbed more rapidly and are burned as

14   fuel quicker than [long-chain fatty acids]." *Id.*, Ex. 8, p.81-82, 85. The study concluded "it is clear that

15   not all [saturated fatty acids], particularly MCFA, increase CVD risk." *Id.*, Ex. 8, p.86.

16       A 2015 study concluded a diet rich in virgin coconut oil "increases HDL [good] cholesterol

17   and decreases waist circumference and body mass in coronary artery disease patients." *Id.*, Ex. 9,

18   p.2144. The authors observed "studies have not proved the association between the intake of saturated

19   fat and cardiovascular disease" and "considering a specific population that regularly used this coconut

20   oil, there was no positive association with the onset of cardiovascular disease." *Id.*, p.2150.

21       Another scientific study produced by Delalat concluded "cholesterol synthesis is reduced

22   leading to lower plasma lathosterol levels when butter is replaced by coconut fat in the diet." *Id.*, Ex.

23   10, p.654. In 2012, the *Harvard Health Letter* stated "coconut oil may be less unhealthy than butter"

24   and "we don't have evidence as to whether the regular use of coconut oil actually affects heart health

25   negatively." *Id.*, Ex. 11. In fact, "[t]he countries consuming the highest amounts of coconut oil—the

26   Polynesians, Indonesians, Sri Lankans, Indians, Filipinos—have not only low serum cholesterol but

27   

28   

---

[2] When the merits become at issue, Nutiva will submit expert opinions rebutting Dr. Greger.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

also low coronary heart disease rates—morbidity and mortality." *Id.*, Ex. 12 at PLTF001272.

Just three months ago, a landmark epidemiological study devastated Delalat's case (and Dr. Greger's simplistic opinions). The study, called PURE, found that diets rich in fats, including saturated fats, don't increase mortality risk, but high-carbohydrate diets do. PURE studied the diets of over 135,000 people in 18 countries. *Id.*, Ex. 14, p.2050-2051. Published in *The Lancet*, PURE found that high carbohydrate intake was associated with a significant increase in the risk of death, while both total fat and saturated and unsaturated fats were associated with a *decreased* risk of death. *Id.*, Ex. 14, p.2050. PURE found that "[t]otal fat and types of fat were not associated with cardiovascular disease, myocardial infarction, or cardiovascular disease mortality, whereas saturated fat had an inverse association with stroke." *Id.* The researchers concluded "[g]lobal dietary guidelines should be reconsidered in light of these findings." *Id.* So much for Delalat's allegation "there is 'no safe level' of saturated fat intake" (TAC ¶ 25), a view akin to the fear one might sail off the edge of the earth.

In words that could have been written with Delalat's Complaint in mind, one scientist, in a presentation rebutting the notion that coconut oil is unhealthy, observed: "It is unfortunate that man oftentimes is too simplistic; he thinks in terms of black and white, good or bad.  Like a pendulum, he swings from extreme right to extreme left. . . . Taken in adequate amounts to prevent deficiencies and not in excess to avoid 'toxicities', all foods should be good for health and nutrition." Cole Decl., Ex. 12 at PLTF001282. Delalat's case is an attempt to foist false, "black and white" nutrition dogma on all consumers nationwide, and to get the judiciary to do the foisting.

### D.    Labeling Changes During the Proposed Class Period

During the proposed class period, Nutiva regularly changed its coconut oil labels. In early 2012, the Extra Virgin Coconut Oil label for smaller product sizes appeared as follows:



DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Naccarato Decl., Ex. 1. At the same time, Nutiva used a *different* label for the larger product sizes. *See id.*, Ex. 2. This larger-size label contained a paragraph with the heading "America Needs an Oil Change" and discussing Omega-6 versus Omega-3 ratios, as follows:

> A diet that consists of a 3:1 ration of Omega-6 to Omega-3 is a good balance versus the average American diet, which consists of a ratio of approximately 15:1 or more. So avoid out-of-balance soy, corn, and canola oils with their trans fats, oxidation and GMOs. Cook with coconut oil, olive oil, and hemp oil for the perfect 3:1 Omega ratio.

*Id.* The smaller-size labels did not contain the "America Needs an Oil Change" paragraph at all.

In April 2012, Nutiva removed the statement "Non-GMO and Zero Trans Fats" from the green band at the bottom of the label and adding the separate statements "Zero Trans Fats" and "Non-Hydrogenated" to the green band, with the "Zero Trans Fats" moved to below the Nutrition Facts box. *Id.*, Exs. 3, 5. A few months later, Nutiva changed the label on the 54 oz. and 78 oz. versions again, substantially revising the "America Needs an Oil Change" paragraph, so that it read as follows:

> Research shows that a healthy diet consists of an Omega-6 to Omega-3 ratio between 1:1 and 4:1. The average American diet is around 15:1 due to grains high in Omega-6 fats. Avoid high-Omega-6 butter, soy and corn oils, and low-oleic safflower and sunflower oils. Also, most corn, soy, and canola oils contain GMOs. Cook with coconut oil for its low Omega-6 content and stable fat profile. Use olive oil, with its high Omega-9 content, and hemp oil, with its desirable 3:1 Omega ratio, for dressings and sauces.

*See id.*, Ex. 7. The 15 oz. and 29 oz. versions still had no "America Needs an Oil Change" paragraph at all. In late 2012, Nutiva revised the 78 oz. Extra Virgin label yet again to bold certain phrases in the "America Needs an Oil Change" paragraph. *Id.*, Ex. 8.

In early 2013, Nutiva revised the Extra Virgin 29 oz. and 54 oz. labels to move "non-hydrogenated" and "Zero Trans Fats" from the bottom green band to red font on the side label, "No Hexane" moved from a white, stylized graphic to red font on the side label, and "Non-GMO" now appeared in the bottom green band, and a prominent "Non-GMO Project Verified" logo was added to the front of the label. *Id.*, Exs. 11, 12. The statement "Help yourself to this creamy taste of the tropics by enjoying up to 3 tablespoons of extra-virgin coconut oil each day" was replaced with "This creamy taste of the tropics is great for frying and baking, enhancing your favorite recipes, as well as body care." *Id.*, Ex. 11. The 15 oz. was revised in similar ways, but without the "Non-GMO" in the green

1    band. *Id.*, Ex. 10. These changes were not made to the 78 oz. version, which also continued to bear the

2    "America Needs an Oil Change" paragraph. *Id.*, ¶ 13.

3        In about January 2013, Nutiva introduced 15 oz. and 23 oz. glass jar versions of Extra Virgin

4    Coconut Oil with a red label. *Id.*. ¶ 12 and Ex. 9. These red labels did not include the statement

5    "World's Best Cooking Oil" (but the plastic container versions still include this statement). In late

6    2013, Nutiva discontinued the Extra Virgin label and switched to an entirely new label design (the

7    "watercolor" label) for the new Virgin Coconut Oil product. *Id.* ¶ 14.[3]

8        Delalat purports to identify "start" and "end" dates for when products bearing the challenged

9    label statements were supposedly "available for purchase." Pls.' Mot., p.6. These dates are fictional.

10   Sell-through rates vary by retailer, and from one product size to another. Naccarato Decl., ¶ 7.[4]

11       **E.      Shirin Delalat's False Testimony**

12       At her deposition, Delalat testified (falsely, as explained below) that she was with her father on

13   three occasions when he purchased Nutiva coconut oil at Costco, each time using his money.  Cole

14   Decl., Ex. 1 (Delalat Tr. 23:24-24:2, 25:12-15, 31:8-13, 36:23-37:2, 37:3-7, 38:1-3, 42:2-11, 43:5-10).

15   She testified that her father's first purchase of coconut oil at Costco was in 2009 or 2010, that his

16   second purchase was approximately a year after the first purchase, and that his third purchase was

17   about one year after the second purchase.  *Id.* at 23:24-24:2, 36:21-37:11.

18       Delalat testified that, at the time of her father's first purported purchase, she did not read the

19   entire label but read various statements scattered across different parts of the label, including "World's

20   Best Cooking Oil", "organic", "nourishing people and planet", "less cholesterol than butter", "non-

21   hydrogenated", "non-BPA", "nature's ideal all-purpose oil", "better than butter" and "zero trans fats."

22   _____

23   [3] The Virgin Coconut Oil label differed in myriad ways from the Extra Virgin labels. Among other
     things, the Virgin Coconut Oil label dropped the statements "nourishing people & planet", "Zero Trans
24   Fats", "World's Best Cooking Oil", and "Nature's Ideal All-Purpose Oil", and added to all sizes the
     new statements "Superfood", "Vegan", "62% MCTs", and "Contains 62% medium chain triglycerides
25   (MCTs) along with lauric and caprylic acids." Naccarato Decl., Ex. 13. In early 2017, Nutiva revised
     the watercolor labels, no longer including the statements "100% less cholesterol than butter", "better
26   than butter", and a "nutritious substitute in baking." *Id.*, Ex. 16.
     [4]    When Nutiva revised a label, the date it would show up in a particular store depended on how
27   much stock with the old label Nutiva still had on hand by product size, and the rate an individual
     retailer sold existing stock and ordered new stock. *Id.* ¶ 7. Delalat's own experience is a good example.
28   She asserts the 78 oz. Extra Virgin product was "available for purchase" until about "Early 2014."
     Pls.' Mot., p.6.  But she alleges she bought that 78 oz. product on July 27, 2014. TAC, ¶ 110.

CALL &
JENSEN

1    *Id.* at 31:14-32:5, 85:2-4, 90:13-21, 91:13-15, 92:11-94:22. She testified she interpreted these

2    statements "all together" to mean the product was a "healthy choice." *Id.* at 89:24-90:21, 136:15-

3    137:1. She repeatedly testified that she could not separate out any single label statement as misleading

4    to her, because she "read them together in context" and "as a whole." *Id.* at 91:17-92:10, 110:13-20,

5    135:25-136:13. While she claims she read parts of the label when she helped her father purchase

6    Nutiva Extra Virgin at Costco in 2009 or 2010, she did not read or recall anything about the label

7    during his second or third purported purchases. *Id.* at 38:12-21, 44:1-7, 85:2-4.

8        Delalat testified that she later purchased one 78 oz. container of Nutiva Extra Virgin at Costco

9    in July 2014. *Id.* at 57:12-19. **She testified she did not read the label when making this purchase;**

10   **she just believed, based on "the color and brand," that it was the same product her father had**

11   **previously purchased at Costco while she was with him.** *Id.* at 60:6-15. She does not know if the

12   labels on her purchase and her father's three purported purchases were all the same. *Id.* at 84:14-85:4.

13   She always knew, however, that coconut oil was "100 percent fat." *Id.* at 65:20-66:5.

14       Delalat testified she used the Nutiva Extra Virgin Coconut oil for cooking, dental hygiene, hair

15   care, and skin moisturizing. *Id.* at 26:13-15, 38:22-24, 64:22-65:6. She has no complaint with the

16   quality of Nutiva's coconut oil, and the only reason she believes coconut oil is "unhealthy" is because

17   her attorneys told her so (after she received an out-of-the-blue solicitation). *Id.* at 157:18-158:1.

18       Although Delalat claims she was misled into believing Nutiva Extra Virgin was "healthy," she

19   testified it is "hard to define what healthy means" because "everyone has a different definition of

20   healthy, so it would just be my definition." (*Id.* at 137:11-16, 138:9-18.)

21       In its most fundamental aspects, Delalat's testimony is false.  Nutiva did not begin selling any

22   coconut oil to Costco until mid-2012 (and Nutiva was the first brand of coconut oil that Costco ever

23   sold). Naccarato Decl., ¶ 17. In fact, the first shipment of Nutiva coconut oil to any Costco location in

24   the United States was not until June 22, 2012, and the first shipment to any Costco location in

25   California was not until July 27, 2012. *Id.* ¶ 17. But Delalat's father died on July 18, 2012. Cole Decl.,

26   Ex. 15. Her testimony about repeatedly purchasing Nutiva coconut oil with her father is all false. This

27   is devastating, not only in and of itself, but also because she repeatedly testified that the only time she

28   read the Extra Virgin label was during the first (phantom) Costco purchase with her father in 2009 or

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

CALL &
JENSEN

1   2010—an event that never happened. *Id.*, Ex. 1 (Delalat Tr. 38:12-21, 44:1-7, 60:1-15, 85:2-4).

2   **III.   ARGUMENT**

3       **A.   Legal Standards**

4   A class action is "an exception to the usual rule that litigation is by and on behalf of the

5   individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). To come within

6   that exception, Delalat must "affirmatively demonstrate" compliance with Rule 23.  *Wal-Mart Stores,*

7   *Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  First, she must prove that the four requirements of Rule 23(a)

8   are met: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are

9   questions of law or fact common to the class; (3) the claims or defenses of the representative parties

10   are typical of the claims or defenses of the class; and (4) the representative parties will fairly and

11   adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Class certification is proper only if

12   the court "is satisfied, after a *rigorous* analysis, that the prerequisites of Rule 23(a) have been

13   satisfied." *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013)(citations and quotations omitted).

14   Second, Delalat must satisfy Rule 23(b)(3), which requires her to prove "predominance" and

15   "superiority"—that is, that questions of law or fact common to the class predominate over individual

16   questions and that a class action is superior to other available methods for fairly and efficiently

17   adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s predominance criterion "is even

18   more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34.

19       **B.   Delalat Cannot Represent Virgin Coconut Oil Consumers on any Claim that the Label Is False or Misleading**

20   The proposed class includes consumers of Nutiva Extra Virgin *and* Nutiva Virgin Coconut Oil.

21   Now that Preston Jones (who allegedly purchased the Virgin Coconut Oil product) has been dismissed

22   (Dkt. No. 125), the proposed class is overbroad. Delalat never purchased Nutiva Virgin Coconut Oil,

23   and the labels on that product materially differed from the Extra Virgin product. *See* Section II.D,

24   supra; Dkt. No. 55, p. 8 ("Plaintiff concedes that Defendant's Extra Virgin, Virgin, and Refined labels

25   are different and do not all contain the same allegedly misleading statement."). This Court's rulings

26   already make clear that Delalat has no standing to challenge the Virgin Coconut Oil labels as false or

27   misleading. *See* Dkt. No. 55, p. 8 (ruling that Preston Jones, who purchased only Nutiva Virgin

28   Coconut Oil, had no standing to challenge Nutiva Extra Virgin Coconut Oil labels on the basis they are

CALL&
JENSEN

likely to deceive or mislead a reasonable consumer); Dkt. No. 104, p.6 (ruling that neither Jones nor Delalat had standing to challenge Nutiva Refined Coconut Oil labels, because neither purchased the product).[5]

### C.    Delalat Fails to Satisfy Rule 23(a)'s Typicality and Adequacy Requirements

Delalat fails Rule 23(a)'s typicality and adequacy requirements. First, typicality requires a determination whether the named plaintiff's claims are typical of those of the proposed class members. Fed. R. Civ. P. 23(a)(3). "[A] named plaintiff's motion for class certification should not be granted 'if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)(citation omitted); *accord J.H. Cohen & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 999 (7th Cir. 1980). Second, "[a] named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *CE Designs Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011); *see also Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010)(credibility is a relevant consideration when performing the adequacy inquiry).

Delalat is subject to unique defenses raised by her testimony that she was with her father on three occasions when he purchased Nutiva Extra Virgin coconut oil at Costco, that she read the label statements only on the first such occasion, and that she did *not* read the label in making her own purchase in July 2014. She has serious credibility problems because Costco did not even sell Nutiva coconut oil during the times she claimed her father purchased it. This credibility issue goes to the heart of her claims, as it was only during the non-existent first purchase with her father that she supposedly read the label claims. She is subject to the defense that *she never even read*, let alone relied upon, the challenged statements before making her purchase. *See, e.g., Williamson v. The Reinalt-Thomas Corp.*, 2012 WL 1438812, at *8 (N.D. Cal. Apr. 25, 2012)(citing *Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310,

---

[5] In the First Amended Complaint, Delalat had alleged (falsely) that she purchased both the Extra Virgin and Virgin products. Dkt. No. 73, ¶ 110. Thus, Nutiva's motion to dismiss challenged her standing as to the Refined Coconut Oil, which she did not allege to have purchased, and the Court's Order confirmed she had no standing to challenge the Refined product. Dkt. No. 104, p.6. Delalat has since amended her allegations, making clear she purchased only the Extra Virgin product, not the Virgin product. TAC ¶ 110; *see also* Delalat Decl. (Dkt. No. 109), ¶ 2.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

CALL&
JENSEN

326-27 (2011))(to establish standing as a class representative, "a plaintiff must show he personally lost money or property because of his own actual and reasonable reliance on the allegedly untrue or misleading statements"); *Figy v. Amy's Kitchen, Inc.*, No. CV 13-03816 SI, 2013 WL 6169503, at \*3 (N.D. Cal. Nov. 25, 2013). Accordingly, she lacks typicality and adequacy.

### D.   Delalat Has Not Satisfied the Requirements of Rule 23(b)(3)

 "The Rule 23(b)(3) predominance inquiry tests whether proposed class members are sufficiently cohesive to warrant adjudication by representation." *Amchem. Prods., Inc.v. Windsor*, 521 U.S. 591, 623 (1997). The predominance test is "far more demanding" than commonality. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010)(quoting *Amchem*, 521 U.S. at 623-24). The focus is on the relationship between the common and individual issues. *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009). The common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014). Delalat must demonstrate predominance for each cause of action. *Amchem*, 521 U.S. at 620.

Delalat contends that common issues predominate because materiality, reliance and damages purportedly can be determined on a class-wide basis.  For many reasons, she is wrong on all fronts.

### 1.   The UCL and CLRA Claims Do Not Meet the Predominance Requirement Because Delalat Does Not Demonstrate Class Cohesion as to Materiality

Under both the UCL and the CLRA, courts do not presume reliance – and no class may be certified – where the question of what is material itself varies from consumer to consumer.  Instead, a presumption of reliance is appropriate only where a plaintiff establishes there is "common evidence as to what consumers perceived and what they would find material."  *In re Vioxx Class Cases* 180 Cal. App. 4th 116, 133 (2010)(quoting trial court and affirming denial of class certification). "If the misrepresentation or omission *is not material as to all class members*, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011)(citation omitted; emphasis added).

Accordingly, to meet the predominance requirement, Delalat must demonstrate "cohesion among the members" as to materiality. *Stearns*, 665 F.3d at 1020; *Jones v. ConAgra Foods, Inc.*, No. C 12-1633 CRB, 2014 WL 2702726, at \*17 (N.D. Cal. Jun. 13, 2014). There is no such cohesion

CALL &
JENSEN

where the evidence reflects that consumers purchased the product "'for many different reasons and for many different purposes'" and where "there is a lack of evidence demonstrating the impact of the challenged label statements." *Jones*, 2014 WL 2702726, at *16 (quoting *Badella v. Deniro Mktg. LLC*, 2011 WL 5358400, at *9 (N.D. Cal. Nov. 4, 2011)); *see also Caro v. Proctor & Gamble Co.*, 18 Cal. App. 4th 644, 668 (1993)(affirming denial of class certification where "the court properly concluded the issue whether any asserted misrepresentation induced the purchase of Citrus Hill Fresh Choice orange juice would vary from consumer to consumer").

There is also no class cohesion where the plaintiff fails to show any single, common meaning of the challenged statements. *Astiana v. Kashi*, 291 F.R.D. 493, 508 (S.D. Cal. 2013)(finding no predominance where plaintiffs failed to show that "All Natural" has any kind of uniform definition among class members). In *Jones*, the plaintiffs failed to demonstrate cohesion, and therefore failed to establish predominance, because the challenged label statements had "no fixed meaning" and thus "even if the challenged statements were *facially* uniform, consumers' *understanding* of those representations would not be." 2014 WL 2702726, at *15, 17 (citation omitted).  Furthermore, there is a particular need to point to "common proof" of materiality where people purchase the product at issue "for many different reasons and for many different purposes." *Badella*, 2011 WL 5358400, at *9.

Delalat fails to establish class cohesion as to materiality. This is no surprise. She challenges label statements that either have no fixed, common meaning or are indisputably true, and her theory is that consumers supposedly read these statements in the context of the label as a whole to imply a secondary message that also has no fixed, common meaning (i.e, "healthy" or "healthier than butter"), because what consumers perceive to be "healthy" varies as widely as lifestyles and diets.

For example, Delalat has not submitted any evidence as to how consumers perceive the statement "'better-than-butter' replacement on bread, vegetables, or popcorn", let alone that the phrase has any *common* meaning. The statement appeared on the back of the label, under the heading "VERSATILE." Naccarato Decl., Ex. 1. "'Better' is not an objective term that carries a single definition or refers to a specific product feature." *Hughes v. The Ester C Company*, 317 F.R.D. 333, 355 (E.D.N.Y. 2016); *see also Time Warner Cable, Inc. v. DIRECTV, Inc*. 497 F.3d 144, 160 (2d Cir. 2007)("a general claim of superiority over comparable products" is non-actionable puffery). Coconut

oil could be subjectively perceived as "better" than butter for many reasons, including taste, versatility, dairy-free, vegan, longer shelf-life, or nutritional profile. Indeed, the "better-than-butter" statement is preceded on the label with the statements "creamy taste of the tropics" and "Savor its naturally rich aroma and enticing light taste." Naccarato Decl., Ex. 1. Delalat submits no evidence that the class cohesively interpreted "'better-than-butter' replacement on bread, vegetables, or popcorn" to mean "healthy" or "healthier than butter." Similarly, she fails to show that consumers had any common understanding of "nutritious substitute in baking"—a phrase buried in the middle of a paragraph on the back of the label—much less that consumers understood the phrase as "healthier than butter."[6]

Also, the proposed class members were not exposed to the same labels. *See* Section II.D, *supra*. This is problematic for Delalat, because she alleges the challenged statements are false and misleading "in the context of the labels *as a whole*." TAC, ¶¶ 56-62, 64 (emphasis added). The Extra Virgin labels as a whole always differed by product size and were repeatedly revised. *See* Section II.D, *supra*. Earlier in this case, while addressing Preston Jones's claims, this Court discussed how the context of the label as a whole fended off dismissal on grounds of puffery:

> The Court agrees with Defendant that some of the Virgin Coconut Oil statements that Plaintiff purportedly relied upon could, standing alone, be characterized as puffery. For example, "is 'better than butter'" is closer to a subjective, general assertion of superiority than a statement of concrete, measurable fact. But considered in the context of Defendant's entire Virgin Coconut Oil label, this statement could "certainly contribute[] . . . to the deceptive context of the package as a whole." The same is true of each statement Defendant purports to isolate and analyze on a stand-alone basis without considering the context of the label as a whole. Accordingly, the Court declines to dismiss Plaintiff's UCL, FAL and CLRA claims as based on non-actionable puffery.

Dkt. No. 55, p.11 (citations omitted). But as the court in *Hughes v. Ester C. Company* insightfully observed: "Plaintiffs cannot have it both ways. They cannot, on the one hand, insulate their claims from dismissal on grounds of puffery by pointing to contextual language surrounding the phrase 'The Better Vitamin C,' yet, on the other hand, satisfy the predominance element of class certification by ignoring that same contextual language." 320 F.R.D. 337, 343 (E.D.N.Y. 2017)(denying reconsideration of order denying class certification). The same is true here. There is a fundamental

---



[6] Also, while Delalat challenges "Zero Trans Fats", she does not challenge the statement "Trans Fat 0g", which appears *by law* in the nutrition facts box, and she makes no showing that proposed class members cohesively perceived "Zero Trans Fat" to mean anything different from the legally-required "Trans Fat 0g."

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1    lack of class-wide exposure to the same label.

2        Furthermore, even had there been class-wide exposure to the same label, and even had Delalat

3    presented evidence that class members shared a *common* understanding that the challenged claims, in

4    the context of that label as a whole, meant Nutiva's coconut oil is "healthy" and "healthier than

5    butter," whether coconut oil is "healthy" or "healthier than butter" is itself a vague concept, and

6    Delalat has not offered any evidence of a common, fixed meaning.  "Healthy" is inherently subjective,

7    and depends on consumers' own personal lifestyles, diets, and preconceived notions. Delalat's own

8    testimony confirmed this: she testified it is "hard to define what healthy means" because "everyone

9    has a different definition of healthy, so it would just be my definition." Cole Decl., Ex. 1 (Delalat Tr.

10   137:11-16, 138:9-18).[7] This is the *antithesis* of the predominance requirement. *See, e.g., Astiana*, 291

11   F.R.D. at 508; *Jones*, 2014 WL 2702726, at *17.

12       Delalat also fails to show any class-wide cohesion as to materiality because consumers

13   purchase coconut oil for a wide variety of purposes, many of which do not involve consumption.

14   Delalat, for example, has purchased coconut oil solely for topical use. Cole Decl., Ex. 1 (Delalat Tr.

15   72:9-23). Record evidence establishes that 24% of Nutiva purchasers "did not purchase coconut oil for

16   consumption, but only for skin, hair or other uses." *Id.*, Ex. 6, p.20. Yet, the plaintiff must point to

17   "common proof" of materiality, particularly where people purchase the product "for many different

18   reasons and for many different purposes." *Badella*, 2011 WL 5358400, at *9; *see also Jones*, 2014 WL

19   2702726 (plaintiffs lacked "common proof of materiality," and the predominance requirement was not

20   met, where there were "numerous reasons a customer might buy" the products). Delalat offers no such

21   proof here. "[C]ourts agree that a proposed class that would 'include a substantial number of people

22   who have no claim under the theory advanced by the named plaintiff' is overbroad, and, therefore,

23   should not be certified." *Otto v. Abbott Laboratories, Inc.*, 2015 WL 12776591, at *2 (C.D. Cal. Jan.

24   28, 2015)(citation omitted). Delalat's theory of liability concerns the health impacts of consumption,

25   and the alleged misrepresentations are "'obviously unimportant' for swaths of the proposed class"—

26   namely, the substantial percentage that purchased only for topical use. *Id.* at *3.

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [7]  She couldn't even state whether an apple was "healthy" or "unhealthy," she believes oranges are not
28   good for her but have "healthy qualities," and she identified olive oil as "unhealthy" for her but maybe
     not for other people. Cole Decl., 1 (Delalat Tr. 126:4-7, 127:25-128:5, 137:22-138:18).



1    Finally, Delalat fails to show any class cohesion as to materiality because the record evidence

2    establishes that "[a] variety of sources of information and factors influenced Nutiva purchasers, and

3    most purchasers did not form any belief about the nutritional health benefits of coconut oil as a result

4    of Nutiva advertising, and did not rely on any such advertising in purchasing Nutiva coconut oil." *Id.*,

5    Ex. 6, p.4. In fact, "43.5 of Nutiva purchasers did not purchase Nutiva with the expectation of

6    receiving any health benefits, and 69.5% of Nutiva purchasers did not expect <u>nutritional</u> health

7    benefits when purchasing Nutiva[.]" *Id.*, Ex. 6, p.20 (emphasis in original). Only 13% of Nutiva

8    purchasers "believed the product would provide health benefits <u>and</u> formed this belief while looking at

9    Nutiva advertising and packaging." *Id.* And even that miniscule percentage includes health benefits

10   *from topical uses*. *Id.*, p.41-42. This record evidence further rebuts any notion of class-wide cohesion

11   or any theoretical "presumption" of class-wide reliance urged by Plaintiffs.

12   For all these reasons, the UCL and CLRA claims do not meet the predominance requirement.

13   **2.    There is No Class Cohesion as to the Express Warranty Claim**

14   For all the same reasons, Delalat does not meet the predominance requirement on her express

15   warranty claim. She attempts to justify class treatment by contending that, under California law, an

16   express warranty claim does not require reliance. While there is some disagreement among courts over

17   whether California law requires reliance for such claims, this Court has already held that reliance is a

18   required element. Dkt. No. 55, p.13 (citing *In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1235

19   (N.D. Cal. 2012)). Furthermore, even courts that have concluded reliance is not required still recognize

20   that "[a]s with California's consumer protection statutes . . . class treatment of breach of express

21   warranty claims is only appropriate if plaintiffs can demonstrate that the alleged misrepresentations

22   would have been material to a reasonable consumer", *In re ConAgra Food, Inc.*, 90 F. Supp. 3d 919,

23   987 (C.D. Cal. 2015), and that certification is not appropriate where "[t]he individual views of each

24   class member as to the exact nature of Defendant's warranty would predominate over common

25   issues." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 505 (S.D. Cal. 2013). Thus, all the same reasons the

26   UCL and CLRA claims do not meet the predominance test apply to the express warranty claim as well.

27

28

1

2

**3.     The Implied Warranty Claim Fails the Predominance Test for the Additional Reason that Privity Cannot be Established on a Common Basis**

3      Delalat's implied warranty claim fails the predominance test not only for all of the same

4 reasons as the UCL, CLRA and express warranty claims, but for another, independent reason as well:

5 the claim requires vertical privity, which cannot be established on a common basis.  *ConAgra*, 90 F.

6 Supp. at 919, 986 (C.D. Cal. 2015); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 669-70 (C.D. Cal. 2014).

7      Under California law, the implied warranty of merchantability is breached when the goods are

8 not fit for the ordinary purposes for which the goods are used, or when the goods do not conform to

9 the promises or affirmations contained on the container or label. *Martinez v. Metabolife Intern., Inc.*,

10 113 Cal. App. 4th 181, 189 (2003). In this case, Delalat alleges only the latter theory—that is, that

11 "plaintiffs and the Class did not receive goods as impliedly warranted by Nutiva to be merchantable in

12 that they did not conform to promises and affirmations made on the containers or labels of the goods."

13 TAC, ¶ 176. That labeling theory, however, requires vertical privity between the plaintiff and the

14 defendant. *ConAgra*, 90 F. Supp. 3d at 986; *Allen*, 300 F.R.D. at 669 n.24. In *Burr v. Sherwin Williams*

15 *Co.*, 42 Cal.2d 682 (1954), the California Supreme Court held that while there is an exception to the

16 privity requirement where the plaintiff claims that a foodstuff *was not fit for its ordinary purpose*, no

17 such exception exists for implied warranty claims based on representations made on labels or

18 advertisements. *Id.* at 696.  Instead, the privity exception for claims based on label representations is

19 "applicable only to *express* warranties." *Id.*; *accord ConAgra*, 90 F. Supp. 3d at 986.[8]

20      Here, it is undisputed that most proposed class members purchased coconut oil from third

21 parties, but that some purchased directly from Nutiva. *See, e.g.,* TAC, ¶¶ 47, 94, 110; Naccarato Decl.,

22 ¶ 15. Nutiva also sells some coconut oil directly to consumers. Naccarato Decl., ¶ 5.  Thus, Delalat has

23 not demonstrated "that common questions of fact and law predominate with respect to this claim,

24 given that each class member will be required to demonstrate that he or she is in vertical privity" with

---

25  [8]   In *Hunter v. Nature's Way Products, LLC*, No. 16cv532-WQH-BLM, 2016 WL 4262188 (S.D.

26 Cal. Aug. 12, 2016), the court concluded that an implied warranty claim did not require privity if based on statements on the product's label. *Id.* at *9. The *Hunter* court purported to rely on *Clemens v.*

27 *DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008), but as pointed out by Judges Gee and Morrow in the *Allen* and *ConAgra* cases, *Clemens* cited to *Burr*, 42 Cal.2d 682, which explicitly held that the

28 exception for label representations is applicable only to *express* warranty claims.  *Allen*, 300 F.R.D. at 669 n.24; *ConAgra*, 90 F. Supp. 3d at 986 n.201.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

CALL &
JENSEN

Nutiva.  *Allen*, 300 F.R.D. at 670; *accord ConAgra*, 90 F. Supp. 3d 919, 987.

### 4.     Delalat Has Failed to Offer a Valid Method for Determining Class-Wide Damages, as Required by *Comcast*

The proposed class also fails the predominance requirement because Delalat fails to offer an appropriate damages methodology capable of measuring damages on a class-wide basis. In *Comcast Corporation v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that the predominance test requires the named plaintiff to present a valid class-wide damages model, and that the model must be able to measure those damages attributable only to the plaintiff's theory of liability.  *Id.* at 35. Otherwise, the plaintiff cannot establish "that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*; *see also Hughes v. The Ester C Company*, 317 F.R.D. 333, 356 (E.D.N.Y. 2016)(denying class certification where plaintiffs' proposed damages model failed to isolate the damages associated with the plaintiffs' specific theory of liability).  Courts must conduct a "rigorous" analysis on this issue. *Comcast*, 569 U.S. at 35.

Delalat proposes only one class-wide damages model for all her claims: a "price premium" purportedly calculated through a conjoint survey alone. As the Ninth Circuit has held, a "price premium" is defined as the difference between the prices customers paid and the actual market value of the product they received. *Brazil v. Dole Packaged Foods, LLC*, 660 Fed. App'x 531, 534-34 (9th Cir. Sep. 30, 2016); *accord Vioxx*, 180 Cal. App. 4th at 131 (under the UCL, restitution is measured by the difference between the amount paid and the product's true worth); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118 (C.D. Cal. 2015). For several reasons, Delalat's proposed damages model flunks *Comcast*. As explained hereafter, the model does not measure a price premium at all, let alone one isolated to Delalat's theory of liability.

### a)     Delalat's conjoint analysis is not valid because it measures only a consumers' "willingness-to-pay", not actual market value

Delalat purports to determine the "price premium" solely through Dr. Dennis's conjoint survey.[9]  Conjoint analysis, however, measures only a consumer's subjective willingness to pay.  But willingness to pay does not establish actual market value. Cole Decl., Ex. 4, ¶¶ 12, 23; Ex. 5, ¶ 24.

---

[9]    Colin Weir adds nothing to the purported "price premium" percentages calculated by Dr. Dennis. Weir merely multiplies those percentages by retail sales figures. *See* Fitzgerald Decl., Ex. 3 at ¶ 62.

CALL &
JENSEN

1    Rather, price is set by the law of supply *and* demand. Thus, several courts have rejected conjoint

2    analysis as a method for purportedly determining class-wide damages. *See, e.g., NJOY*, 120 F. Supp.

3    3d at 1119 ("A consumer's subjective valuation of the purported safety messages, measured by their

4    relative willingness to pay for products with or without the message, is not an accurate indicator of

5    restitutionary damages, because it does not permit the court to calculate the *true market price* of NJOY

6    e-cigarettes absent the purported misrepresentations. Plaintiffs' damages methodology is therefore

7    deficient under *Comcast*."); *Saavedra v. Eli Lilly & Co.*, No. 12-9366, 2014 WL 7338930, at *5 (C.D.

8    Cal. Dec. 18, 2014)(denying class certification because of the flawed damages model, and observing

9    the court had "found no case holding that a consumer may recover based on consumers' willingness to

10   pay irrespective of what would happen in a functioning market (i.e., what could be called sellers'

11   willingness to sell)"); *see also Apple, Inc. v. Samsung Elecs., Co.*, No. 11-01846, 2014 WL 976898, at

12   *11 (N.D. Cal. Mar. 6, 2014)(rejecting a damages model that failed to provide a way to compare

13   "willingness to pay metrics—which relate only to demand for the patented feature—to the market

14   price of the infringing devices, which reflects the real-world interaction of supply and demand for the

15   infringing and noninfringing devices").

16         In *In re Tobacco Cases II*, the court roundly rejected conjoint analysis as a method for

17   determining restitution under the UCL:

> 18    Conjoint analysis was not intended to be used for the purpose employed by Plaintiffs in this case.  Although conjoint surveys have been utilized to determine or rank consumer
> 19    preferences for certain product attributes, conjoint analysis has not been accepted in the relevant scientific community as a means of assigning a monetary value to any
> 20    particular attribute. Even the creator of the Sawtooth software cautioned that it could not be used to convert its measured utilities to dollar equivalents.

21   Cole Decl., Ex. 16, p.12; *see also* Cole Decl., Ex. 4, ¶ 24.

22         Dr. Dennis admits that his conjoint analysis and his resulting so-called "price premiums"

23   measure only consumer preference—i.e., the value *consumers* place on an attribute stated on the

24   label—not the *market value* of the product actually received:

> 25     Q.  And so when we use the term 'price premium,' are we talking about the delta
> 26    between what the consumer paid and what the product was actually worth at the time of the purchase?
> 27
> 28     A.  Well, it's the difference between what they paid versus how much value that the consumers placed on the product, having the challenged label or labels.


CALL &
JENSEN

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1   Cole Decl., Ex. 2 (Dennis Tr. 27:8-15).[10] But Dr. Dennis concedes that the value consumers put on a

2   product does *not* determine its actual market value. *Id.* at 45:24-47:10, 60:4-15, 65:5-12. In fact, he

3   could not render the opinion that the so-called "price premiums" generated by his conjoint analysis

4   measure the difference between what consumers paid and the actual market value of the product

5   without the challenged label statements:

> Q. . . . can you render the opinion that if the lower bound premium, of let's say three of the challenged claims together was 50 percent, can you render the opinion that the market price of that product would have been 50 percent lower if those three claims were not on it when the product was sold?

> A.  *I think I explained it's difficult to predict what the market price would be. Because that's the dance between consumers sellers.*
> What I can rely on and attest to is the survey which is making your prediction of what the consumer preferences and utilities would be in that scenario.

*Id.* at 212:22-213:11 (emphasis added).

Thus, by Dr. Dennis's own admission, his analysis does not do what the law requires for a "price premium" theory of damages or restitution: measure the difference between the prices consumers paid and the actual market value of the product they received. *Brazil*, 660 Fed. App'x  at 534-34.[11] For this reason alone, Delalat's proposed damages model does not meet *Comcast*.

### b)   The Damages Model Does Not Isolate Damages Attributable Only to Delalat's Theory of Liability

Delalat's damages model also fails *Comcast* because it does not match her theory of liability. First, while her theory is that the challenged statements are misleading in the "context of the labels as a whole," and while she relies on that theory to insulate challenged label claims from dismissal on grounds of puffery, Dr. Dennis's conjoint survey never showed consumers the label as a whole, and never showed the consumers any of the challenged statement within the context of the label as a

---

[10]  *See also id.* at 30:14-18 ("measuring values that the consumers place on certain attributes of a product" is "exactly what conjoint surveys do"); *id.* at 59:10-14 ("[M]y assignment is to measure these valuations that consumers place on the claims. Not to try to figure out all the possible scenarios about how businesses might react to the challenge if not being able to use these labels anymore.").

[11]  Despite this, Weir adopted Dennis's "price premium" percentages wholesale, merely multiplying them against alleged retail sales figures to generate class-wide "damages." Weir's testimony made clear that he did not even understand what Dr. Dennis did: While Dr. Dennis repeatedly testified that his survey was designed to measure the value *consumers* placed on the label claims, not the market value, Weir was operating under the incorrect assumption that the conjoint analysis measured "the market value of the presence versus absence of those claims." Cole Decl., Ex. 3 (Weir Tr. 45:5-19).

whole. Cole Decl., Ex. 2 (Dennis Tr. 95:5-20, 207:20-208:2). Thus, for example, consumers were shown the "better-than-butter" statement *out of context*. Even though "better-than-butter" could mean any number of things, the conjoint survey did not even purport to determine whether the survey takers perceived that statement in a way that matched Delalat's theory of liability (i.e., "healthier" than butter), and, even assuming any survey takers interpreted the statement that way, Dr. Dennis did not attempt to isolate the value survey takers may place on "healthier than butter" versus the value associated with all the other meanings (e.g., tastes better or dairy-free). *Id.* at 123:14-125:9 ("I did not attempt to parse the reasons that the consumers valued those claims."). This is fatal. *See Hughes*, 317 F.R.D. at 356 (denying class certification, explaining that isolation of the representation "The Better Vitamin C" from the contexts of the varying labels on which it appears render the analysis meaningless because consumers naturally will interpret "better" differently based on the surrounding context, and "[t]he only solution is to determine damages based on each class members' precise definition of 'better,' a result plainly prohibited by *Comcast*"); *Hughes*, 320 F.R.D. at 342-43; *see also* Cole Decl., Ex. 4, ¶ 44.

Second, the conjoint analysis does not fit the theory of liability because, by failing to show the label as a whole, it deprived the survey taker of information material to how the consumer may value the challenged statements. Dr. Dennis designed the survey so that, with respect to almost all challenged statements, the consumers *could not see the nutrition facts box*, which clearly states that the coconut oil consists almost entirely of saturated fat. Cole Decl., Ex. 2 (Dennis Tr. 111:4-21). In other words, although Delalat's theory is that coconut oil is unhealthy *because of its saturated fat content*, Dr. Dennis designed a survey that purported to measure consumers' willingness-to-pay for coconut oil without letting the consumers see the saturated fat content—information which, in the real world, appears on every Nutiva coconut oil label. Similarly, Dr. Dennis purported to measure consumer willingness-to-pay for the isolated attribute "Zero Trans Fats" *without* letting the consumers see the nutrition facts box, which always states "Trans Fat 0g." Dr. Dennis did not measure whether consumers perceive "Zero Trans Fats" to mean *anything* different from "Trans Fat 0g." *Id.* at 109:23-110:24, 113:2-114:3. Showing challenged statements out of context did not, and could not, isolate damages attributable only to Delalat's theory of liability. As Delalat herself insisted, she could not

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1  identify any single label statement as misleading because she reads them "together in context" and "as

2  a whole." Cole Decl., Ex. 1 (Delalat Depo. 91:17-92:10, 110:13-20, 135:25-136:13.).[12]

3      Third, as Delalat observed, "everyone has a different definition of healthy." *Id.* at 137:11-16,

4  138:9-18. In fact, purchasers associate a variety of different health benefits with coconut oil, including

5  boosting energy, reducing cravings, aiding weight loss, balancing hormones, increasing fatty acid

6  intake, and improving cholesterol levels. Dr. Dennis admittedly did not design the conjoint survey to

7  determine even whether the consumers interpreted any challenged statement to mean "healthy" or

8  "healthier than butter" (Cole Decl., Ex. 2 (Dennis Tr. 155:8-21)), let alone to isolate what portion of

9  value consumers may assign to Nutiva coconut oil being "healthier than butter" versus the value

10  assigned to coconut oil reducing cravings, aiding weight loss, boosting energy, etc.

11      Fourth, to the extent Delalat purports to pursue a UCL claim on an "unlawful"-prong theory (as

12  opposed to a misrepresentation theory), she has not proposed any damages model for that theory, let

13  alone one meeting *Comcast*.  Dr. Dennis testified that his survey did not attempt to measure the value

14  consumers assign to a lawful versus unlawful food label. *Id.* at 116:5-117:25.

15      Fifth, under the UCL, restitution is confined to the restoration of money or property "which

16  may have been *acquired* by means of such unfair competition." Bus. & Prof. Code § 17203 (emphasis

17  added). "A restitution order against a defendant thus requires both that money or property have been

18  lost by a plaintiff, on the one hand, *and that it have been acquired by a defendant, on the other.*"

19  *Kwikset*, 51 Cal. 4th at 336 (emphasis added). Nutiva sells most of its coconut oil wholesale. Dennis's

20  and Weir's calculations focus solely on purported retail premiums paid by consumers; the analysis

21  does not even purport to provide any insight into the money acquired by Nutiva. Neither Dennis nor

22  Weir have proposed any method to determine whether, or to what extent, the wholesale price was

23  increased because of the challenged statements. Thus, Delalat does not propose any model capable of

24  calculating what amount of money Nutiva acquired that is attributable only to her theory of liability.

25          **5.    Applying California Law to a Nationwide Class Is Improper**

26  _____

27  [12]   Also, by stripping each statement from its context, Dennis gave the statements equal emphasis
even though, in the real world, the statements appear in different sizes on different parts of the label
(front, back or side). Yet, Dr. Dennis admits that the placement of a statement can impact value. Cole

28  Decl., Ex. 2 (Dennis Tr. 114:14-115:4); *see also* Cole Decl., Ex. 4, ¶ 45.

CALL &
JENSEN

1     Delalat also fails the predominance requirement because she does not demonstrate how a trial

2 of this proposed nationwide class could proceed given variations in state laws. Instead, she improperly

3 seeks wholesale application of California law based solely on Nutiva's contacts with California.

4     The conflicts-of-law analysis is critical in analyzing whether to certify a nationwide class.

5 *Zinser v. Accufix Research Inst., Inc.*, 235 F.3d 1180, 1189 (9th Cir. 2001). Courts may only apply

6 California law on a class-wide basis if the foreign states' interests do not outweigh California's

7 interest, as measured by the well-established, three-step governmental interest test. *See McCann v.*

8 *Foster Wheeler LLC*, 48 Cal.4th 68, 81-82 (Cal. 2010).

9     Here, while Nutiva has a significant aggregation of contacts in California, California's interest

10 falls far short of outweighing the foreign states' interest.  Applying California law to foreign residents'

11 claims for acts that took place in other states is not "necessary to achieve that [California] interest".

12 *Mazza v. American Honda Co., Inc.*, 666 F.3d 581, 594 (9th Cir. 2012).[13] Delalat has failed even to

13 acknowledge, let alone weigh, the substantial interests of any other jurisdiction in applying their laws

14 to the putative class members' claims.[14]  *See* Pl.'s Mot., p. 22.

15          **a)      California Law Conflicts with the Laws of Other Jurisdictions**

16     The differences between California law and other states' laws are material, and "make a

17 difference in this litigation."  *Mazza*, 666 F.3d at 590; see also Decl. of L. Lisa Sandoval, Exhibits 1-3.

18     **Consumer protection laws.** "State consumer-protection laws vary considerably, and courts

19 must respect these differences rather than apply one state's law to sales in other states with different

20 rules." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002). State statutes

21 [13] Plaintiffs' reliance on *Bruno v. Eckhart Corp.*, 280 F.R.D. 540 (C.D. Cal. 2012), is misplaced.  In

22 *Bruno*, the court merely held that the government interest test requires case-specific analysis even after *Mazza. Id.* at 547. Unlike Nutiva, the defendant in *Bruno* "provide[d] no law from any jurisdiction for the Court consider[.]" *Id.* at 543 (internal quotations omitted). The fact a defendant "is a California

23 entity with its place of business in California, does not automatically give rise to the presumption that California law should apply to Plaintiff's claims." *Holt v. Globalinx Pet LLC*, No. SACV13-0041

24 DOC (JPRx), 2013 WL 3947169, at *10 (C.D. Cal. July 30, 2013); *see also Glenn v. Hyundai Motor America*, No. SA CV 15-2052-DOC (KESx), 2016 WL 3621280, at *9 (C.D. Cal. June 2, 2016).

25 [14] Plaintiff relies on cases where, unlike Nutiva, the defendants failed to address adequately the three-step government interest analysis in their briefing.  *See Opperman v. Path, Inc.*, No. 13-cv-00453-JST,

26 2016 WL 3844326, at *8-9 (N.D. Cal. July 15, 2016); *Allen*, 300 F.R.D. at 658; *Forcellati v. Hyland's Inc.*, 876 F.Supp.2d 1155, 1160 (C.D. Cal. 2012); *Bruno v. Quten Research Inst., LLC*, 280 F.R.D.

27 524, 540 (C.D. Cal. 2011)(defendants did not identify "any specific state's law or articulated any argument" to indicate there is a conflict of law).  The other cases cited by Plaintiffs, all decided before

28 *Mazza*, fail to fully analyze the governmental interest test.



DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

materially differ (i) in whether they require scienter, (ii) in whether they require a showing of reliance, and (iii) in the remedies available to consumers. *See Mazza*, 666 F.3d at 590-91. For example, the UCL and CLRA have scienter requirements differing from other states' laws. *Compare Mazza*, 666 F.3d at 591 *with* Colo.Rev.Stat. -1-105(1)(e), (g), (u) (knowingly); N.J. Stat. Ann. § 56.8-2 (knowledge and intent for omissions); *Debbs v. Chrysler Corp.*, 810 A.2d 137, 155 (Pa. Super. 2002) (common law requires knowledge or reckless disregard). The different scienter requirements "are not trivial or wholly immaterial differences." *Mazza*, 666 F.3d at 591.

California's statutes also require reliance, while other states' consumer laws do not. *Compare Mazza*, 666 F.3d at 591 *with Egwuatu v. South Lubes, Inc.*, 976 So.2d 50, 53 (Fla.App. 2008); *Dabush v. Mercedes-Benz USA, Inc.*, 378 N.J. Super. 105, 874 A.2d 1110, 1121 (App. 2005); *Stultman v. Chem. Bank*, 95 N.Y.2d 24, 731 N.E.2d 606, 611-12 (N.Y. 2000). These material differences could "spell the difference between the success and failure of the claim." *Mazza*, 666 F.3d at 591.

In addition, there are "material differences in the remedies given by state laws." *Id.* Under the CLRA, a plaintiff may recover actual damages, restitution, punitive damages and other relief the court deems proper. Cal. Civ. Code § 1780(a)(1)-(5). The UCL only provides restitution. Cal. Bus. & Prof. Code § 17203. Other states' remedies vary and sometimes depend upon the willfulness of the defendant's conduct. *See, e.g.,* Mich. Comp. Laws Ann. § 445.911(6) (limiting recovery to actual damages if the violation was result of a bona fide error).

**Express warranty laws.** States' express warranty laws, as applied here, differ materially in (i) whether privity is required; (ii) whether a pre-litigation notice is required; and (iii) whether reliance is required. *See Tasion Comm'n, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 635-37 (N.D. Cal. 2015); *Dei Rossi v. Whirlpool Corp.*, No. 2:12-cv-00125, 2015 WL 1932483, at *9-10 (E.D. Cal. Apr. 27, 2015)(same). Some states—including California—require a notice for a claim of breach of express warranty, others do not. *Compare, e.g., Tasion Communs., Inc. v. Ubiquiti Networks, Inc.,* No. C–13–1803 EMC, 2014 WL 1048710, at *4–5 (N.D.Cal. Mar. 14, 2014), *with Kolarik v. Cory Int'l Corp.,* 721 N.W.2d 159, 163 (Iowa 2006). Furthermore, for those jurisdictions that do require notice, some require pre-litigation notice while others do not. *Compare, e.g., Tasion,* 2014 WL 1048710, *4–5, with Pace v. Sagebrush Sales Co.,* 114 Ariz. 271, 274, 560 P.2d 789 (Ariz. 1977).

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

CALL & JENSEN

1  Some jurisdictions also require a showing of reliance—or at a minimum exposure to the

2 warranty—for an express warranty claim, while other states do not. *See, e.g., Tasion,* 2014 WL

3 1048710, at \*9–10; *compare Compaq Comp. Corp. v. Lapray,* 135 S.W.3d 657, 676 (Tex.

4 2004), *with Norcold, Inc. v. Gateway Supply Co.,* 154 Ohio App.3d 594, 601, 798 N.E.2d 618

5 (2003); *Samuel–Bassett v. Kia Motors Am., Inc.,* 613 Pa. 371, 411–12, 34 A.3d 1 (Pa. 2011).

6  **Implied warranty.** Jurisdictions' implied warranty laws differ materially in (i) whether privity

7 is required; (ii) the statute of limitations; and (iii) whether there is a manifestation of the defect before

8 a consumer may recover. *See Czuchaj v. Conair Corp.*, No. 13-cv-1901-BEN (RBB), 2016 WL

9 1240391, at \*2-3 (S.D. Cal. Mar. 30, 2016); *see also Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 271-

10 73 (D.D.C. 1990). In short, there is a true conflict.

11    **b)  California's Interests Do not Outweigh Other States' Interests**

12  Other jurisdictions have significant interest in applying their own laws. *Mazza*, 666 F.3d at

13 592-93; *accord Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1187 (9th Cir. 2001). Other states

14 have a significant interest in maximizing the welfare of Nutiva's consumers while ensuring Nutiva of

15 the limitations on liability for its actions in their states. Each state has approached that balance

16 differently in accordance with federalism principles.

17  The Court must evaluate the nature and strength of the interest of each jurisdiction in the

18 application of its own law to determine which state's interest would be most impaired if its policy

19 were subordinated to the policy of the other state. *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th

20 95, 108 (2006). Under California law, "with respect to regulating or affecting conduct within its

21 borders, the place of the wrong has the predominant interest.'" *Mazza*, 666 F.3d at 593 (citation

22 omitted). The "place of the wrong" occurs "where the last event necessary to make the actor liable

23 occurred." 666 F.3d at 593 (citations omitted). Here, the alleged "place of wrong"—where Nutiva

24 advertised the products at issue and the putative class members relied on those advertisements—

25 occurred in other states. *See id.* at 594. Each putative class member's claim should be governed by the

26 laws of the jurisdiction in which the transaction occurred.[15]

27 ───────────────

28 [15] Delalat requests, in a footnote, leave to amend the Complaint to add another California plaintiff. Pl.'s. Mot., p.22 n.13. The Court should deny the request. The deadline to file motions to amend pleadings was in 2016. Dkt. No. 65. Furthermore, the cursory request for leave to amend is not based on any new

Continued on the next page

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

CALL & JENSEN

1

**6.     The Proposed Class Action is not Manageable or Superior**

2    The superiority requirement concerns, among other things, "the likely difficulties in managing

3    a class action." Fed. R. Civ. P. 23(b)(3).  Because there is no predominance, the proposed class action

4    is inherently unmanageable and not superior.  Additionally, it is unmanageable because Delalat does

5    not, and cannot, propose any valid means of identifying each class member, which of the disparate

6    labels was on the product that each class member purchased, how many products each class member

7    purchased, or the price each class member paid. *See, e.g., Jones*, 2014 WL 2702726, at *24. The issues

8    are far from hypothetical: Delalat herself testified to three transactions *that never occurred*.

9    Furthermore, she has not proposed any valid solution for determining the value of individual class

10   member claims. Dr. Dennis testified that his conjoint analysis is intended and designed only "to be

11   projected to the aggregate and not to an individual level transaction." Cole Decl., Ex. 2 (Dennis Tr.

12   68:17-70:6). Weir similarly refused to offer any opinion that the "premium" percentages calculated by

13   Dr. Dennis could be used to value individual class member claims. *Id.*, Ex. 3 (Weir Tr. 100:10-102:16,

14   105:6-106:22).

15   **IV.    CONCLUSION**

16   For the foregoing reasons, Nutiva respectfully requests that the Court deny the motion for class

17   certification.

18   Dated:  December 1, 2017                 CALL & JENSEN
                                              A Professional Corporation
19                                            Matthew R. Orr
                                              William P. Cole
20

21                                            By:*/s/ William P. Cole*
                                                    William P. Cole
22                                            Appearance *Pro Hac Vice:*
                                              AMIN TALATI & UPADHYE, LLC
23                                            Rakesh M. Amin
                                              Ryan M. Kaiser
24                                            Sanjay S. Karnik
                                              Attorneys for Defendant Nutiva, Inc.
25

26

---

27   Continued from the previous page

     facts or theories not known to Delalat or her counsel from the outset of the case. *See Jackson v. Bank
28   of Hawaii*, 902 F.2d 1385, 138 (9th Cir. 1990). Adding a new party at this stage would prejudice
     Nutiva, requiring new discovery and new motion practice.

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2017, I electronically filed the foregoing document described as **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** with the Clerk of the Court using the CM/ECF System which will send notification of such filing via electronic mail to all counsel of record.

*/s/ William P. Cole*
William P. Cole

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION